## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

KEVIN D. HARDWICK

              Plaintiff,

v.

3M COMPANY, E. I. DU PONT DE
NEMOURS AND COMPANY, THE
CHEMOURS COMPANY L.L.C.,
ARCHROMA MANAGEMENT LLC,
ARKEMA, INC., ARKEMA FRANCE,
S.A., AGC CHEMICALS AMERICAS,
INC., DAIKIN INDUSTRIES LTD.,
DAIKIN AMERICA, INC., and SOLVAY
SPECIALTY POLYMERS, USA, LLC.

              Defendants.

CIVIL ACTION NO.: 2:18-cv-1185

CHIEF JUDGE EDMUND A. SARGUS, JR.

CHIEF MAGISTRATE JUDGE
ELIZABETH A. PRESTON DEAVERS

**FIRST AMENDED CLASS ACTION
COMPLAINT AND JURY DEMAND**

Plaintiff, Kevin D. Hardwick, by his undersigned attorneys, alleges upon information and belief, as follows:

## I.      NATURE OF THE ACTION

1.     This is a national class action brought on behalf of Plaintiff individually, and on behalf of all others similarly situated, for injunctive, equitable, and declaratory relief, by Plaintiff and other class members for injuries arising from the intentional, knowing, reckless and/or negligent acts and/or omissions of Defendants in connection with contamination of the blood and/or bodies of Plaintiff and other class members with synthetic, toxic per- and polyfluoroalkyl substances (collectively "PFAS"), including but not limited to perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS") and related chemicals, including but not limited to those that degrade to PFOA and/or PFOS, and including but not limited to C3-C-15 PFAS chemicals, such as perfluorohexanesulfonate (PFHxS), perfluorononanoate (PFNA),

perfluorobutanesulfonate (PFBS), perfluorohexanoate (PFHxA), perfluoroheptanoate (PFHpA), perfluoroundecanoate (PFUnA), perfluorododecanoate (PFDoA), HFPA Dimer Acid (CAS # 13252-13-6/C3 Dimer Acid/P-08-508/FRD903/GX903/C3DA/GenX), and HFPA Dimer Acid Ammonium Salt (CAS# 62037-80-3/ammonium salt of C3 Dimer Acid/P-08-509/FRD902/GX902/GenX), which resulted and continues to result from Defendants using Plaintiff and the other class members as part of a massive, undisclosed human health experiment without the knowledge and/or consent of Plaintiff or the other class members.

## II.    JURISDICTION AND VENUE

2.    This Court has jurisdiction over the subject matter of this Complaint, pursuant to 28 U.S.C. §§ 1332, 2201-02, and because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), which provides for the original jurisdiction of the Federal Courts of any class action in which any member of the Class is a citizen of a different State from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs.

3.    Venue is appropriate in this District pursuant to 28 U.S.C. § 1391 and S.D. Ohio Civ. R. 3.1(b).

## III.    PARTIES

4.    Plaintiff, Kevin D. Hardwick, is a citizen of the State of Ohio and a resident of the Southern District of Ohio, and has worked as a firefighter for more than forty years, during which he has used firefighting foams containing one of more PFAS materials, used equipment/gear treated and/or coated with materials containing and/or contaminated with one or more PFAS materials, and/or otherwise was exposed to one or more PFAS materials, and now has one or more PFAS materials in his blood serum.

5.      Upon information and belief, Defendant, 3M Company (a/k/a Minnesota Mining and Manufacturing Company) ("3M"), is a Delaware corporation and does business throughout the United States, including conducting business in Ohio. 3M has its principal place of business in St. Paul, Minnesota.

6.      Upon information and belief, 3M marketed, developed, manufactured, distributed released, trained users, produced instructional materials, sold and/or otherwise handled and/or used PFAS that are the subject of this Complaint, including in Ohio and this District, in such a way as to result in the contamination of Plaintiff's and the other class members' blood and/or bodies with PFAS, and the biopersistence and bioaccumulation of such PFAS in such blood and/or bodies.

7.      Upon information and belief, Defendant, E. I. du Pont de Nemours & Co. ("DuPont"), is a Delaware corporation and does business throughout the United States, including conducting business in Ohio. DuPont has its principal place of business in Wilmington, Delaware.

8.      Upon information and belief, DuPont marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used PFAS that are the subject of this Complaint, including in Ohio and this District, in such a way as to result in the contamination of Plaintiff's and the other class members' blood and/or bodies with PFAS, and the biopersistence and bioaccumulation of such PFAS in such blood and/or bodies.

9.      Upon information and belief, Defendant, The Chemours Company, L.L.C. ("Chemours"), is a Delaware corporation and does business throughout the United States,

including conducting business in Ohio. Chemours has its principal place of business in Wilmington, Delaware.

10.     Upon information and belief, Chemours marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used PFAS that are the subject of this Complaint, including in Ohio and this District, in such a way as to result in the contamination of Plaintiff's and the other class members' blood and/or bodies with PFAS, and the biopersistence and bioaccumulation of such PFAS in such blood and/or bodies.

11.     Upon information and belief, Defendant, Archroma Management, LLC ("Achroma"), is a corporation existing under the laws of the country of Switzerland and does business throughout the United States, including conducting business in Ohio.  Archroma has its principal place of business in Reinach, Switzerland.

12.     Upon information and belief, Archroma marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used PFAS that are the subject of this Complaint, including in Ohio and this District, in such a way as to result in the contamination of Plaintiff's and the other class members' blood and/or bodies with PFAS, and the biopersistence and bioaccumulation of such PFAS in such blood and/or bodies.

