# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**KEVIN D. HARDWICK,**

        **Plaintiff,**

v.

**3M COMPANY,** *et al.,*

        **Defendants.**

**Case No. 2:18-cv-1185**
**JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Elizabeth A. Deavers**

## OPINION AND ORDER

This matter is before the Court on Defendants' Joint Motion to Dismiss for Failure to

State a Claim and for Lack of Subject Matter Jurisdiction (ECF No. 67) and Defendant Arkema

Inc.'s and Arkema France's Motion to Dismiss for Failure to State a Claim and for Lack of

Subject Matter Jurisdiction  (ECF No. 83), Defendants' Motions to Dismiss for Lack of Personal

Jurisdiction (ECF Nos. 68, 69, 71, 72, 73, 82, 84, 113), Plaintiffs' Combined Memorandum in

Opposition to all Defendants' Motions to Dismiss (ECF No. 94) and Plaintiff's Memorandum in

Opposition to Arkema Inc.'s and Arkema France's Motion to Dismiss for Failure to State a

Claim and for Lack of Subject Matter Jurisdiction  (ECF No. 119), Defendants' Joint Reply Brief

in Support of the Motion to Dismiss for Failure to State a Claim and for Lack of Subject Matter

Jurisdiction (ECF No. 105), and Defendants' Reply Briefs in Support of their Motions to Dismiss

for Lack of Personal Jurisdiction (ECF Nos. 105–111, 121).  For the reasons that follow, the

Court **DENIES** all of these motions.

### I.

This case focuses on "PFAS," which are man-made chemicals described by the United

States Environmental Protection Agency as follows:

Per- and polyfluoroalkyl substances (PFAS) are a group of man-made chemicals that includes PFOA, PFOS and GenX chemicals. Since the 1940s, PFAS have been manufactured and used in a variety of industries around the globe, including in the United States. PFOA and PFOS have been the most extensively produced and studied of these chemicals. Both are very persistent in the environment and in the human body. Exposure to certain PFAS can lead to adverse human health effects.

https://www.epa.gov/pfas/pfas-what-you-need-know-infographic

Plaintiff Kevin D. Hardwick filed the instant action, describing the nature of it as follows:

This is a national class action brought on behalf of Plaintiff individually, and on behalf of all others similarly situated, for injunctive, equitable, and declaratory relief, by Plaintiff and other class members for injuries arising from the intentional, knowing, reckless and/or negligent acts and/or omissions of Defendants in connection with contamination of the blood and/or bodies of Plaintiff and other class members with synthetic, toxic per- and polyfluoroalkyl substances (collectively "PFAS"), including but not limited to perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS") and related chemicals, including but not limited to those that degrade to PFOA and/or PFOS, and including but not limited to C3-C-15 PFAS chemicals, such as perfluorohexanesulfonate (PFHxS), perfluorononanoate (PFNA), perfluorobutanesulfonate (PFBS), perfluorohexanoate (PFHxA), perfluoroheptanoate (PFHpA), perfluoroundecanoate (PFUnA), perfluorododecanoate (PFDoA), HFPA Dimer Acid (CAS # 13252-13-6/C3 Dimer Acid/P-08-508/FRD903/GX903/C3DA/GenX), and HFPA Dimer Acid Ammonium Salt (CAS# 62037-80-3/ammonium salt of C3 Dimer Acid/P-08-509/FRD902/GX902/GenX), which resulted and continues to result from Defendants using Plaintiff and the other class members as part of a massive, undisclosed human health experiment without the knowledge and/or consent of Plaintiff or the other class members.

(Am. Compl. ¶ 1, ECF No. 96.)

In this Opinion and Order, the Court reviews only the plausibility of Mr. Hardwick's individual claims and makes no determination as to whether they are appropriate for class certification.

Mr. Hardwick alleges that he is a citizen of the State of Ohio and a resident of the Southern District of Ohio, and has "worked as a firefighter for more than forty years, during which he has used firefighting foams containing one of more PFAS materials, used

equipment/gear treated and/or coated with materials containing and/or contaminated with one or more PFAS materials, and/or otherwise was exposed to one or more PFAS materials, and now has one or more PFAS materials in his blood serum." *Id.* ¶ 4.

Mr. Hardwick names as Defendants 3M Company ("3M"), E. I. du Pont de Nemours and Company ("DuPont"), the Chemours Company ("Chemours"), Archroma Management L.L.C. ("Archroma"), Arkema, Inc. ("Arkema America"), Arkema France, S.A. ("Arkema France"), Daikin Industries Ltd. ("Daikin Industries"), Daikin America, Inc. ("Daikin America"), Solvay Specialty Polymers, USA, LLC ("Solvay"), and Asahi Glass Company, Ltd. ("Asahi Glass").

Plaintiff and Asahi Glass filed a Joint Stipulation (ECF No. 89), in which they stipulated that Asahi Glass did not engage in business in Ohio or the United States. They stipulated that all of the chemical products produced by Asahi Glass, including products that contain PFAS, were sold in the United States and in Ohio by AGC Chemicals Americas, Inc. ("AGC Chemicals"). AGC Chemicals is registered to do business in Ohio and has a registered agent in Ohio. Based on this Joint Stipulation, Asahi Glass was dismissed without prejudice and in Plaintiff's Amended Complaint he substituted AGC Chemicals for Asahi Glass.

In the Amended Complaint, Plaintiff alleges that "Defendants have each marketed, developed, distributed, sold, manufactured, released, trained users on, produced instructional materials for, and/or otherwise handled and/or used one or more PFAS materials, including in Ohio and this District, in such a way as to cause the contamination of Plaintiff's and the class members' blood and/or bodies with PFAS, and the resultant biopersistence and bioaccumulation of such PFAS in the blood and/or bodies of Plaintiff and other class members." (Am. Comp. ¶ 29.)

Mr. Harwick further alleges that "Defendants manufacturing and/or using PFAS materials released such PFAS materials into the environment during, as a result of, or in connection with their manufacturing and other commercial operations, including into the air, surface waters, ground water, soils, landfills, and/or through their involvement and/or participation in the creation of consumer or other commercial products and materials and related training and instructional materials and activities, including in Ohio and this District, that Defendants knew, foresaw, and/or reasonably should have known and/or foreseen would expose Plaintiff and the other class members to such PFAS." *Id.* ¶ 34.

The Amended Complaint provides a history of PFAS materials, which "were first developed in the late 1930s to 1940s and put into large-scale manufacture and use by the early 1950s." *Id.* ¶ 28. Plaintiff alleges that PFAS are unique chemicals because of their biopersistent and bioaccumulative qualities. The pleading contains allegations that PFAS cause significant adverse health effects, "including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medially-diagnosed high blood pressure, high cholesterol and is known to cause permanent subcellular injuries." *Id.* ¶ 53.

Plaintiff alleges that each Defendant learned of various studies and data indicating that exposure to PFAS have significant negative impacts on human health, including "increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts, which such Defendants' own scientists, lawyers, and advisors recommended be studied further to assess the extent to which PFAS exposures were causing those effects." *Id.* ¶ 43. Plaintiff further states that Defendants "knew and shared among themselves all relevant information relating to the presence, biopersistence, and bioaccumulation of PFAS in human blood and associated toxicological, epidemiological, and/or adverse health effects and/or risks." *Id.* ¶ 54.

4

Mr. Hardwick alleges that in spite of these studies and data and Defendants' knowledge of them, "Defendants repeatedly assured and represented" to "the United States Environmental Protection Agency ("USEPA") and other state and local public health agencies and officials" that exposures to PFAS "presented no risk of harm and were of no legal, toxicological, or medical significance of any kind." *Id.* ¶ 44.