13.     Upon information and belief, Defendant, Arkema, Inc., is a Pennsylvania corporation and does business throughout the United States, including conducting business in Ohio.  Arkema Inc. has its principal place of business in King of Prussia, Pennsylvania.

14.     Upon information and belief, Defendant Arkema, Inc., marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or

otherwise handled and/or used PFAS that are the subject of this Complaint, including in Ohio and this District, in such a way as to result in the contamination of Plaintiff's and the other class members' blood and/or bodies with PFAS, and the biopersistence and bioaccumulation of such PFAS in such blood and/or bodies.

15.　Defendant Arkema, Inc. is an operating subsidiary of Defendant Arkema France, S.A.

16.　Defendant Arkema France, S.A., is a publicly traded foreign corporation having its principal place of business in Colombes, France. Defendant Arkema France, S.A., is the parent corporation of Defendant Arkema, Inc.

17.　Upon information and belief, Defendant Arkema France, S.A., marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used PFAS that are the subject of this Complaint, including in Ohio and this District, in such a way as to result in the contamination of Plaintiff's and the other class members' blood and/or bodies with PFAS, and the biopersistence and bioaccumulation of such PFAS in such blood and/or bodies.

18.　Defendant Arkema France, S.A. and Defendant Arkema, Inc. are collectively referred to herein as "Arkema."

19.　Upon information and belief, Defendant, AGC Chemicals Americas, Inc. ("AGCCA"), is a Delaware corporation and does business throughout the United States, including conducting business in Ohio. AGCCA has its principal place of business in Exton, Pennsylvania.

20.　Upon information and belief, AGCCA marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise

handled and/or used PFAS that are the subject of this Complaint, including in Ohio and this District, in such a way as to result in the contamination of Plaintiff's and the other class members' blood and/or bodies with PFAS, and the biopersistence and bioaccumulation of such PFAS in such blood and/or bodies.

21.     Upon information and belief, Defendant, Daikin Industries, Ltd., is a corporation existing under the laws of Japan and does business throughout the United States, including conducting business in Ohio.  Defendant Daikin Industries, Ltd., has its principal place of business in Osaka, Japan.

22.     Upon information and belief, Defendant Daikin Industries, Ltd., marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used PFAS that are the subject of this Complaint, including in Ohio and this District, in such a way as to result in the contamination of Plaintiff's and the other class members' blood and/or bodies with PFAS, and the biopersistence and bioaccumulation of such PFAS in such blood and/or bodies.

23.     Upon information and belief, Defendant, Daikin America, Inc., is a corporation existing under the laws of Delaware and does business throughout the United States, including conducting business in Ohio. Daikin America, Inc. has its principal place of business in Orangeburg, New York.

24.     Upon information and belief, Daikin America, Inc. marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used PFAS that are the subject of this Complaint, including in Ohio and this District, in such a way as to result in the contamination of Plaintiff's and the other class

members' blood and/or bodies with PFAS, and the biopersistence and bioaccumulation of such PFAS in such blood and/or bodies.

25.     Defendant Daikin Industries, Ltd. and Defendant Daikin America, Inc. are collectively referred to herein as "Daikin."

26.     Upon information and belief, Defendant, Solvay Specialty Polymers, USA, LLC ("Solvay"), is a Delaware corporation and does business throughout the United States, including conducting business in Ohio. Solvay has its principal place of business in Alpharetta, Georgia.

27.     Upon information and belief, Solvay marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used PFAS that are the subject of this Complaint, including in Ohio and this District, in such a way as to result in the contamination of Plaintiff's and the other class members' blood and/or bodies with PFAS, and the biopersistence and bioaccumulation of such PFAS in such blood and/or bodies.

## IV.     GENERAL FACTUAL ALLEGATIONS

28.     PFAS materials are a class of non-naturally-occurring, man-made chemicals that were first developed in the late 1930s to 1940s and put into large-scale manufacture and use by the early 1950s.

29.     Defendants have each marketed, developed, distributed, sold, manufactured, released, trained users on, produced instructional materials for, and/or otherwise handled and/or used one or more PFAS materials, including in Ohio and this District, in such a way as to cause the contamination of Plaintiff's and the class members' blood and/or bodies with PFAS, and the resultant biopersistence and bioaccumulation of such PFAS in the blood and/or bodies of Plaintiff and other class members.

7

30.     Prior to commercial development and large-scale manufacture and use of PFAS materials, no such PFAS materials had been found, detected, or were present in human blood.

31.     By at least the end of the 1960s, animal toxicity testing performed by Defendants manufacturing and/or using PFAS materials indicated that exposure to such materials, including at least PFOA, resulted in various adverse health effects among multiple species of laboratory animals, including toxic effects to the liver, testes, adrenals, and other organs and bodily systems.

32.     By at least the end of the 1960s, additional research and testing performed by Defendants manufacturing and/or using PFAS materials indicated that such materials, including at least PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

33.     By at least the end of the 1970s, additional research and testing performed by Defendants manufacturing and/or using PFAS materials indicated that one or more such materials, including at least PFOA and PFOS, because of their unique chemical structure, would bind to proteins in the blood of animals and humans exposed to such materials where such materials would not only remain and persist over long periods of time but would accumulate and build up in the blood/body of the exposed individuals with each additional exposure, no matter how small.

34.     Defendants manufacturing and/or using PFAS materials released such PFAS materials into the environment during, as a result of, or in connection with their manufacturing and other commercial operations, including into the air, surface waters, ground water, soils, landfills, and/or through their involvement and/or participation in the creation of consumer or

8

other commercial products and materials and related training and instructional materials and activities, including in Ohio and this District, that Defendants knew, foresaw, and/or reasonably should have known and/or foreseen would expose Plaintiff and the other class members to such PFAS.