Plaintiff additionally avers that, although Defendants were aware of the dangers and risks of PFAS, they not only withheld that information from the public and regulators, but that they also actively misled the public and regulators as to such dangers and risks. Mr. Hardwick alleges that Defendants made efforts to conceal this data and to manipulate public, regulatory and scientific perception and knowledge of the injurious nature of PFAS. Specifically, Plaintiff states that "Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS materials in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing Plaintiff or the class members from discovering the existence and extent of any injuries/harm as alleged herein." *Id.* ¶ 58.

He further avers that "Defendants encouraged the continued and even further increased use and release into the environment of PFAS, including into Ohio and this District, by their customers and others, including but not limited to through manufacture, use, and release, of aqueous fire-fighting foams containing or made with PFAS and/or emergency responder protection gear or equipment coated with materials made with or containing PFAS, and tried to encourage and foster the increased and further use of PFAS, including in Ohio and this District,

in connection with as many products/uses/and applications as possible, despite knowledge of the toxicity, persistence, and bioaccumulation concerns associated with such activities." *Id.* ¶ 61.

Mr. Hardwick alleges that, although there is evidence and data to the contrary, "[t]o this day, Defendants deny that the presence of any PFAS in Plaintiff's or any class member's blood, at any level, is an injury or presents any harm or risk of harm of any kind, or is otherwise of any legal, toxicological, or medical significance"; they deny that "any scientific study, research, testing, or other work of any kind has been performed that is sufficient to suggest to Plaintiff or any class member that the presence of any PFAS material in their blood, at any level, is of any legal, toxicological, medical, or other significance"; that "Defendants, to this day, affirmatively assert and represent to governmental entities, their customers, and the public that there is no evidence that any of the PFAS found in human blood across the United States causes any health impacts or is sufficient to generate an increased risk of future disease sufficient to warrant diagnostic medical testing, often referring to existing studies or data as including too few participants or too few cases or incidents of disease to draw any scientifically credible or statistically significant conclusions." *Id.* ¶¶ 63–65.

Mr. Hardwick specifies that because "[t]here is no naturally-occurring 'background,' normal, and/or acceptable level or rate of any PFAS in human blood, as all PFAS detected and/or present in human blood is present and/or detectable in such blood as a direct and proximate result of the acts and/or omissions of Defendants." *Id.* ¶ 56. Plaintiff continues, averring that "Defendants have collectively reaped billions of dollars in profits from the acts and/or omissions that caused, permitted, allowed, and/or otherwise resulted in the PFAS contamination of Plaintiff's and the other class members' blood and/or bodies and resultant biopersistence and bioaccumulation of such PFAS in such blood and/or bodies." *Id.* ¶ 78.

Plaintiff alleges that the "presence, accumulation, toxic invasion, and/or persistence of PFAS in human blood, including that of Plaintiff and the other class members, is injurious and physically harmful and results in unwanted, unconsented-to, and deleterious alterations, changes, and/or other presently-existing physical injury and/or adverse impacts to the blood and/or bodies of Plaintiff and the other class members, including but not limited to subcellular injuries, including but not limited to biopersistence and bioaccumulation within the body." *Id.* ¶ 57.

Mr. Hardwick brings claims for negligence, battery, conspiracy, and declaratory judgment. He asks for equitable relief in the form of a panel of scientists to study the effects that the PFAS has in his body and for medical monitoring as part of that relief.

Defendants moved jointly to dismiss this case in its entirety for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction, and each Defendant moved separately for dismissal based on lack of personal jurisdiction. After these motions were filed, Plaintiff amended the complaint and the parties jointly moved to apply the motions to dismiss to the Amended Complaint. (ECF No. 101.) The Court ordered oral argument on Defendants' Joint Motion to Dismiss for Failure to State a Claim and for Lack of Subject Matter Jurisdiction, which was held on August 27, 2019. (Transcript ("Tr."), ECF No. 126.) Defendants' motions are now ripe for decision.

## II.

Defendants move to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

### A.    Standard

"A Rule 12(b)(1) motion can either attack the claim of jurisdiction on its face, in which case all allegations of the plaintiff must be considered as true, or it can attack the factual basis for

jurisdiction, in which case the trial court must weigh the evidence and the plaintiff bears the burden of proving that jurisdiction exists." *Abbott v. Michigan*, 474 F.3d 324, 328 (6th Cir. 2007) (*quoting DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir.2004)). Defendants here make a facial attack, and therefore, "[a]s with a Rule 12(b)(6) motion, [the Court] must accept the allegations set forth in the complaint as true, drawing all inferences in favor of the plaintiff," and determine whether Plaintiff has stated a plausible claim. *Gaylor v. Hamilton Crossing CMBS*, 582 Fed. Appx. 576, 579 (6th Cir. 2014) (citations omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–5570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (clarifying the plausibility standard articulated in *Twombly*).

## B.   Analysis

Defendants move for dismissal of Mr. Hardwick's negligence, battery, and conspiracy claims, summarizing why they are entitled to dismissal as follows:

> The Court lacks Article III authority to resolve the dispute; the complaint alleges no 'injury' under Ohio law; it seeks relief exceeding this Court's equitable and constitutional powers; it fails to state a claim under the federal pleading standards and Ohio law; and it runs headlong into the Ohio Product Liability Act.

(Defs' Mot. to Dismiss at (i), ECF No. 67-1.) Defendants further assert that because Mr. Hardwick has failed to allege injury under Ohio law, "all three of Hardwick's substantive claims under Ohio law—negligence, battery, and conspiracy" fail. *Id*. at 13.

The Court will first address all of Defendants' arguments under Rules 12(b)(1) and 12(b)(6), except those related to the Ohio Product Liability Act ("OPLA"), which it will address separately below.

1. **Subject Matter Jurisdiction, Injury Under Ohio Law, Pleading Under Ohio and Federal Standards, and Requested Relief**

Article III standing is "the threshold question in every federal case," and if the plaintiff lacks standing, the federal court lacks jurisdiction. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Constitutional standing consists of three elements: (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990).

Defendants contend that Mr. Hardwick has failed to show that he possesses standing under federal law and "[u]nder Ohio law, exposure to a toxic substance does not create an 'injury' unless an identifiable 'condition' results." (Defs' Mot. to Dismiss at 13) (citing the law on constitutional standing set out by this Court *supra*, and *Bouchard v. Am. Home Prods. Corp.*, 213 F. Supp. 2d 802, 807 (N.D. Ohio 2002)). Further, Defendants maintain that the relief of a science panel "was not 'traditionally accorded by courts of equity' and thus cannot be accorded now either." *Id.* at 15 (citing *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). Finally, Defendants assert that "even if this relief were generally available, awarding it in this case would violate the Seventh Amendment, Article III, and due process." *Id.* That is, Defendants contend that if a science panel was fashioned in the exact way Plaintiff requests, such a panel would decide the issue of general causation, removing the constitutional right to a trial by jury. Defendants further submit that the role of a science panel would not be bound by the rules of evidence, and would not include procedural safeguards. Defendants' arguments are not well taken.

9

With regard to standing and injury, Defendants maintain that Mr. "Hardwick's alleged injury—the mere presence of an unidentified level of some type of PFAS in his blood—does not constitute currently existing or future injury in fact." (Defs' Mot. to Dismiss at I, ECF No. 67-1.) They continue:

> *No Article III standing.* To begin with, Article III courts may not decide abstract disputes like this one. Hardwick admits to: not being ill; not having symptoms of illness; not having suffered any actual harm; being concerned only with the *potential* effects of the substances at the center of this lawsuit, per- and polyfluoroalkyl substances (PFAS);

. . . .

> *No injury under Ohio law.* Courts applying Ohio law have consistently dismissed amorphous claims such as these for failure to state a concrete injury. Simply put, in the absence of an actual identifiable condition or illness, the mere presence of a substance, even if allegedly toxic, in a plaintiff's blood or body does not constitute "injury" under Ohio law.

*Id.* at 1.