35.     By at least the end of the 1970s, Defendants manufacturing and/or using PFAS materials, including at least DuPont and 3M, were aware that PFAS materials, including at least PFOA and PFOS, had been detected not only in the blood of workers at PFAS manufacturing facilities, but in the blood of the general population of the United States in people not known to be working at or living near PFAS manufacturing and/or use facilities, indicating to such Defendants that continued manufacture and use of such PFAS materials would inevitably result in continued and increased levels of PFAS getting into the environment and into human blood across the United States, even in areas nowhere near or associated with specific PFAS manufacturing or use facilities.

36.     By at least the end of the 1980s, additional research and testing performed by Defendants manufacturing and/or using PFAS materials indicated that at least one such PFAS material, PFOA, had caused Leydig cell (testicular) tumors in a chronic cancer study in rats, resulting in at least one such Defendant, DuPont, classifying such PFAS material internally as a confirmed animal carcinogen and possible human carcinogen.

37.     It was understood by Defendants by at least the end of the 1980s that a chemical that caused cancer in animal studies must be presumed to present a cancer risk to humans, unless the precise mechanism of action by which the tumors were caused was known and it was known that such mechanism of action would not be operative and/or occur in humans.

38.     By at least the end of the 1980s, scientists had not determined the precise mechanism of action by which any PFAS material caused tumors and thus prevailing scientific principles of carcinogenesis classification mandated that Defendants presume any such PFAS material that caused tumors in animal studies could present a potential cancer risk to exposed humans.

39.     By at least the end of the 1980s, additional research and testing performed by Defendants manufacturing and/or using PFAS materials, including at least DuPont, indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to such materials, including at least PFOA, but such data was not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

40.     By at least the end of the 1980s, Defendants, including at least 3M and DuPont, understood that, not only did these PFAS materials, including at least PFOA and PFOS, get into and persist and accumulate in human blood and in the human body, but that once in the human body and blood, particularly the longer-chain PFAS materials, such as PFOS and PFOA, had a long half-life, meaning that they would take a very long time (years) before even half of the material would start to be eliminated (assuming no further exposures), which allowed increasing levels of the chemicals to build up and accumulate in the blood and/or body of exposed individuals over time, particularly if any level of exposures continued.

41.     By at least the end of the 1990s, additional research and testing performed by Defendants manufacturing and/or using PFAS materials, including at least 3M and DuPont, indicated that at least one such PFAS material, PFOA, had caused a triad of tumors (Leydig cell (testicular), liver, and pancreatic) in a second chronic cancer study in rats.

42.     By at least the end of the 1990s, the precise mechanism(s) of action by which any PFAS material caused each of the tumors found in animal studies had still not been identified, mandating that Defendants continue to presume that any such PFAS material that caused such tumors in animal studies could present a potential cancer risk to exposed humans.

43.     By at least 2010, additional research and testing performed by Defendants manufacturing and/or using PFAS materials, including at least 3M and DuPont, revealed multiple potential adverse health impacts among workers exposed to such PFAS materials, including at least PFOA, such as increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts, which such Defendants' own scientists, lawyers, and advisors recommended be studied further to assess the extent to which PFAS exposures were causing those effects.

44.     When the United States Environmental Protection Agency ("USEPA") and other state and local public health agencies and officials first began learning of PFAS exposures in the United States and potential associated adverse health effects, Defendants repeatedly assured and represented to such entities and the public that such exposures presented no risk of harm and were of no legal, toxicological, or medical significance of any kind.

45.     After USEPA and other entities began asking Defendants to stop manufacturing and/or using certain PFAS materials, Defendants began manufacturing and/or using and/or began making and/or using more of certain other and/or "new" PFAS materials, including PFAS materials with six or fewer carbons, such as GenX (collectively "Short-Chain PFAS").

46.     Defendants manufacturing and/or using Short-Chain PFAS, including at least DuPont and 3M, are aware that one or more such Short-Chain PFAS materials also have been found in human blood.

11

47.     By at least the mid-2010s, Defendants, including at least DuPont and Chemours, were aware that at least one Short-Chain PFAS had been found to cause the same triad of tumors (Leydig (testicular), liver, and pancreatic) in a chronic rat cancer study as had been found in a chronic rat cancer study with a non-Short-Chain PFAS.

48.     As of today's date, the precise mechanism(s) of action by which any PFAS causes each of the tumors found in animal studies has(ve) not been identified, mandating that Defendants presume that any such PFAS material that caused such tumors in animal studies be presumed to present a potential cancer risk to exposed humans.

49.     Research and testing performed by and/or on behalf of Defendants making and/or using Short-Chain PFAS indicates that such Short-Chain PFAS materials present the same, similar, and/or additional risks to human health as had been found in research on other PFAS materials, including cancer risk.

50.     Nevertheless, Defendants repeatedly assured and represented to governmental entities and the public (and continue to do so) that the presence of PFAS materials, including these Short-Chain PFAS materials, in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

51.     As of at least October 4, 2018, Archroma, Arkema France, Chemours, Daikin Industries, Ltd., and Solvay, through their membership in the FluoroCouncil, represented to the public through the FluoroCouncil website that: "The newer, short-chain chemistries currently in use are well studied [and] … [t]he science supports the conclusion that the newer FluoroTechnology is not expected to present a significant risk to humans and the environment."