At oral argument, defense counsel maintained:

> The fact that they have asked for a science panel, even if they were to withdraw that request today, the fact that they have asked for a science panel, it's what that substitutes for in the complaint that is fatal here with regard to the 12(b)(6). It substitutes for any allegation that there is a harmful substance in the plaintiff.

(Tr. at 13, ECF No. 126.)

Plaintiff disagreed, contending:

> Defendants refuse to recognize that Mr. Hardwick has pleaded an injury—a significant one—the unwanted presence of a man-made chemical toxin in his blood, caused by Defendants' actions, without his consent, that persists, continues to accumulate, and has altered the structure of his blood. That concrete and present injury, coupled with the additional imminent harm that will continue to manifest as the chemicals continue to accumulate and interact synergistically, is more than sufficient to establish an injury in fact.

. . . .

In fact, the Sixth Circuit has recognized the possibility that a plaintiff could recover under Ohio law for the "increased risk" of disease as the result of the defendant's actions. *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 363 (6th Cir. 2011). As such, Defendants' claim that an identifiable condition is a prerequisite for an injury is a significant overstatement of what Ohio law requires.

(Mem. in Opp. at 5, 15, 19, ECF No. 94.)

The Court finds *Hirsch v. CSX Transportation, Inc.,* on point and binding. *Hirsch* was born of a train derailment that was "accompanied by a chemical spill, fire, and rail car explosion, allegedly causing toxic substances, toxic fumes, and/or carcinogens (collectively 'toxic substances' hereinafter) to be released into the atmosphere, ground and water." *Hirsch v. CSX Transp., Inc.*, No. 1:07-cv-3512, slip op. at 2 (N.D. Ohio Oct. 22, 2008) (Opinion & Order granting in part and denying in part Defendant's Motion to Dismiss). A group of individuals, on behalf of a putative class comprising those individuals exposed to the allegedly toxic substances, brought, *inter alia*, a negligence claim against the defendants "primarily seeking the establishment of a judicially administered medical monitoring program, punitive damages and attorney's fees." *Id.* at 2. Within the plaintiff groups, one was described by the trial court as follows:

The remaining group of eleven Plaintiffs have not alleged any symptoms but have alleged exposure to potentially toxic materials arising from the derailment (the "no injury" Plaintiffs).

*Id.* at 11.

Similar to Defendants in the case *sub judice*, the *Hirsch* defendant moved to dismiss at the pleadings stage the claims filed by the "no injury" Plaintiffs, as stated by the trial court:

Defendant challenges the sufficiency of the damages allegations as to the "no injury" Plaintiffs and the sufficiency of both the damages and causation allegations as to the "injury" Plaintiffs.

Defendant contends that the "no injury" Plaintiffs have not stated a claim because they do not have any physical injuries. Defendant further argues that

11

allegations of exposure and potential injury do not give rise to a viable tort claim under Ohio law because they are not actual injuries.

*Id.* at 11.

The trial court disagreed with the defendant and found that "physical injury is not required to demonstrate damages" in an Ohio tort claim. *Id.* The Court explained:

> While physical injury is not required to demonstrate damages entitling a plaintiff to medical monitoring relief, a plaintiff must demonstrate that because of defendant's actions, he has incurred an increased risk of disease or illness. "It is sufficient for the Plaintiffs . . . to show by expert medical testimony that they have increased risk of disease which would warrant a reasonable physician to order monitoring." *Day v. NLO*, 851 F.Supp. [869, at] 881 [(S.D. Ohio 1994)]. *See also Hansen v. Mountain Fuel Supply*, 858 P.2d at 979 ("Because the injury in question is the increase in risk that requires one to incur the cost of monitoring, the plaintiff need not prove . . . probability of actually experiencing the toxic consequences of exposure. It is sufficient that the plaintiff show the requisite increased risk.").
>
> Thus, a claim for medical monitoring relief must sufficiently allege that defendant's conduct created an increased risk of disease or illness.

*Id.* at 12.

While the trial court held that medical monitoring was not an independent cause of action under Ohio law, it noted that "Ohio law recognizes medical monitoring as a form of damages for an underlying tort. *See Wilson v. Brush Wellman*, 103 Ohio St.3d 538, 817 N.E.2d 59, 63 (Ohio 2004)." *Id.* at 3. The trial court further observed:

> Holding that "[c]ourt supervision and participation in medical-monitoring cases is a logical and sound basis on which to determine whether the action is injunctive,' the [*Brush Wellman*] court evidenced a clear intent to permit medical monitoring damage claims to move forward.

*Id.* at 3-4 (first alteration in original).

The *Hirsch* trial court denied the defendant's motion to dismiss the plaintiffs' negligence claims, relying on the allegations in the complaint:

> To summarize, Plaintiffs have sufficiently alleged that toxic substances were on the train and were released because of the derailment, they were exposed to these

substances because of the derailment, the toxic substances are associated with increased risk of disease, and because Defendant's conduct caused them to be exposed to these toxic substances they face an increased risk of disease requiring medical monitoring. Since Plaintiffs' allegations must be accepted as true when analyzing a 12(b)(6) motion to dismiss, Plaintiffs have alleged injuries sufficient for a negligence claim seeking medical monitoring relief. Defendant's motion to dismiss as to these "no injury" representative Plaintiffs is therefore denied.

*Id.* at 14.

After discovery, the *Hirsch* defendant moved for summary judgment, arguing that the

plaintiffs failed to proffer the expert testimony and evidentiary support required to prove the

causation and risk/injury elements of their negligence case. The district court agreed and granted

the defendant's motion for summary judgment. Plaintiffs appealed that decision.

On review, the Sixth Circuit began:

We next turn to the merits of this case. To succeed on a negligence claim in Ohio, the Plaintiffs must show the basic elements taught to every first-year law student: duty; breach; causation; and damages. . . .

What makes the present claim conceptually unique is that the Plaintiffs—though no doubt distraught from the stress of a train crash and evacuation—have, even by their own admission, as of now not suffered any discernable compensable injury. Rather, their alleged injuries consist solely of the increased risk of—and corresponding cost of screening for—certain diseases that, according to Plaintiffs, are more likely to occur as a result of the train crash. *See Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 825–26 (D.C.Cir.1984). Assuming that Ohio would recognize such an injury, the remedy could be a medical monitoring program that would spare the Plaintiffs these expenses.

*Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 363 (6th Cir. 2011).

The Sixth Circuit relied on the district court's finding regarding medical monitoring,

stating that the trial "court was clear that court-supervised medical monitoring was available as

an equitable remedy under Ohio law." *Id.* at 361 (citing *Wilson v. Brush Wellman*, 103 Ohio

St.3d 538 (2004) and *Day v. NLO*, 851 F. Supp. at 869 (S.D. Ohio 1994) ("[W]here periodic

future medical treatment[s], including tests, are required these have traditionally been granted as compensable future medical expenses.")).

The Sixth Circuit then framed this issue before it as follows:

But the question remains: are these Plaintiffs actually at such an increased risk of disease that they are entitled to a medical monitoring program?

*Hirsch*, 656 F.3d at 363. The court continued:

> After all, not every increased risk of disease warrants increased medical scrutiny. The expenses must be reasonable. *See Friends for All Children*, 746 F.2d at 825; *Day*, 851 F. Supp. at 880. In other words, for the Plaintiffs to prevail, there must be evidence that a reasonable physician would order medical monitoring for them.

*Id.*

Thus, the Sixth Circuit adopted the trial court's evidentiary standard that must be met by a plaintiff utilizing the equitable relief of medical monitoring as damages in an Ohio negligence case. The court found that the *Hirsch* plaintiffs had not met this standard on summary judgment: "The Plaintiffs in this case have failed to produce sufficient evidence such that a reasonable jury could believe that a reasonable physician would order medical monitoring." *Id.* at 364.