52.     At all relevant times, Defendants, individually and/or collectively, have had the resources and ability but have intentionally, purposefully, recklessly, and/or negligently chosen

not to fund or sponsor any study, investigation, testing, and/or other research of any kind of the nature Defendants claim is necessary to confirm and/or prove that the presence of any one and/or combination of PFAS in human blood causes any disease and/or adverse health impact of any kind in humans, presents any risk of harm to humans, and/or is of any legal, toxicological, or medical significance to humans, according to standards Defendants deem acceptable.

53.     Even after an independent science panel, known as the "C8 Science Panel," publicly announced in the 2010s that human exposure to 0.05 parts per billion or more of one PFAS, PFOA, in drinking water for one year or more had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFAS in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind, and have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate to satisfy the standards of Defendants to prove such adverse effects upon and/or any risk to humans with respect to PFAS in human blood.

54.     At all relevant times, Defendants shared and/or should have shared among themselves all relevant information relating to the presence, biopersistence, and bioaccumulation of PFAS in human blood and associated toxicological, epidemiological, and/or other adverse effects and/or risks.

55.     As of the present date, blood serum testing and analysis by Defendants, independent scientific researchers, and/or government entities has confirmed that PFAS

materials are clinically demonstrably present in approximately 99% of the current population of the United States.

56.     There is no naturally-occurring "background," normal, and/or acceptable level or rate of any PFAS in human blood, as all PFAS detected and/or present in human blood is present and/or detectable in such blood as a direct and proximate result of the acts and/or omissions of Defendants.

57.     Data exists to indicate that the presence, accumulation, toxic invasion, and/or persistence of PFAS in human blood, including that of Plaintiff and the other class members, is injurious and physically harmful and results in unwanted, unconsented-to, and deleterious alterations, changes, and/or other presently-existing physical injury and/or adverse impacts to the blood and/or bodies of Plaintiff and the other class members, including but not limited to subcellular injuries, including but not limited to biopersistence and bioaccumulation within the body.

58.     At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS materials in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing Plaintiff or the class members from discovering the existence and extent of any injuries/harm as alleged herein.

59.     At all relevant times, Defendants, through their acts and/or omissions, took steps to attack, challenge, discredit, and/or otherwise undermine any scientific studies, findings, statements, and/or other information that proposed, alleged, suggested, or even implied any

potential adverse health effects or risks and/or any other fact of any legal, toxicological, or medical significance associated with the presence of PFAS in human blood.

60.     At all relevant times, Defendants, through their acts and/or omissions, concealed and/or withheld information from their customers, governmental entities, and the public that would have properly and fully alerted Plaintiff or the class members to the legal, toxicological, medical, or other significance and/or risk from having any PFAS material in their blood.

61.     At all relevant times, Defendants encouraged the continued and even further increased use and release into the environment of PFAS, including into Ohio and this District, by their customers and others, including but not limited to through manufacture, use, and release, of aqueous fire-fighting foams containing or made with PFAS and/or emergency responder protection gear or equipment coated with materials made with or containing PFAS, and tried to encourage and foster the increased and further use of PFAS, including in Ohio and this District, in connection with as many products/uses/and applications as possible, despite knowledge of the toxicity, persistence, and bioaccumulation concerns associated with such activities.

62.     Once governmental entities and regulators began learning of the potential toxicity, persistence, and bioaccumulation concerns associated with PFAS, Defendants cited to the pervasive use of such PFAS throughout numerous sectors of the American economy (which they had intentionally and purposefully encouraged and created) and the widespread presence of PFAS in blood of Americans (which they also had negligently, recklessly, and/or intentionally caused) as an excuse and/or reason not to restrict or regulate PFAS, essentially arguing that the issues associated with PFAS had become "too big to regulate."

63.     To this day, Defendants deny that the presence of any PFAS in Plaintiff's or any class member's blood, at any level, is an injury or presents any harm or risk of harm of any kind, or is otherwise of any legal, toxicological, or medical significance.

64.     To this day, Defendants deny that any scientific study, research, testing, or other work of any kind has been performed that is sufficient to suggest to Plaintiff or any class member that the presence of any PFAS material in their blood, at any level, is of any legal, toxicological, medical, or other significance.

65.     Defendants, to this day, affirmatively assert and represent to governmental entities, their customers, and the public that there is no evidence that any of the PFAS found in human blood across the United States causes any health impacts or is sufficient to generate an increased risk of future disease sufficient to warrant diagnostic medical testing, often referring to existing studies or data as including too few participants or too few cases or incidents of disease to draw any scientifically credible or statistically significant conclusions.

66.     Defendants, to this day, use and rely upon what they claim is this same "lack of definitive evidence of causation" as between any PFAS and any adverse human health effect to oppose and try to discourage regulatory and/or legislative efforts to limit, restrict, and/or address PFAS impacts to the environment or human health, and to oppose, reject, and deny claims that PFAS has caused any injury or increased the risk of any adverse human health effects.

67.     Yet, to this day, Defendants knowingly, willfully, purposefully, intentionally, recklessly, and/or negligently refuse to fund or conduct any scientific study, research, testing, and/or other work of any kind that is extensive or comprehensive enough, according to Defendants, to generate results that Defendants will accept (outside the context of an existing written settlement agreement such as DuPont entered with respect to certain PFOA exposures,

which created the C8 Science Panel) as sufficient to confirm a causal connection between any single or combination of PFAS in human blood and any injury, human disease, adverse human health impact, and/or a risk sufficient to warrant any personal injury compensation or future diagnostic medical testing, including medical monitoring (hereinafter "Sufficient Results").