*Hirsch* provides the following guidance:

> Our holding today does not foreclose any number of possibilities; for example, perhaps the Plaintiffs might have been able to survive summary judgment had Dr. Kornberg provided some indication of why medical monitoring would be the standard practice for risks this remote. Perhaps, though we do not require blood tests in every toxic tort case, *see Redland Soccer Club v. Dep't of the Army*, 55 F.3d 827, 847 (3d Cir.1995), the Plaintiffs might have survived summary judgment had they obtained conclusive medical evidence that they faced a one-in-a-million increased risk of cancer. Those would be harder cases, and we leave them for another day. In this case, the Plaintiffs have failed to show a genuine issue of material fact. We therefore AFFIRM the judgment of the district court.

*Id.* at 364.

The Sixth Circuit has since then relied upon *Hirsch* and *Brush Wellman* for the proposition that medical monitoring is an available remedy in a tort action under Ohio law. In

*Baker v. Chevron U.S.A. Inc.*, 533 Fed. Appx. 509, 517 (6th Cir. 2013), the Sixth Circuit referred to *Hirsh* as "a case in which this court addressed the evidentiary requirements for medical monitoring damages under Ohio law." The court observed:

> As this court explained in *Hirsch*, in accordance with *Day v. NLO*, 851 F. Supp. 869 (S.D. Ohio 1994) and *Wilson v. Brush Wellman, Inc.*, 103 Ohio St.3d 538, 817 N.E.2d 59 (2004), "medical monitoring" is a remedy for being presently injured with an "increased risk of—and corresponding cost of screening for—certain diseases that . . . are more likely to occur as a result of [a defendant's tortious conduct]." *Hirsch*, 656 F.3d at 363.

*Id.* at 525 (alteration in original).

Relying on *Hirsch, Baker, and Brush Wellman,* this Court finds that Mr. Hardwick has alleged injury sufficient to state a claim of negligence and/or battery upon which relief can be granted. The Court disagrees with Defendants' position that the request for a science panel substitutes for any allegation that there is a harmful substance in Mr. Hardwick's body. As set forth above in the fact section, the Amended Complaint reflects allegations in similar fashion to the *Hirsch* complaint that survived the defendant's motion to dismiss.

That is, comparable to the "no injury" *Hirsch* plaintiffs, Mr. Hardwick alleges that PFAS are toxic substances that are in aqueous firefighting foams and/or emergency responder protection gear or equipment and other media, that the PFAS were released into Ohio because of Defendants' acts and/or omissions, that he was exposed to PFAS because of Defendants' conduct, that PFAS is associated with increased risk of disease in humans, that each Defendant's conduct caused him to be exposed to these toxic substances in Ohio, and that he now faces an increased risk of disease requiring medical monitoring and scientific research.

Specifically, Mr. Hardwick alleges that he has worked as a firefighter for more than forty years and has used firefighting foams containing one of more PFAS materials, used equipment/gear treated and/or coated with materials containing and/or contaminated with one or

15

more PFAS materials, and/or otherwise was exposed to one or more PFAS materials in Ohio. (Am. Compl. ¶¶ 1, 4, 31, 37, 57, 69, 72, 100, 103, 109, 25.) He further specifies that each of the Defendants marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used PFAS in Ohio and, through their commercial operations, contaminated Ohio's air, surface waters, ground water, soils, landfills and/or otherwise was exposed Plaintiff to one or more PFAS materials. *Id.* ¶¶ 6, 8, 10, 12, 14, 17, 20, 22, 24, 27, 29, 34, 56, 61, 78, 97. He alleges that Defendants tried to encourage and foster the increased and further use of PFAS in Ohio, in connection with as many products/uses/and applications as possible, despite knowledge of the toxicity, persistence, and bioaccumulation concerns associated with such activities resulting in the contamination in Ohio and in Mr. Hardwick's body and blood. *Id.* ¶¶ 29, 34, 56, 61, 78, 109, 110, 116, 125. He additionally specifically alleges that Defendants conspired to, among other things, conceal material facts regarding the dangers of PFAS so that they could conduct operations and activities that resulted in PFAS contaminating his blood and body in Ohio. *Id.* ¶¶ 44, 53, 58, 60–65. Mr. Hardwick avers that the PFAS are toxic substances that are associated with increased risk of disease including cancer, and that Mr. Hardwick faces an increased risk of disease as a result of Defendants' conduct causing him to be exposed to PFAS. *Id.* ¶¶ 43, 53, 54, 57.

These same allegations support Article III standing. Plaintiff avers (1) that he has the present injury in fact of an increased risk of disease caused by the PFAS that is currently in his blood and body, (2) that the injury is fairly traceable to each Defendant whose acts and/or omissions placed the PFAS into Ohio and into Plaintiff's body (discussed more below in section on personal jurisdiction), and (3) that the injury is likely to be redressed by a favorable decision from the Court granting injunctive relief (discussed next).

16

Moving to Plaintiff's requested injunctive relief, Defendants assert that Mr. Hardwick's request for a science panel is beyond this Court's power to award. They contend:

> *Impermissible relief requested.* Just as federal courts may decide only what was traditionally considered a Case or Controversy, they may award only the kind of relief traditionally awarded by courts at the founding.

(Defs' Mot. to Dismiss at 1) (citing, *inter alia, Atlas Life Ins. Co. v. W.I. Southern, Inc.*, 306 U.S. 563, 568 (1939) (for the proposition that "federal courts exercising their equitable powers have only the 'authority to administer' the 'judicial remedies which had been devised and [were] being administered by the English Court of Chancery' at the time the Constitution was ratified").

Defendants further contend that, to the extent medical monitoring is available as relief, Plaintiff has not sufficiently requested it in his Amended Complaint, stating at oral argument:

> And the fact is medical monitoring around the country in various jurisdictions has taken on a variety of forms, some of which require -- all of them require more than is pled here and far more than is pled here.

(Tr. at 8, ECF No. 126.) This Court, however, disagrees.

As the Sixth Circuit has explained, "[t]he equity jurisdiction of the District Courts, and of their predecessor circuit courts, as it has existed since conferred by § 11 of the Judiciary Act of 1789 (1 Stat. 78), has never been held to exceed in scope that which the High Court of Chancery in England . . . [which] is why Federal courts of equity have always eschewed jurisdiction of divorce matter, and of determinations as to child custody; and of the probate of wills and the administration of estates, including the enforcement of charitable bequests." *Slapin v. Slapin*, 352 F.2d 55, 56 (6th Cir. 1965) (dissent relying on, among others, *Atlas Life Ins. Co. v. W.I. Southern, Inc.*, 306 U.S. 563 (1939)). In the instant action, Plaintiff does not ask this Court to extend its jurisdiction over the type of case described in *Slapin, supra.* Instead, Plaintiff pleads traditional tort claims and seeks medical testing and monitoring as a remedy. "Once invoked,

'the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.'" *Milliken v. Bradley*, 433 U.S. 267, 281 (1977).

The Court also finds that the Amended Complaint sufficiently requests medical monitoring relief. Mr. Hardwick requests "monitoring deemed appropriate" by the science panel and any other equitable relief the Court deems suitable under the circumstances. (Am. Compl. ¶ 133, ECF No. 96.) The Court need not make a determination as to the exact nature of the requested relief as long as it has the power to provide some of the requested relief, which is the case as to medical monitoring only. Therefore, at this juncture the Court need not address the exact parameters of the relief sought by Plaintiff in the form of a science panel.

The Court notes, however, that requesting oversight of further scientific study in some fashion in an Ohio tort claim with medical monitoring as the remedy is not exceptional. Indeed, it is not new to this Court. Thirty years ago in *In re Fernald Litigation,* this Court heard a case in which the plaintiffs "sought an order requiring defendants to establish a fund to pay the costs of medical monitoring for all class members and epidemiology to determine the adverse health affect caused by defendants' operation of the [Feed Material Production Center]." *In re Fernald Litig.*, C-1-85-149, 1989 WL 267039, at *1 (S.D. Ohio Sept. 29, 1989). This case involved a class action against National Lead of Ohio and National Lead Industries of Ohio. The plaintiffs brought claims for, *inter alia*, negligence and punitive damages with property value diminution and potential physical injury as the alleged damages.