68.    Instead, Defendants claim that they should be permitted to wait to see if and when Plaintiff or any class member dies, develops any serious disease, adverse health effect, or risk of a nature necessitating diagnostic testing demonstrated through data Defendants believe constitutes Sufficient Results, even if that means watching, monitoring, or analyzing what happens to Plaintiff and/or class members based on PFAS in their blood over many years or even decades.

69.    Thus, rather than fund and perform the work necessary to prove through Sufficient Results the precise nature and extent of potential adverse effects and/or risks from having PFAS in human blood *before* such PFAS materials were caused, allowed, and/or permitted by Defendants, through their acts and/or omissions, to contaminate the blood and/or bodies of Plaintiff and the other class members, Defendants have used and/or continue to use Plaintiff and the other class members as human guinea pigs in a decades-long experiment through which Defendants knowingly, recklessly, and /or negligently cause, allow, and/or permit Plaintiff and the other class members to be contaminated with PFAS materials, allow such PFAS to persist and accumulate in their blood and/or bodies, and then watch, record, study, assess, and/or monitor what happens to Plaintiff and the class members over time as a result of the contamination, biopersistence, and bioaccumulation of PFAS, while arguing that Plaintiff and the other class members have no rights to stop or address these PFAS exposures until and unless *they*

17

can prove, at *their* cost, that such exposures have caused them a serious disease or killed them outright.

70.     Plaintiff and the other class members were not told that their blood and/or bodies were being contaminated with PFAS, nor did they consent to either such exposure or being part of any study, experiment, and/or other activity by and/or on behalf of any Defendant that purported to associate, monitor, and/or evaluate whether any of their health conditions were related to any PFAS or combination of PFAS.

71.     Defendants were and/or should have been aware, knew and/or should have known, and/or foresaw or should have foreseen that their marketing, development, manufacture, distribution, release, training of users, production of instructional materials, sale and/or other handling and/or use of PFAS materials, including in Ohio and this District, would result in the contamination of the blood and/or bodies of Plaintiff and the other class members with PFAS materials, and the biopersistence and bioaccumulation of such PFAS in such blood and/or bodies.

72.     Defendants were and /or should have been aware, or knew and/or should have known, and/or foresaw or should have foreseen that allowing PFAS materials to contaminate the blood and/or bodies of Plaintiff and the other class members would cause injury, irreparable harm, and/or unacceptable risk of such injury and/or irreparable harm to Plaintiff and the other class members.

73.     Defendants were and/or should have been aware, knew and/or should have known, an/or foresaw or should have foreseen that Sufficient Results did not, according to Defendants, exist before Defendants caused, allowed, and/or permitted PFAS materials to contaminate the blood and/or bodies of Plaintiff and the other class members.

24824703.1

74.     Defendants did not seek or obtain permission or consent from Plaintiff or the other class members before engaging in such acts and/or omissions that caused, allowed, and/or otherwise resulted in the contamination of Plaintiff's and the other class members' blood and/or bodies with PFAS materials, and resulting biopersistence and bioaccumulation of such PFAS in such blood and/or bodies.

75.     Defendants did not seek or obtain permission or consent from Plaintiff or the other class members before using any data relating to them in whatever studies, research, investigations, testing, and/or other work upon which Defendants rely to support their claims and/or representations that the PFAS in Plaintiff's or the other class members' blood is insufficient to cause and/or increase the risk of any injury, adverse health effects, and/or any other effects of any legal, toxicological, medical or other significance.

76.     Plaintiff and the other class members are reasonably concerned and fearful of the effects of having PFAS in their blood, including the synergistic effects of having multiple PFAS materials in their blood at the same time, and what such effects will and/or are reasonably likely and/or probable to do to them and/or their children, including reasonable fear of cancer and/or other serious disease that may have long latency periods after such exposures.

77.     Plaintiff and the other class members should not have to wait until actual diseases, death, or other adverse effects occur as a result of the PFAS in their blood and/or bodies before adequate testing and/or research is funded and/or performed to generate Sufficient Results upon which Plaintiff and other class members can rely.

78.     Plaintiff and the other class members should not have to bear the burden of funding and/or performing such testing and/or research to generate Sufficient Results, which is likely to cost more than $5 Million, when Plaintiff and the other class members are not the ones

who put the PFAS in their blood and/or bodies, they did not consent or provide any permission to Defendants to do so (or were they even aware they were being contaminated with such PFAS materials), and Defendants have collectively reaped billions of dollars in profits from the acts and/or omissions that caused, permitted, allowed, and/or otherwise resulted in the PFAS contamination of Plaintiff's and the other class members' blood and/or bodies and resultant biopersistence and bioaccumulation of such PFAS in such blood and/or bodies.

79. Defendants are relying upon and citing the purported lack of Sufficient Results to reject, oppose, and/or deny any claims by Plaintiff and/or the class members that they have suffered any injury or are entitled to any damages, monitoring, or other relief because of any such injury.

80. Defendants have more than sufficient collective assets and resources to fund a completely independent scientific process, similar to that funded by DuPont and conducted by the C8 Science Panel with respect to PFOA drinking water exposures, that all persons, including Defendants, governmental and regulatory entities, Plaintiff, class members, the scientific community and the public, can rely upon to provide Sufficient Results with respect to PFAS materials in Plaintiff's and other class members' blood and/or bodies, including any synergistic effects of such PFAS materials.