This Court explained that "to facilitate pretrial settlement, . . . [a]n advisory summary jury trial was conducted." *Id.* at *2. "During the summary jury trial and following same, the parties conducted settlement negotiations, on some occasions with the assistance of the Court." *Id.* "At the conclusion of the summary jury trial, the jury returned a non-binding verdict in favor

of the plaintiffs awarding them a total of $136,000,000, including $1,000,000 for diminution of property values, $80,000,000 for a medical monitoring fund, and $55,000,000 for punitive damages. No award of damages was made by the summary jury to the bellwether plaintiffs for their specific claims of diminution of property value and emotional distress." *Id.*

After the summary jury trial, the *In re Fernald Litigation* parties settled and moved for Court approval of the settlement. In the portion of its Opinion and Order that considered the "potential relief that plaintiffs may realize following a full trial on the merits balanced against the relief offered by the settlement," the Court addressed the scientific studies encompassed in the medical monitoring relief that had been requested by the plaintiffs and awarded by the summary jury:

> [The Court] find[s] that the advisory summary jury verdict suggests that there are considerable risks inherent in proceeding to a full trial on the merits. Specifically, the plaintiffs did not convince the advisory jury that they had endured compensable harm in the form of diminution of property or emotional distress as a result of the defendant's conduct in operating the FMPC. The summary jury did endorse plaintiffs' claim for damages for the establishment of a fund for medical monitoring and epidemiological studies and punitive damages.

*In re Fernald Litig.*, 1989 WL 267039, at *4.

The Court approved the settlement which included the following provision:

The Fund shall be used as follows:

> 1. An amount shall be set aside for epidemiology and medical monitoring as more fully defined by the Court. The costs, nature, and extent of epidemiology and medical monitoring shall be subject to approval of the Court pursuant to Plaintiffs' counsel's recommendations. The Defendants shall have a right to have input into the nature and extent of medical monitoring and epidemiology. It is the intention of the parties that epidemiology and medical monitoring will be administered by one or more academic or medical institutions acceptable to the Court, in cooperation with the Centers for Disease Control.

*Id.* at *11.

Additionally, the Ohio Supreme Court in *Brush Wellman* discussed scientific studies as part of medical monitoring relief in considering and adopting guidelines to determine whether an action is injunctive. *See Brush Wellman, Inc.*, 103 Ohio St. at 543 ("Court supervision and participation in medical-monitoring cases is a logical and sound basis on which to determine whether the action is injunctive. It has the added advantage of being a bright-line test, which can be readily and consistently applied. We hereby adopt that guideline for making such determinations."). In *Brush Wellman*, the Ohio Supreme Court, reviewed the "multitudinous variations that these claims may take" and quoted this Court as follows:

> "Relief in the form of medical monitoring may be by a number of means. First, a court may simply order a defendant to pay a plaintiff a certain sum of money. The plaintiff may or may not choose to use that money to have his medical condition monitored. Second, a court may order the defendants to pay the plaintiffs' medical expenses directly so that a plaintiff may be monitored by the physician of his choice. Neither of these forms of relief constitute[s] injunctive relief as required by rule 23(b)(2).

> "However, a court may also establish an elaborate medical monitoring program of its own, managed by court-appointed court-supervised trustees, pursuant to *which a plaintiff is monitored by particular physicians and the medical data produced utilized for group studies*. In this situation, a defendant, of course, would finance the program as well as being required by the court to address issues as they develop during program administration. Under these circumstances, the relief constitutes injunctive relief as required by rule 23(b)(2)." *Day v. NLO, Inc.*, 144 F.R.D. at 335–336.

*Brush Wellman, Inc.*, 103 Ohio St. 3d at 543 (emphasis added).

Finally, the Court notes that the Northern District of Ohio too has evaluated a request for scientific studies as part of medical monitoring relief. In a multidistrict litigation regarding welding fumes, the plaintiffs asked for "court[-]supervised observational epidemiological study of steel welders that is sufficiently powered to assess the association between such welding and neurological and neuropsychological injury." *In re Welding Fume Products Liab. Litig.*, 245 F.R.D. 279, 285 (N.D. Ohio 2007).

The Court here makes no final determination as to the appropriateness of scientific studies in the present action. The Court does find that Plaintiff has properly pleaded a plausible claim for damages and medical monitoring sufficient to survive the 12(b)(1) and 12(b)(6) motions.

## 2. Ohio Product Liability Act

Defendants move for dismissal of this case, claiming that artfully pleaded claims of negligence and battery are in fact product liability claims. A "'product liability claim' means a claim or cause of action that is asserted in a civil action . . . that seeks to recover compensatory damages from a manufacturer or supplier . . . that allegedly arose from . . . [t]he design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product." Ohio Rev. Code § 2307.71(13).

In the instant action, nowhere in the Amended Complaint does Plaintiff seek compensatory damages. Further, in his briefing on this issue, he likewise states:

> Neither Mr. Hardwick nor the class seeks compensatory damages for personal injuries in this action. (Compl. ¶ 140.) Hardwick and the class seek only declaratory, equitable, and/or injunctive relief. (*Id.* at PageID #31-32.)

(Pl's Mem. in Opp. at 29.)

Defendants, however, contend that although Plaintiff's Amended Complaint seeks injunctive and declaratory relief only, Plaintiff is actually seeking compensatory damages in a disguised way. Defendants maintain that "the statutory language [of OPLA] does not specify the way in which a claim must seek compensatory damages." (Defs' Reply at 28.) They continue: "For example, [Mr. Hardwick] seeks declarations of liability on each of his claims that serve no function other than to lay the basis for a compensatory-damages award." (Defs' Mot. to Dismiss

at 29.) Further, Defendants assert that Mr. "Hardwick also seeks compensatory damages through his demand that Defendants fund the science panel he requests." (Defs' Reply at 28.)

Defendants conclude that Mr. "Hardwick seeks, in essence, a shortcut on a future route to the courthouse to seek money damages, predicated on potential declaratory judgments and science-panel findings. He also seeks to have Defendants pay for his initial investigative costs." *Id.* Defendants caution the Court that if it "refus[es] to apply OPLA abrogation to complaints that seek compensatory damages in roundabout or disguised ways, as Hardwick would have it, [it] would open a massive loophole, allowing plaintiffs to easily circumvent OPLA abrogation through artful pleading." *Id.*

Plaintiff responds:

> Mr. Hardwick and the class do not seek compensatory damages, which is fatal to Defendants' argument. Defendants contend, however, that because Mr. Hardwick and the class might seek compensatory damages in a future action, the Court should disregard his request for relief and conclude that Mr. Hardwick is seeking compensatory damages. No logical or legal basis supports this argument.

> Defendants have not pointed to any instance where a court has found that an action is a product liability claim despite the fact that the claim does not seek compensatory damages. Nor have Defendants identified any instance where a court has concluded that a claim seeks compensatory damages because the plaintiff might seek compensatory damages in a future case. Defendants cannot point to such case law because the plain language of § 2307.71(A)(13) defines product liability claims as claims that, among other things, *seek to recover compensatory damages.* Nowhere in the statute is there a reference to potential future claims for compensatory damages.

(Pl's Mem. in Opp. at 33.) Plaintiff's arguments are well taken.