## V. CLASS ACTION ALLEGATIONS

81. Plaintiff incorporates all the foregoing paragraphs as though the same were set forth at length herein.

82. Plaintiff brings this action as a class action on his own behalf and on behalf of all other persons similarly situated as members of the proposed class pursuant to Federal Rules of

24824703.1

Civil Procedure 23(a) and (b)(1) and (b)(2). This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of those provisions.

83. Plaintiff brings this lawsuit as a class action on behalf of the following nationwide class, as set forth below:

> All individuals residing within the United States who, at the time a class is certified in this case, have a detectable level of PFAS materials in their blood serum (the "Class").

84. Excluded from the Class are: (a) Defendants' legal representatives, employees, officers and/or directors; (b) the Judge to whom this case is assigned, the Judge's staff, and the Judge's immediate family; (c) any class counsel or their immediate family; and (d) class members who have already released their claims pertaining to the PFAS that are the subject of this Complaint (as to the specific PFAS that are the subject of the release(s) and the specific parties and claims that are covered by such release(s)).

85. Plaintiff reserves the right to amend the class definition set forth above if discovery and/or further investigation reveals that the Class should be expanded, divided into subclasses, or modified in any way.

86. The definition of the Class is unambiguous.  Plaintiff is a member of the Class that he seeks to represent.

87. Class members are so numerous that individual joinder is impracticable. The precise number of Class members is unknown to Plaintiff, but it is clear the number greatly exceeds the number to make joinder possible, particularly given the widespread nature of PFAS contamination of human blood samples collected from throughout the United States on multiple occasions.

88. The resolution of the claims of class members in a single action will provide substantial benefits to all parties and the Court.

89. Plaintiff's claims are typical of the claims of all the members of the proposed Class; like all proposed class members, Plaintiff has detectable levels of one or more PFAS in his blood serum.

90. Moreover, the factual bases of Defendants' acts and/or omissions are common to all members of the proposed Class.

91. Plaintiff will fairly and adequately represent and protect the interests of the proposed Class.

92. Plaintiff has retained counsel with substantial experience litigating environmental torts, and specifically environmental torts involving PFAS, as well as class actions.

93. Common questions of law and fact predominate over the questions affecting only individual Class members. Some of the common legal and factual questions include:

  a. Whether Defendants owed a duty to Plaintiff and members of the Class to refrain from acts and/or omissions reasonably likely to result in PFAS in the blood of Plaintiff and the members of the Class, and the biopersistence and bioaccumulation of such PFAS in such serum;

  b. Whether Defendants knew, foresaw, anticipated and/or should have known, anticipated, and/or foreseen that it was unreasonably dangerous to engage in acts and/or omissions that resulted in the presence, persistence, and accumulation of PFAS in the blood and/or bodies of humans;

  c. Whether Defendants knew, anticipated, foresaw, and/or should have known, anticipated, and/or foresaw that their acts and/or omissions were

likely to result in Plaintiff and the class members having persistent and accumulating PFAS in their blood and/or bodies;

d.    Whether Defendants' acts and/or omissions proximately caused PFAS to contaminate, persist in, and accumulate in the blood and/or bodies of Plaintiff and the class members;

e.    Whether the presence, persistence, and accumulation of PFAS in Plaintiff's and the class members' blood and/or bodies and any resultant subcellular or other impact and/or effect, is injurious, offensive, and/or otherwise harmful to Plaintiff and the class members; and

f.    Whether Defendants' conduct is resulting in irreparable harm to Plaintiff and the class members; and

g.    Whether Defendants' conduct warrants injunctive and/or declaratory relief.

94.    Plaintiff and members of the Class all have PFAS in their serum bloodstream. A class action is superior to other methods for the fair and efficient adjudication of this controversy.

95.    Absent a class action, most class members would likely find the cost of litigating their claims to be prohibitively high and, therefore, would have no effective remedy at law.

96.    Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

97.    Whether or not Plaintiff proves which particular Defendant produced the PFAS that contaminated, infiltrated, persists in, and/or accumulated in Plaintiff's and other members of the class' blood and/or bodies, Defendants will be liable to Plaintiff and the class members,

23

based on theories of alternative liability and/or market share liability, because they marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used the PFASs that are the subject of this Complaint, including in Ohio and this District, in such a way as to result in the contamination of Plaintiff's and the other class members' blood and/or bodies with PFAS, and the biopersistence and bioaccumulation of such PFAS in such blood and/or bodies.

## VI.     CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**(Negligence)**

98.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

99.     Defendants had a duty to exercise reasonable care in their design, engineering, manufacture, development, fabrication, testing, release, training of users, production of informational materials, handling, selling, use, and/or distribution of PFAS, including a duty of care to ensure that PFAS did not infiltrate, persist in, and accumulate in the blood and/or bodies of Plaintiff and members of the proposed Class.

100.    Defendants owed a duty of care towards Plaintiff and members of the proposed Class that was commensurate with the inherently dangerous, harmful, injurious, bio-persistent, environmentally-persistent, toxic, and bio-accumulative nature of PFAS.

101.    Defendants failed to exercise ordinary care by acts and/or omissions that permitted, allowed, and/or otherwise resulted in the contamination of, persistence in, and accumulation in the blood and/or bodies of Plaintiff and the other class members with one or more PFAS materials, including all such acts and/or omissions referenced in this Complaint,

resulting in Plaintiff and the other members of the proposed Class having one or more PFAS materials in their blood.

102.    Defendants knew, foresaw, anticipated, and/or should have foreseen, anticipated, and/or known that the design, engineering, manufacture, fabrication, sale, release, training of users, production of informational materials, handling, use, and/or distribution of PFAS and/or other acts and/or omissions as described in this Complaint could likely result in the contamination of the blood and/or bodies of Plaintiff and the proposed class members and its persistence and accumulation in such blood and/or bodies.