Plaintiff has requested only injunctive relief as that phrase is interpreted under OPLA. Defendants have not presented, nor has the Court found, any case that provides support for their proposition that Plaintiff's requested relief constitutes compensatory damages. Indeed, as stated *supra*, the Ohio Supreme Court has held that relief is considered injunctive when the plaintiff

requests medical monitoring to be established and overseen by a court. *Brush Wellman, Inc.*, 103 Ohio St. 3d at 538. The *Brush Wellman* court specifically stated that "the relief constitutes injunctive relief" where the medical monitoring is established and overseen by a court, and that the "defendant, of course, would finance the program as well as being required by the court to address issues as they develop during program administration." *Brush Wellman, Inc.*, 103 Ohio St. 3d at 538.

Accordingly, because Plaintiff's requested relief is injunctive, not compensatory damages, the Court finds that his claims are not abrogated by OPLA.

## III.

Each individual Defendant has filed a Motion to Dismiss for Lack of Personal Jurisdiction. They also move to dismiss the claims brought on behalf of non-Ohio putative class members. The Court declines Defendants' invitation to determine whether this Court has jurisdiction over non-Ohio putative class members as there is currently no class certified, nor a motion to certify, to which such an opinion would pertain.

### A. Standard

When faced with a motion to dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a plaintiff bears the burden of proving personal jurisdiction exists over each defendant. *CompuServe Inc. v. Patterson,* 89 F.3d 1257, 1262-63 (6th Cir. 1996). "[A] motion to dismiss brought under Fed. R. Civ. P. 12(b)(2) may be heard and determined before trial, but [] the court has the power to defer hearing of evidence and a ruling on the motion until trial." *Serras v. First Tennessee Bank Nat. Ass'n,* 875 F.2d 1212, 1213–14 (6th Cir. 1989). "As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court." *Id.* (quoting *Gibbs v. Buck,* 307 U.S. 66, 71–72 (1939)).

If a trial court "decides that the motion can be ruled on before trial," and "rules on the motion without an evidentiary hearing, the plaintiff need only make a '*prima facie*' case that the court has personal jurisdiction." *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012). In other words, "[t]he court need only find that plaintiff has set forth specific facts that support a finding of jurisdiction in order to deny the motion to dismiss." *Kroger Co. v. Malease Foods Corp.*, 437 F.3d 506, 510 (6th Cir. 2006); *see also Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002) (stating that a plaintiff may make a *prima facie* showing by "establishing with reasonable particularity sufficient contacts between [the defendants] and the forum state to support jurisdiction").

In deciding a Rule 12(b)(2) motion to dismiss, the Court is to "construe the facts in the light most favorable to the non-moving party." *Id.* The Court "will not consider facts proffered by the defendant that conflict with those offered by the plaintiff." *Id.* This refusal to weigh the defendants' controverting assertions is necessary "to prevent non-resident defendants from avoiding jurisdiction simply by filing an affidavit that denies all jurisdictional facts." *Compuserve*, 89 F.3d at 1262 (citing *Theunissen*, 935 F.2d at 1459).

In the instant action, four Defendants filed affidavits to support their motions and the remaining Defendants filed briefs unsupported by evidence. The Court will review each group separately.

## B. DuPont, Chemours, 3M, Solvay, Daiken America, and AGC Chemicals

DuPont, Chemours, 3M, Solvay, Daiken America, and AGC Chemicals contend that Plaintiff has failed to sufficiently allege that they are responsible for the PFAS in Ohio and in Mr. Hardwick, and therefore Defendants are not subject to personal jurisdiction in Ohio. Thus,

the Court will construe the facts in the light most favorable to Plaintiff and determine whether he

has sufficiently made a *prima facie* showing of personal jurisdiction over these Defendants.

"Under Ohio law, personal jurisdiction over non-resident defendants is available only if

(1) the long-arm statute confers jurisdiction and (2) jurisdiction is proper under the Federal Due

Process Clause." *Conn v. Zakharov*, 667 F.3d 705, 712 (6th Cir. 2012). Further, "[u]nlike other

jurisdictions, Ohio does not have a long-arm statute that reaches to the limits of the Due Process

Clause, and the analysis of Ohio's long-arm statute is a particularized inquiry wholly separate

from the analysis of Federal Due Process law." *Id.*

Ohio's long-arm statute provides in relevant part:

(A) A court may exercise personal jurisdiction over a person who acts directly or
by an agent, as to a cause of action arising from the person's:

    (1) Transacting any business in this state;

    (2) Contracting to supply services or goods in this state;

    (3) Causing tortious injury by an act or omission in this state;

    (4) Causing tortious injury in this state by an act or omission outside this
    state if he regularly does or solicits business, or engages in any other
    persistent course of conduct, or derives substantial revenue from goods used
    or consumed or services rendered in this state;
    . . .
    (6) Causing tortious injury in this state to any person by an act outside this
    state committed with the purpose of injuring persons, when he might
    reasonably have expected that some person would be injured thereby in this
    state;

Ohio Rev. Code Ann. § 2307.382 (West)

The Due Process Clause requires that the nonresident defendant possessed "minimum

contacts" with the forum state such that exercising jurisdiction would comport with "traditional

notions of fair play and substantial justice." *SFS Check, LLC v. First Bank of Delaware*, 774

F.3d 351, 356 (6th Cir. 2014) (citing *Beydoun v. Wataniya Restaurants Holding, Q.S.C.*, 768

F.3d 499, 505 (6th Cir. 2014) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)).  A

three-part test assesses the existence of "minimum contacts":

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state.  Second, the cause of action must arise from the defendant's activities there.  Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Id.* (quoting *Beydoun,* 768 F.3d at 505).

### 1.    Ohio's Long-Arm Statute

Plaintiff contends that he has sufficiently alleged jurisdiction under Ohio's long-arm

statute:

> Mr. Hardwick's allegations satisfy sections (1) and (2) of the long-arm statute. The Complaint pleads that each Defendant transacted business in Ohio and contracted to supply goods or services in Ohio. Each Defendant did so in the variety of ways repeatedly described in the Complaint—from marketing to manufacturing to distributing to training in the use of PFAS products. (Compl. ¶¶ 6, 8, 10, 12, 14, 16, 19, 22, 24, 26, 29, 37.)  Those actions occurred in Ohio and caused harm in Ohio by contaminating the blood of Mr. Hardwick. (*Id.*)

> Sections (3), (4), and (6) of the long-arm statute are satisfied for the same reasons. Paragraphs 42, 69, and 79 of the Complaint describe how each Defendant committed torts in Ohio and outside Ohio that affected Ohio residents.  Each Defendant manufactured and used PFAS, thereby releasing it into Ohio and injuring Mr. Hardwick and others in Ohio.

> Through their commercial operations, each Defendant contaminated Ohio's air, surface waters, ground water, soils, landfills. (Compl. ¶ 42.) Their PFAS was used in the fire-fighting foams and on the gear that Ohio firefighters, including Mr. Hardwick, use and are exposed to. (Compl. ¶ 69.)  And each Defendant knew or should have known that their manufacture, release, distribution, and use of PFAS would cause harm in Ohio. (Compl. ¶ 79.)

(Pl's Mem. in Opp. at 39–40) (footnoting that "AGC Chemicals Americas admits that it does

business in Ohio and sells PFAS products in Ohio" in the Joint Stipulation, which "alone

satisfies the basic elements of the long-arm statute as to it" citing ECF No. 89).