103.    Despite knowing, anticipating, and/or foreseeing the bio-persistent, bio-accumulative, toxic, and/or otherwise harmful and/or injurious nature of PFAS materials, Defendants, their agents, servants, and/or employees, committed negligent acts and/or omissions that resulted in the contamination of the blood and/or bodies of Plaintiff and the other class members with one or more PFAS materials, and the biopersistence and bioaccumulation of such PFAS in such blood and/or bodies.

104.    Defendants, through their acts and/or omissions as described in this Complaint, breached their duty to Plaintiff and the members of the proposed Class.

105.    It was reasonably foreseeable to Defendants that Plaintiff, and the members of the proposed Class, would likely suffer the injuries and harm described in this Complaint by virtue of Defendants' breach of their duty and failure to exercise ordinary care, as described herein.

106.    But for Defendants' negligent acts and/or omissions, Plaintiff and members of the proposed class would not have been injured or harmed.

107.    Defendants' negligent conduct was the direct and proximate cause of the injuries and harm to Plaintiff and the proposed class members, as described herein.

## SECOND CLAIM FOR RELIEF
### (Battery)

108.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

109.    At all relevant times, Defendants possessed knowledge that the PFAS which they designed, engineered, manufactured, fabricated, sold, handled, released, trained users on, produced instructional materials for, used, and/or distributed were bio-persistent, bio-accumulative, toxic, potentially carcinogenic, and/or otherwise harmful/injurious and that their continued manufacture, use, sale, handling, release, and distribution would result in Plaintiff and the other members of the proposed Class having PFAS in their blood, and the biopersistence and bioaccumulation of such PFAS in such blood.

110.    However, despite possessing such knowledge, Defendants knowingly, purposefully, and/or intentionally continued to engage in such acts and/or omissions, including but not limited to all such acts and/or omissions described in this Complaint, that continued to result in Plaintiff and the other proposed class members accumulating PFAS in their blood and/or bodies, and such PFAS persisting and accumulating in such blood and/or bodies.

111.    Defendants did not seek or obtain permission or consent from Plaintiff or members of the class to put or allow PFAS materials into their blood and/or bodies, or to persist in and/or accumulate in their blood and/or bodies.

112.    Entry into, persistence in, and accumulation of such PFAS in Plaintiff's and the other class members' bodies and/or blood without permission or consent is an unlawful and harmful and/or offensive physical invasion and/or contact with Plaintiff's and the other class members' persons and unreasonably interferes with Plaintiff's rightful use and possession of Plaintiff's and the other Class members' blood and/or body.

24824703.1

113.    At all relevant times, the PFAS present in the blood of Plaintiff and the other class members originated from Defendants' acts and/or omissions.

114.    Defendants continue to knowingly, intentionally, and/or purposefully engage in acts and/or omissions that result in the unlawful and unconsented-to physical invasion and/or contact with Plaintiff and the other class members that results in persisting and accumulating levels of PFAS in their blood.

115.    Plaintiff, the class members and any reasonable person find the contact at issue harmful and/or offensive.

116.    Defendants acted intentionally with the knowledge and/or belief that the contact, presence and/or invasion of PFAS with, onto and/or into Plaintiff's blood serum, including its persistence and accumulation in such serum, was substantially certain to result from those very acts and/or omissions.

117.    Defendants' intentional acts and/or omissions resulted directly and/or indirectly in harmful contact with Plaintiff's and the class members' blood and/or body.

118.    The continued presence, persistence, and accumulation of PFAS in the blood and/or body of Plaintiff and the other class members is offensive, unreasonable, and/or harmful, and thereby constitutes a battery.

119.    The presence of PFAS in the blood and/or body of Plaintiff and the other class members has altered the structure and/or function of such blood and/or body parts.

120.    As a direct and proximate result of the foregoing acts and omissions, Plaintiff and the other class members suffered and/or continue to suffer physical injury for which Defendants are therefore liable.

## THIRD CLAIM FOR RELIEF
### (Declaratory Judgment under the Declaratory Judgment Act)

121.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

122.    An actual, substantial, and justiciable controversy has arisen and exists between Plaintiff and members of the class and Defendants herein and their respective rights, obligations, and duties with respect to Defendants' contamination of the blood and/or bodies of Plaintiff and the other members of the Class with PFAS, and the biopersistence and bioaccumulation of such PFAS in such blood and/or bodies.

123.    By reason of the foregoing, Plaintiff and the other class members seek a declaratory judgment against Defendants that Defendants are liable and responsible for the PFAS in Plaintiff's and the class members' blood and/or bodies and all equitable and/or injunctive relief, and such other relief as the Court may Order, that the Court deems reasonable and appropriate in relation thereto.

## FOURTH CLAIM FOR RELIEF
### (Conspiracy)

124.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

125.    Defendants maliciously conspired among each other and with consulting firms, agents, representatives, and others and/or through forming joint task forces, committees, coalitions, trade groups, and/or councils and/or otherwise colluding through unlawful, affirmative misrepresentations and/or unlawful concealment of material facts regarding PFAS, including but not limited to each such act and/or omission described in this Complaint, to illegally and/or wrongfully create and perpetuate a market for PFAS, increase exposures to

PFAS, produce profits for PFAS, conceal, misrepresent, and/or mislead as to the dangers and toxicity associated with PFAS and/or conduct other operations and activities in a manner as to illegally and/or wrongfully cause, permit, and/or allow PFAS to contaminate the blood and/or bodies of Plaintiff and the other members of the Class with PFAS, by illegally and/or wrongfully using, creating, and/or collecting data related to PFAS exposure among Plaintiff and/or other members of the Class in experiments, studies, research, and/or other scientific inquires without the consent, knowledge, permission, and/or awareness, of Plaintiff and/or such other members of the Class, and also by illegally and/or wrongfully avoiding properly notifying the public or government officials of the ongoing release and continuing exposure of PFAS into the environment, and illegally and/or wrongfully avoiding correcting, clarifying, rescinding, and/or qualifying their misrepresentations to Plaintiff and other members of the Class regarding PFAS and that Defendants acts and/or omissions were not causing any physical harm, injury of any kind, and/or damage to them.