Defendants maintain that, while "Ohio's long-arm statute grants Ohio courts personal jurisdiction over a non-resident if his conduct falls within the nine bases for jurisdiction listed by the statute . . . there is a further requirement—the long-arm statute allows jurisdiction only for 'causes of action arising from' these enumerated bases." (Daiken America Mot. to Dismiss at 3, ECF No. 72) (citing *Conn*, 667 F.3d at 712 and Ohio Rev. Code § 2307.382(C)); *see also* (3M's Mot. to Dismiss at 5, ECF No. 68); (Archroma's Mot. to Dismiss at 4–8, ECF No. 69); (Solvay's Mot. to Dismiss at 3, ECF No. 71); (DuPont's and Chemours' Mot. to Dismiss at 5–7, ECF No. 73); (Daiken Ind.'s Mot. to Dismiss at 2, ECF No. 82); (Arkema and Arkema France's Mot. to Dismiss at 9–12, ECF No. 84); (AGC Chemicals Mot. to Dismiss at 5, ECF No. 113). They continue:

> Here, "arising from" means that there is "a 'proximate cause' relationship between a plaintiff's . . . claim and the defendant's conduct in Ohio." *Brunner v. Hampson*, 441 F.3d 457, 463, 466 (6th Cir. 2006); *see also Seitz v. U.S. Nat'l Whitewater Ctr., Inc.*, No. 2:17-CV-524, 2018 WL 582553, at *2 (S.D. Ohio Jan. 26, 2018) ("contact with the forum state must be proximately related to the plaintiff's injuries").

*Id.* at 3–4; *see also* (3M's Mot. to Dismiss at 5, ECF No. 68); (Archroma's Mot. to Dismiss at 4–8, ECF No. 69); (Solvay's Mot. to Dismiss at 5, ECF No. 71); (DuPont's and Chemours' Mot. to Dismiss at 6, ECF No. 73); (Daiken Ind.'s Mot. to Dismiss at 4–6, ECF No. 82); (Arkema and Arkema France's Mot. to Dismiss at 12–14, ECF No. 84); (AGC Chemicals Mot. to Dismiss at 5–6, ECF No. 113).

Defendants argue that the Amended Complaint offers the exact same boilerplate, vague, and conclusory allegations of wrongdoing as to each of the Defendants, and thus pleads no specific facts that could establish with reasonable particularity a basis for jurisdiction. This Court, however, disagrees.

First, as to proximate cause, in Ohio it is defined as an act or failure to act that was a substantial factor in bringing about an injury and without which the injury would not have occurred. *In re: E. I. Du Pont De Nemours and Co. C-8 Personal Injury Litig.*, 2:13-CV-170, 2016 WL 659112, at *62 (S.D. Ohio Feb. 17, 2016) (citations omitted). "To prove proximate cause, [a plaintiff] must show that her injuries were a natural and probable consequence of [the defendant's] conduct." *Id.* To be considered the natural and probable consequence of an act, Plaintiff must prove that Defendants should have foreseen or reasonably anticipated that injury would result from the alleged negligent act. *See id.*

In the case at bar, Plaintiff alleges that through their commercial operations, each Defendant contaminated Ohio's air, surface waters, ground water, soils, landfills and additionally that their PFAS was used in the fire-fighting foams and on the gear that Ohio firefighters, including Mr. Hardwick, used. He alleges that each Defendant knew or should have known that their manufacture, release, distribution, and use of PFAS would cause harm in Ohio and that each Defendant conspired with the others to keep the dangers associated with the PFAS secret, failing to inform Mr. Hardwick of the danger associated with the PFAS to which he was subjected, and that Defendants misled government agencies, refused to publish relevant findings and information, and chose not to study the injuries their own studies showed were potential harmful effects of the PFAS materials. Plaintiff maintains that those acts and failures to act of each Defendant, in a natural and continuous sequence, resulted in the contamination of Mr. Hardwick's body and/or blood with PFAS, and without each Defendant's acts or failures to act the PFAS would not have entered Ohio and entered Mr. Hardwick's body and/or blood. Consequently, Plaintiff has alleged a proximate cause relationship between his claims and each Defendants' conduct in Ohio.

Second, Defendants contend that Mr. Hardwick's allegations are vague and conclusory and "[are] capable of multiple interpretations . . . , at least one of which does not support personal jurisdiction in Ohio." (Daiken America Mot. to Dismiss at 6, ECF No. 72.) They posit:

> In short, even if conclusory allegations were enough to plead personal jurisdiction (which they are not), the conclusory "allegations contained in [Plaintiff's] complaint [are] capable of multiple interpretations . . . , at least one of which does not support personal jurisdiction in Ohio." *Palnik v. Westlake Entm't, Inc.*, 344 F. App'x 249, 253 (6th Cir. 2009). And as a result, Plaintiff fails to plead "specific facts that could establish with reasonable particularity a basis for jurisdiction." *Id.*

*Id.*; *see also* (3M's Mot. to Dismiss at 2, ECF No. 68); (Archroma's Mot. to Dismiss at 3, ECF No. 69; Reply at 6, ECF No. 108); (Solvay's Reply at 4, ECF No. 112); (DuPont's and Chemours' Mot. to Dismiss at 3, ECF No. 73; Reply at 7, ECF No. 111); (Daiken Ind.'s Mot. to Dismiss at 7, ECF No. 82); (Arkema and Arkema France's Mot. to Dismiss at 10, ECF No. 84; Reply at 4, ECF No. 109).

Defendants are correct that the *Palnik* court found that the plaintiffs' allegations were not pleaded with particularity when they were capable of two equally plausible interpretations, at least one of which did not support personal jurisdiction. However, Mr. Hardwick's allegations are not susceptible to *any* interpretation that does not support personal jurisdiction. By way of explanation, the *Palnik* plaintiff made very similar allegations to those made by Mr. Hardwick, as described by the Sixth Circuit:

> His complaint, to be sure, makes a number of relevant allegations. About our defendants, it asserts that "PEC [Picture Entertainment Company] is a producer and/or distributor" and that "Cineville, Inc. or Cineville, LLC, or both, are producers and/or distributors" of the movie.

> And it makes *allegations about the defendants collectively*. It alleges that the "Defendants have made, and will continue to make, substantial profit from the sale of the Infringing work" and that the "Defendants have offered for sale and rental, and have distributed and continue to distribute, through sale, rental or otherwise

substantial numbers of copies of the Infringing Work throughout the United States, including in the Southern District of Ohio . . . ."

*Palnik*, 344 F. App'x at 251–52 (alterations in original, emphasis added).

The *Palnik* court concluded that when "[d]rawing inferences for Palnik, as we must, these allegations permit two potential conclusions as to the distribution of [the product] to Ohio." *Id.* at 252. Specifically, the court explained:

> First, our defendants, after making the movie, caused it to be distributed to Ohio through a national or regional distribution contract. Second, our defendants, for whatever reason—because they do not own the distribution rights, because they deferred entirely to a third-party distributor, or for another reason that gave them no control over the movie's distribution—were not responsible for the movie appearing in Ohio.

*Id.*

In other words, if one of the defendants to which the collective allegation pertained was a producer and distributor, the allegations were sufficient to sustain personal jurisdiction over that defendant. The allegations to which the court refers that were sufficient to sustain personal jurisdiction are what Defendants in the present case refer to as boilerplate, conclusory, and vague. *Id.* (the *Palnik* plaintiffs alleged collectively that "Defendants have made, and will continue to make, substantial profit from the sale of the Infringing work" and that the "Defendants have offered for sale and rental, and have distributed and continue to distribute, through sale, rental or otherwise substantial numbers of copies of the Infringing Work throughout the United States, including in the Southern District of Ohio."). The *Palnik* court found that these allegations constituted specific facts that established with reasonable particularity a basis for jurisdiction.

Conversely, the *Palnik* court explained that if the defendant was only the producer it was not responsible for the product appearing in Ohio, and the allegations were therefore insufficient.

In the instant action, however, Mr. Hardwick's allegations support *only* a conclusion that each Defendant was responsible for putting PFAS into Ohio and into Mr. Hardwick. For example, in the paragraph Defendants take most issue with, Plaintiff alleges that each individual Defendant "marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used PFAS … including in Ohio and this District, in such a way as to result in the contamination of Plaintiff's and other class members' blood and/or bodies." (Am. Compl. ¶ 29.)