126.    The purpose and result of Defendants' and their co-conspirators' conspiracy was to wrongfully and/or unlawfully hide Defendants' illegal and unlawful acts and/or omissions that resulted in the contamination of the blood and/or bodies of Plaintiff and the other members of the class, to improperly minimize, trivialize, and/or misrepresent the actual harm and/or risks of PFAS exposures, to wrongfully and/or unlawfully deceive Plaintiff, and other members of the Class, into believing that PFAS was safe and/or to avoid lost profits and other economic harm to Defendants.

127.    Defendants' and their co-conspirators' conspiracy and the wrongful and/or unlawful acts in furtherance of their conspiracy directly and proximately induced justified reliance by Plaintiff, and other members of the Class, which directly and proximately caused the

contamination of the blood and/or bodies of Plaintiff and the other members of the Class with PFAS.

128.    At the time Defendants and their co-conspirators made their misrepresentations, they knew of the health hazards and/or other risks posed by PFAS to Plaintiff and other members of the Class.

129.    There was great likelihood and/or certainty that serious harm would arise from Defendants' and their co-conspirators' misconduct, Defendants were aware of the likelihood of such harm, Defendants made profits from their and their co-conspirators' misconduct, and Defendants made no effort to disclose and/or remedy their PFAS pollution after discovery of their and their co-conspirators' misconduct.

## VII.    RELIEF SOUGHT BY THE CLASS

130.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

131.    Plaintiff and the proposed Class have sustained and will continue to sustain presently existing physical injury and/or irreparable harm in the form of PFAS being present, accumulating, and/or persisting in their blood, as a result of Defendants' acts and/or omissions.

132.    As a result, Plaintiff and the Class seek equitable and/or injunctive relief for each of the causes of action alleged herein; neither Plaintiff nor the Class are seeking any compensatory damages for personal injuries through any class-wide claims asserted herein.

133.    In particular, Plaintiff and the proposed Class seek the establishment of an independent panel of scientists, including but not limited to epidemiologists, toxicologists, medical doctors, and/or exposure-risk assessors, to be jointly selected by the parties (the "PFAS Science Panel") and tasked with independently studying, evaluating, reviewing, identifying,

publishing, and notifying/informing the Class of Sufficient Results that shall be deemed definitive and binding on all the parties, which work, including but not limited to any testing, sampling, or monitoring deemed appropriate by the PFAS Science Panel, (hereinafter "PFAS Science Panel Work") shall all be funded by Defendants.

## PRAYER FOR RELIEF

Plaintiff, on behalf of himself and all others similarly situated, requests the Court to enter judgment against the Defendants, as follows:

(a) an order certifying the proposed Class, designating Plaintiff as the named representative of the proposed Class, and designating undersigned counsel as Class Counsel; and

(b) an order finding Defendants liable for negligence in the manner described herein;

(c) an order finding Defendants liable for battery in the manner described herein;

(d) an order finding Defendants liable for conspiracy in the manner described herein;

(e) a declaratory judgment declaring and finding Defendants liable for the injuries and injunctive relief described herein;

(f) equitable relief and/or an injunction ordering Defendants to provide for and fund the PFAS Science Panel Work described herein;

(g) an award of attorneys' fees and costs, as permitted by law;

(h) an award of pre-judgment and post-judgment interest, as provided by law;

(i)     leave to amend this Complaint to conform to the evidence produced at

trial; and

(j)     such other relief as may be appropriate under the circumstances and/or

permitted by law and/or equity, or as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Dated:  April 16, 2019                              Respectfully submitted,

*/s/ David J. Butler*
David J. Butler (0068455), Trial Attorney
Jonathan N. Olivito (0092169)
Taft Stettinius & Hollister LLP
65 East State Street, Suite 1000
Columbus, Ohio 43215
Telephone: (614) 221-2838
Facsimile: (614) 221-2007
dbutler@taftlaw.com
jolivito@taftlaw.com

Robert A. Bilott (0046854)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Telephone: (513) 381-2838
Facsimile: (513) 381-0205
bilott@taftlaw.com

-and-

Michael A. London (pro hac vice)
Rebecca G. Newman (pro hac vice)
Douglas & London, PC
59 Maiden Lane, 6th Floor
New York, NY 10038
Telephone: (212) 566-7500
Facsimile: (212) 566 7501
mlondon@douglasandlondon.com
rnewman@douglasandlondon.com

24824703.1

-and-

Ned McWilliams (pro hac vice application forthcoming)
Levin Papantonio Thomas Mitchell Rafferty & Proctor P.A.
316 South Baylen Street
Pensacola, FL 32502
Telephone: (850) 435-7138
nmcwilliams@levinlaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was served through the Court's

CM/ECF system this 16th day of April, 2019, on all counsel of record.


                                        */s/ David J. Butler*
                                        David J. Butler

24824703.1