These are the only conclusions from this collective allegation, which all support jurisdiction: 1) Each Defendant marketed PFAS in Ohio and in this District and/or otherwise handled and/or used PFAS in such a way as to result in the contamination of Plaintiff's blood and/or body in Ohio; 2) Each Defendant developed PFAS in Ohio and in this District and/or otherwise handled and/or used PFAS in such a way as to result in the contamination of Plaintiff's blood and/or body in Ohio; 3) Each Defendant manufactured PFAS in Ohio and in this District and/or otherwise handled and/or used PFAS in such a way as to result in the contamination of Plaintiff's blood and/or body in Ohio; 4) Each Defendant distributed PFAS in Ohio and in this District and/or otherwise handled and/or used PFAS in such a way as to result in the contamination of Plaintiff's blood and/or body in Ohio; 5) Each Defendant released PFAS in Ohio and in this District and/or otherwise handled and/or used PFAS in such a way as to result in the contamination of Plaintiff's blood and/or body in Ohio; 6) Each Defendant trained users on PFAS in Ohio and in this District and/or otherwise handled and/or used PFAS in such a way as to result in the contamination of Plaintiff's blood and/or body in Ohio; 7) Each Defendant produced instructional materials on PFAS in Ohio and in this District and/or otherwise handled and/or used PFAS in such a way as to result in the contamination of Plaintiff's blood and/or body

31

in Ohio; and 8) Each Defendant sold PFAS in Ohio and in this District and/or otherwise handled and/or used PFAS in such a way as to result in the contamination of Plaintiff's blood and/or body in Ohio.

This same exercise may be done with all of the collective allegations made by Plaintiff. Accordingly, as did the *Palnik* plaintiff in the first scenario supporting jurisdiction, Plaintiff has with reasonable particularity set forth specific facts supporting personal jurisdiction over each Defendant.

## 2. Due Process

Defendants argue that Plaintiff alleges no facts to establish that the assertion of specific jurisdiction over Defendants would comport with due process. Defendants rely on *Walden v. Fiore*, 571 U.S. 277, 283 n.6 (2014) for the proposition that to exercise specific jurisdiction consistent with due process, the claims must arise out of Defendant's activities in the forum state.

The Sixth Circuit recently addressed *Walden*, explaining that it stands for the proposition that a plaintiff cannot create jurisdiction on the basis of his or her contacts with the forum; jurisdiction is created by the relationship between a defendant and the forum. *MAG IAS Holdings, Inc. v. Schmuckle*, 854 F.3d 894, 901 (6th Cir. 2017). The *Schmuckle* court explained:

> As an initial matter, we are not persuaded by Schmückle's argument that *Walden* precludes a finding of jurisdiction in this case. In *Walden*, the Court considered whether a federal court in Nevada had jurisdiction over a Georgia police officer who had filed a false affidavit against two Nevada residents knowing that it would affect them in Nevada. 134 S.Ct. at 1120. The Court found that the officer lacked minimum contacts because the officer's conduct occurred in Georgia and he "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Id.* at 1124–25. The officer's only connection to Nevada was by way of the plaintiffs he targeted there. *Id.*
>
> In holding that "mere injury to a forum resident is not a sufficient connection to the forum," *id.* at 1125, the Court distinguished its prior decision in *Calder v. Jones*, 465 U.S. 783 (1984), where it had found personal jurisdiction in California over an

32

out-of-state defendant based on a libelous article published there, reasoning that the
tort had involved the California community beyond just the plaintiff. *Walden*, 134
S.Ct. at 1125; *Calder*, 465 U.S. at 788–89.

*Id.* at 900 (parallel citations omitted).

As to the scope of *Walden*, the *Schmuckle* court stated:

> We need not define the exact scope of *Walden* and its effect on *Calder* in
> order to resolve this case. It is enough to say that plaintiffs must do more than claim
> that Schmückle's actions affected them in Michigan and must show that Schmückle
> had some level of contact with the state, and that Schmückle cannot avoid
> jurisdiction by framing all of his activities as contacts with plaintiffs—who happen
> to be in Michigan—instead of contacts with Michigan itself.

*Id.* at 901.

Here, Mr. Hardwick does not allege that this Court possesses personal jurisdiction over
Defendants based only on his contacts with Ohio and/or the contention that Defendants' actions
affected him in Ohio. Mr. Hardwick, as set out in detail above, alleges that each Defendant has
significant contact with Ohio, and his claims arise out of that specific contact that Defendant has
with Ohio. Those allegations are sufficient to comport with due process.

## C.     Archroma, Daiken Industries, Arkema America, and Arkema France

Archroma, Daiken Industries, Arkema America, and Arkema France have all supported
their Motions to Dismiss for Lack of Personal Jurisdiction with affidavits that they contend
factually challenge the allegations in the Amended Complaint. Archroma offers a declaration
that avers that it was established in 2013 and it has not engaged in any of the activities in Ohio as
alleged by Plaintiff. (ECF No. 69-1.) Daiken Industries offers a declaration that states that it
does not currently engage in any of the activities in Ohio alleged in the Amended Complaint.
(Decl., ECF No. 82-1.) Arkema and Arkema France have offered declarations that aver that at
least since 1998 they have not engaged in any of the activities in Ohio as alleged in the Amended
Complaint. (ECF Nos. 84-1, 84-2.) None of the affidavits addresses whether these four

33

Defendants or their predecessor companies engaged in any of the activities alleged in the Amended Complaint during the 40 years that Mr. Hardwick alleges he was subjected to their PFAS in Ohio.

These Defendants rely on the law that provides that "in the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991) (citing *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 930 (6th Cir. 1974)). These Defendants argue that, because Plaintiff has failed to set forth an affidavit to support his allegations made in the Amended Complaint, they are entitled to dismissal. Plaintiff, however, has otherwise set forth the following facts:

> [T]he Defendants manufactured PFAS and released it into the world—no one else is responsible for the PFAS existing and spreading across the world because it is not naturally occurring and only Defendants manufacture it; PFAS contamination exists in Ohio; PFAS contamination exists in Mr. Hardwick. There is no other plausible explanation for how Mr. Hardwick and his class members have become contaminated by PFAS except by the actions of these Defendants.

(Pl's Mem. in Opp. at 36–37.)

Additionally, the Court notes that these declarations do not factually challenge Plaintiffs' allegations that these Defendants' contacts with Ohio led to his exposure to PFAS in Ohio over the last 40 years. But even if the declarations did factually challenge any conduct that would be sufficient for this Court to exercise personal jurisdiction over them, the Court is not permitted to "weigh the controverting assertions of the party seeking dismissal." *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996). In reversing and remanding the district court's finding of lack of personal jurisdiction in *CompuServe, Inc. v. Patterson*, the Sixth Circuit pointed out that "[a]t various points in its consideration of the case, however, the district court expressly relied on Patterson's affidavit." *Id.* The court went on to explain that "we want 'to

34

prevent non-resident defendants from regularly avoiding personal jurisdiction simply by filing an affidavit denying all jurisdictional facts.'" *Id.*

The Court here merely makes a "threshold determination that personal jurisdiction exists" but it "does not relieve [the plaintiff] . . . at the trial of the case-in-chief from proving the facts upon which jurisdiction is based by a preponderance of the evidence.'" *Serras*, 875 F.2d at 1216. If after discovery it is shown that personal jurisdiction is lacking, any Defendant may, of course, move for dismissal on those grounds.

Accordingly, the Court **DENES** the Motions to Dismiss for Lack of Personal Jurisdiction of Archroma, Daiken Industries, Arkema America, and Arkema France. (ECF Nos. 69, 82,83.)

## IV.

Based on the foregoing, the Court **DENIES** Defendants' Motions to Dismiss. (ECF Nos. 67, 68, 69, 71, 72, 73, 82, 83, 84, 113.)

**IT IS SO ORDERED.**

9-30-2019
**DATE**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**