## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**KEVIN D. HARDWICK**,

      Plaintiff,

v.

**3M COMPANY,** *et al.*,

      Defendants.

Case No. 2:18-cv-1185

Judge Edmund A. Sargus, Jr.

Chief Magistrate Judge Elizabeth
A. Preston Deavers

**ORAL ARGUMENT REQUESTED**

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Plaintiff Kevin Hardwick moves for an order certifying a nationwide class under Federal Rule of Civil Procedure 23(b)(2) and to appoint class counsel under Rule 23(a).  Mr. Hardwick asks to represent a class of "any individual residing within the United States at the time of class certification for one year or more since 1977 with 0.05 parts per trillion (ppt) or more of PFOA and at least 0.05 ppt or more of any other PFAS in their blood serum."  Mr. Hardwick satisfies all prerequisites for certification under Rule 23(b)(2), including numerosity, commonality, typicality, and adequacy under Rule 23(a).  Rule 23(b)(2) class certification is also appropriate because Defendants' conduct affected the entire class equally (they marketed, manufactured, and released PFAS—causing widespread contamination in all the class members); which makes Mr. Hardwick's requested injunctive relief (setting up a program for study and testing/medical monitoring) appropriate for the whole class.

Mr. Hardwick also moves the Court to appoint the undersigned attorneys at the law firms of Taft Stettinius & Hollister LLP, Douglas & London, PC, and Levin Papantonio PA, as class counsel.  A Memorandum in Support is attached.

Respectfully submitted,

/s/ David J. Butler
David J. Butler (0068455), Trial Attorney
TAFT STETTINIUS & HOLLISTER LLP
65 East State Street, Suite 1000
Columbus, Ohio 43215
Telephone: (614) 221-2838
Facsimile: (614) 221-2007
dbutler@taftlaw.com

Robert A. Bilott (0046854)
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Telephone: (513) 381-2838
Facsimile: (513) 381-0205
bilott@taftlaw.com

Gary J. Douglas (pro hac vice *pending*)
DOUGLAS & LONDON, PC
59 Maiden Lane, 6th Floor
New York, NY 10038
Telephone: (212) 566-7500
Facsimile: (212) 566 7501
gdouglas@douglasandlondon.com

Ned McWilliams (pro hac vice)
LEVIN PAPANTONIO P.A.
316 South Baylen Street
Pensacola, FL 32502
Telephone: (850) 435-7138
nmcwilliams@levinlaw.com

*Attorneys for Plaintiff Kevin Hardwick*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **KEVIN D. HARDWICK**, | Case No. 2:18-cv-1185 |
| Plaintiff, | Judge Edmund A. Sargus, Jr. |
| v. | Chief Magistrate Judge Elizabeth A. Preston Deavers |
| **3M COMPANY, *et al.*,** | |
| Defendants. | ORAL ARGUMENT REQUESTED |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF**
**<u>MOTION FOR CLASS CERTIFICATION</u>**

## TABLE OF CONTENTS AND SUMMARY
## PURSUANT TO S.D. OHIO CIV. R. 7.2(a)(3)

Page

**TABLE OF AUTHORITIES** ...........................................................................................v

**INTRODUCTION**.........................................................................................................1

**FACTUAL BACKGROUND** .........................................................................................4

    A.    Defendants Contaminated Mr. Hardwick's Blood and
        Body with PFAS ...............................................................................4

    B.    Defendants Have Known for Decades about the Dangers of PFAS ................................6

    C.    Faced with Regulatory Scrutiny and Increased Public Knowledge
        about PFAS, Defendants Misled Regulators and Denied the
        Dangers of their Chemicals.....................................................................10

    D.    The Scientific Community Recognizes the Immediate Need for
        More Studies ...................................................................................15

    E.    Policymakers Agree that PFAS Represents a Significant Public
        Health Problem ...............................................................................18

    F.    A Nationwide Approach is needed to Study the Health Effects of
        PFAS and to Address PFAS Contamination.................................................22

    G.    Defendants Have Impeded Efforts to Regulate and Study
        PFAS at the Federal Level ...................................................................29

**PROCEDURAL HISTORY** ........................................................................................32

**ARGUMENT** ...........................................................................................................34

**I.**    **The Proposed Class Meets the Requirements of Rule 23 (a)**...........................36

Mr. Hardwick properly defines his proposed class to include "any individual residing within the United States at the time of class certification for one year or more since 1977 with 0.05 parts per trillion (ppt) of PFOA and at least 0.05 ppt of any other PFAS in their blood serum." This proposed class asks to pursue only common injunctive and equitable relief in the form of medical and scientific studies, testing, and analysis.

    **A.**    **The Class is So Numerous that Joinder of
        All Members is Impracticable**.......................................................................37

Mr. Hardwick's proposed class easily meets the numerosity requirement. As Defendants' own blood testing confirms, nearly every American's blood and/or body is contaminated with PFAS. Thus, sheer numbers alone satisfy Rule 23(a)(1).

**B.    There are Questions of Law and Fact Common to the Class** ....................................38

Mr. Hardwick asks the Court to answer many common legal and factual questions that focus on Defendants' conduct, such as whether Defendants owed a legal duty to plaintiff and the class, and whether Defendants caused plaintiff and the proposed class to suffer a common injury. Resolving these questions are critical to the class—and the answers to these common questions will apply uniformly across the entire proposed class to resolve class-wide issues "in one stroke." These common questions of law and fact are also consistent with similar questions about PFAS contamination that courts around the country have certified to proceed on a class-wide basis

**C.    Mr. Hardwick's Claims are Typical of the Class Claims** ..........................................44

Mr. Hardwick's claims are typical of the proposed class because they arise from the same tortious conduct: Defendants' marketing, manufacturing, and releasing of PFAS; causing widespread contamination. And Defendants treated Mr. Hardwick no different than every other potential class member—Defendants contaminated Americans without distinction. Thus, Mr. Hardwick's identical claims and his request for identical relief as the proposed class members satisfies Rule 23(a)(3).

**D.    Mr. Hardwick Will Fairly and Adequately Represent the
Interests of the Class** ....................................................................................................45

    **1.    The Interest of Mr. Hardwick and the proposed class
are identical** .........................................................................................................46

Mr. Hardwick and the proposed class share the same legal claims that arise from the same tortious conduct by Defendants. They also share the same goal: common, uniform, class-wide injunctive and equitable relief in the form of studies, testing, analysis, and monitoring—not money damages for any personal injuries, property damage, or other relief that could vary among the individual class members.

    **2.    Counsel will vigorously prosecute the proposed class** ......................................46

The proposed class counsel are adequately qualified, experienced, and capable of conducting this proposed classwide litigation. In fact, the proposed class counsel and their respective firms are national leaders in PFAS-related litigation; spending significant time and resources to help parties negatively impacted by Defendants' PFAS.

**II.  The Proposed Class Meets the Requirements of Rule 23(b)(2)** ........................................48

The proposed class falls squarely within Rule 23(b)(2). Mr. Hardwick and the proposed class ask for injunctive and equitable/declaratory relief only, which would provide equal relief simultaneosuly to the entire class as a whole. This classwide relief would lead to the creation and funding of a program to design, implement, and administer appropriate medical and scientific studies, testing, and analysis for Mr. Hardwick and all the potential class members, which are necessitated by Defendants' contamination of the proposed class members' blood and bodies with PFAS.

**III. The Court Has Jurisdiction Over Unnamed,**
   **Non-Ohio Class Members** .................................................................................50

In their motions to dismiss, Defendants argued that the Court lacks specific jurisdiction over non-Ohio class members, citing *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017).  But almost every court, including the Seventh Circuit and this Court, to address whether *Bristol-Myers Squibb Co.* applies to class actions (rather than just mass actions) has answered that question in the negative.  As a result, this Court's decision explaining that Mr. Hardwick established personal jurisdiction over each Defendant remains sufficient to resolve this issue at this stage of the litigation.  There are no additional jurisdictional concerns for this proposed nationwide class action.

**CONCLUSION** .......................................................................................................54

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*In re Am. Med. Sys., Inc.*,
75 F.3d 1069 (6th Cir. 1996) ...............................................................35, 38, 44, 48

*Bacon v. Honda of Am. Mfg., Inc.*,
370 F.3d 565 (6th Cir. 2004) ...............................................................................37

*Beattie v. CenturyTel, Inc.*,
511 F.3d 554 (6th Cir. 2007) ...............................................................................46

*Benoit v. Saint-Gobain Performance Plastics Corp.*,
959 F.3d 491 (2d Cir. 2020)............................................................................3, 42

*Bovee v. Coopers & Lyband*,
216 F.R.D. 596 (S.D. Ohio 2003) ...............................................................38, 40, 44

*Bristol-Myers Squibb Co. v. Superior Court*,
137 S. Ct. 1773 (2017).......................................................................50, 51, 52, 53

*Burdick v. Tonoga, Inc.*,
112 N.Y.S.3d 342 (N.Y. App. Div. 2019) .................................................3, 42, 43

*Cash v. Swifton Land Corp.*,
434 F.2d 569 (6th Cir. 1970) ...............................................................................37

*Cmty. Refugee & Immigration Servs. v. Registrar,*
*Ohio Bureau of Motor Vehicles*,
334 F.R.D. 493 (S.D. Ohio 2020) ................................................................. *passim*

*Cole v. Memphis*,
839 F.3d 530 (6th Cir. 2016) ...............................................................................36

*Coleman v. Gen. Motors Acceptance Corp.*,
220 F.R.D. 64 (M.D. Tenn. 2004) ..................................................................36, 37

*Daffin v. Ford Motor Co.*,
458 F.3d 549 (6th Cir. 2006) ...............................................................................37

*Donovan v. Philip Morris USA, Inc.*,
268 F.R.D. 1 (D. Mass. 2010)..............................................................................41

*In re Fernald Litig.*,
No. C-1-85-149, 1989 WL 267039
(S.D. Ohio Sept. 29, 1989).................................................................................32

*Hermens v. Textiles Coated Inc.*,
Nos. 216-2017-CV-524 and 216-2017-CV-525
(N.H. Super. Ct. July 20, 2019) ...............................................................3, 41, 42

*Huguley v. Gen. Motors Corp.*,
925 F.2d 1464 (6th Cir. 1991) ............................................................................49

*Kutschback v. Davies*,
885 F. Supp. 1079 (S.D. Ohio 1995) ..................................................................38

*Lacy v. Comcast Cable Commc'ns, LLC*,
No. 3:19-CV-05007, 2020 WL 1469621
(W.D. Wash. Mar. 26, 2020) ..............................................................................54

*McGee v. East Ohio Gas Co.*,
200 F.R.D. 382 (S.D. Ohio 2001) .......................................................................36

*Munsell v. Colgate-Palmolive Co.*,
No. CV 19-12512-NMG, 2020 WL 2561012
(D. Mass. May 20, 2020) .....................................................................................54

*Murphy v. Aaron's, Inc.*,
No. 19-CV-00601, 2020 WL 2079188
(D. Colo. Apr. 30, 2020) ......................................................................................54

*Mussat v. IQVIA, Inc.*,
953 F.3d 441 (7th Cir. 2020) ....................................................................52, 53, 54

*In re Nat'l Football League Players Concussion Injury Litig.*,
821 F.3d 410 (3d Cir. 2016)................................................................................40

*In re Oil Spill by the Oil Rug Deepwater Horizon*,
295 F.R.D. 112 (E.D. La. 2013).........................................................................41

*Phillips v. Philip Morris Cos.*,
298 F.R.D. 355 (N.D. Ohio 2014) ................................................................37, 39

*Progressive Health & Rehab Corp. v. Medcare Staffing, Inc.*,
No. 2:19-cv-710, 2020 WL 3050185
(S.D. Ohio June 8, 2020) ...............................................................................53, 54

*Rikos Procter & Gamble Co.*,
799 F.3d 497 (6th Cir. 2015) .........................................................................35, 38

*Senter v. Gen. Motors Corp.*,
532 F.2d 511 (6th Cir. 1976) ......................................................................38, 49, 50

*Sprague v. Gen. Motors Corp.*,
133 F.3d 388 (6th Cir.1998) ...................................................................39, 44, 45

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011).........................................................................49

*Sullivan v. Saint-Gobain Performance Plastics Corp.*,
No. 5:16-cv-125, 2019 WL 8272995
(D. Vt. Aug. 23, 2019) ........................................................3, 40, 41, 42

*Sutton v. Hoffman-La Roche Inc.*,
Nos. A-5545–49 (N.J. Super. Ct. App. Div. May 27, 2020) ......................................43, 44, 45

*In re Telectronics Pacing Sys., Inc.*,
172 F.R.D. 271 (S.D. Ohio 1997) ........................................................................41

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)........................................................................36

*Weathers v. Peters Realty Corp.*,
499 F.2d 1197 (6th Cir. 1974) .......................................................................36, 37

*In re Whirlpool Corp. Front-Loading Washer Prod. Liability Litig.*,
722 F.3d 838 (6th Cir. 2013) .....................................................................35

*Young v. Nationwide Mut. Ins. Co.*,
693 F.3d 532 (6th Cir. 2012) ...................................................................37, 44, 45

**Rules**

Fed. R. Civ. P. 4 ........................................................................................53

Fed. R. Civ. P. 23 .......................................................................................*passim*

Fed. R. Civ. P. 26 ......................................................................................34

Fed. R. Evid. 402 .......................................................................................4

**Other Authorities**

Agency for Toxic Substances & Disease Registry,
*Toxicological Profile for Perfluoroalkyls,*
*Draft for Public Comment* (2018)........................................................4, 5, 15, 23, 27

Alice M. Ollstein,
*Trump Invokes DPA for Testing Swabs, Weeks After Reported Shortages*,
Politico (Apr. 19, 2020) ........................................................................29

Am. Chemistry Council,
*America's Drinking Water* (Jan. 22, 2020) ...........................................................31

Am. Chemistry Council,
*Long-Chain Perfluorinated Substances* (May 1, 2015) ......................................12, 31

Arlene Blum, *et al.*,
*The Madrid Statement on Poly- and Perfluoroalkyl Substances (PFASs)*,
123 Envtl. Health Persp. A 107 (2015) ................................................................25

Bundesinstiut für Risikobewertung,
*New Study Shows: One-Year-Old Children Demonstrate
Lower Concentration of Vaccine Antibodies with High
PFOA Concentration in the Blood* (2020) .............................................................16

C8 Med. Monitoring Program,
http://www.c-8medicalmonitoringprogram.com/ ..........................................2, 14, 15

C8 Science Panel,
http://www.c8sciencepanel.org/
(last updated Jan. 22, 2020) .................................................................2, 12, 13, 14

Carol F. Kwiatkowski, *et al.*,
*Scientific Basis for Managing PFAS as a Chemical Class*,
Envtl. Science & Tech. Letters (June 30, 2020) ......................................................31

Christopher Knaus,
*Toxic firefighting chemicals 'the most seminal public health challenge,'*
The Guardian (Oct. 18, 2017) ..............................................................................24

Daniel Wilf-Townsend,
*Did Bristol-Myers Squibb Kill the Nationwide Class Action*,
129 Yale L.J. Forum 205 (2019) .........................................................................52

Donald J. Trump,
*Executive Order on Delegating Authority under the DPA with Respect to
Food Supply Chain Resources During the Nat'l Emergency Caused by the
Outbreak of COVID-19* (Apr. 28, 2020) ................................................................29

Donald J. Trump,
*Presidential Memo. on Expanding State-Approved Diagnostic Tests*
(Mar. 13, 2020) ..................................................................................................29

Donald J. Trump,
*Presidential Memo. on Order Under the DPA Regarding 3M Co.*
(Apr. 2, 2020) .....................................................................................................29

*Hearing on The Devil They Knew—PFAS Contamination
and the Need for Corporate Accountability Before the
Subcomm. on Env't of the H. Comm. on Oversight & Reform,*
116th Cong. (2019) ...........................................................................................13, 18, 26

*Hearing on Examining the Federal response to the risks associated with
per- and polyfluoroalkyl substances (PFAS) Before the
S. Comm. on the Env't & Pub. Works,*
116th Cong. (2019) .........................................................................................................23

*Hearing on The Federal Role in the Toxic PFAS Chemical Crisis
Before the Subcomm. on Fed. Spending Oversight & Emergency Mgmt. of the
S. Comm. on Homeland Sec. & Governmental Affairs,*
115th Cong. (2018) .........................................................................................................24

Liz Bowman,
*FluoroCouncil Cos. to Phase out Long-Chain Chemicals by Year's End,*
Am. Chemistry Council (Jan. 20, 2015) .......................................................................11

Maija Zummo,
*DeWine: Until There's a Vaccine, Life in Ohio Isn't Opening Up Normally,*
Scene (Apr. 15, 2020 at 1:51 PM) .............................................................................16, 17

Office of Gov. DeWine,
*Governor DeWine Orders Analysis of PFAS in Ohio Drinking Water*
(Sept. 27, 2019).........................................................................................................20, 22

Office of Gov. Whitmer,
*Executive Order 2019-03* (Feb. 4, 2019) ......................................................................21

Philippe Grandjean, *et al.,*
*Estimated Exposes to Perfluorinated Compunds in Infancy Predict
Attenuated Vaccine Antibody Concentrations at Age 5-Years,*
14 J. Immunotoxicology 188 (2017)..............................................................................16

Sharon Lerner,
*Lawsuit Reveals How Paid Expert Helped 3M
"Command the Science" on Dangerous Chemicals,*
The Intercept (Feb. 23, 2018, 9:16 AM)........................................................................13

Stockholm Convention on Persistent Organic Pollutants (2019) ...........................18, 19

Tasha Stolber,
*PFAS Chemicals Harm the Immune System, Decrease
Response to Vaccines, New EWG Review Finds,*
Envtl. Working Grp. (June 21, 2019) .............................................................................15

U.S. Census Bureau,
   *U.S. & World Population Clock*,
   https://www.census.gov/popclock/ ........................................................................38

Wright & Miller,
   Fed. Prac. & Proc. Civ. § 1769 (3d ed. 2019).........................................................46

## INTRODUCTION

Defendants have contaminated nearly every person in the United States, including Plaintiff Kevin Hardwick, with PFAS they created.[1] Defendants did so without warning, without asking permission, and without concern for the damage they were doing. Defendants knew for decades that their chemicals would get into humans and present long-lasting, serious risk of disease and harm, but they did not tell anyone. Instead, they kept releasing their PFAS into the world, knowing (and fully expecting) that their chemicals would invade the human body, accumulate, and stay there, presenting a continuing threat of serious, significant harm.

Neither Mr. Hardwick nor any of the other proposed class members had a chance to avoid Defendants' poisoning and contamination of their bodies and blood. And now, as a result, Mr. Hardwick and the proposed class all face the same persistent, continuing, and accumulating contamination of their blood and bodies with Defendants' chemicals—and the associated risks and threats of developing various diseases, including cancer. So Mr. Hardwick, on behalf of the proposed class, brought this class action to seek common equitable and injunctive relief to address this common "ticking time bomb" of PFAS chemicals lingering in the blood and bodies of people across this country. In response, Defendants asked the Court to dismiss the case— basically alleging that there was nothing anyone could do under our current legal system to address this common threat before the inevitable detonation.

---

[1] "PFAS" are synthetic, toxic per- and polyfluoroalkyl substances, including perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS") and related chemicals, including, but not limited to, those that degrade to PFOA and/or PFOS, and including, but not limited to, C3-C-15 PFAS chemicals, such as perfluorohexanesulfonate (PFHxS), perfluorononanoate (PFNA), perfluorobutanesulfonate (PFBS), perfluorohexanoate (PFHxA), perfluoroheptanoate (PFHpA), perfluoroundecanoate (PFUnA), perfluorododecanoate (PFDoA), HFPA Dimer Acid (CAS # 13252-13-6/C3 Dimer Acid/P-08-508/FRD903/GX903/C3DA/GenX), and HFPA Dimer Acid Ammonium Salt (CAS# 62037-80-3/ammonium salt of C3 Dimer Acid/P-08-509/FRD902/GX902/GenX). (First Am. Compl., [ECF No. 96] at PageID #561, ¶ 1.)

But this Court did not let Defendants off-the-hook for dumping destructive chemicals into the bodies of hundreds of millions of Americans.  Instead, it correctly explained that Mr. "Hardwick has alleged injury sufficient to state a claim of negligence and/or battery upon which relief can be granted."  (Op. & Order, [ECF No. 128] at PageID #849.)  And it correctly explained that scientific study and monitoring are available remedies to combat Defendants' tortious conduct.  (*Id.* at PageID #851–55.)  This is the same injury that the entire proposed class shares with Mr. Hardwick.  And the proposed class asks for the same, common injunctive relief.

This type of relief is nothing new—courts have certified class actions seeking analysis and testing of PFAS chemicals.  For example, as far back as 2002, a class action was certified in West Virginia seeking a common, class-wide medical monitoring program for those exposed to PFOA.  And that court eventually approved and oversaw implementation of such a common, class-wide medical monitoring program, which included blood testing and a series of extensive, epidemiological studies of the class members, costing tens of millions of dollars and covering tens of thousands of people.  That program (including the appointment of an independent panel of epidemiologists known as the "C8 Science Panel" and a second panel of independent medical doctors known as the "C8 Medical Panel") led to scientific confirmation for all class members as to the diseases linked to their PFOA exposures—and it led to the creation of a common, class-wide medical monitoring, blood testing, and detection program for those at risk for those diseases.  (C8 Science Panel Program, http://www.c8sciencepanel.org (last visited July 13, 2020); C8 Med. Monitoring Program, http://www.c-8medicalmonitoringprogram.com/ (last visited July 28, 2020).)

This successful program for one PFAS chemical (PFOA), in one impacted community, serves as a model for the testing, monitoring, and research program that Mr. Hardwick now

requests for the broader, common PFAS exposure existing nationwide. In other words, the basic framework is in place. And that framework has already succeeded on a common, class-wide basis for a large group of people, which provided an effective mechanism for resolving shared, common scientific questions regarding the causal connections between PFAS exposures and health risks to class members. This existing model for PFOA in one community just needs to be expanded to include monitoring, testing, and study for additional exposed individuals and additional types of PFAS.

In the years since the West Virginia court approved the original PFOA-related medical monitoring, testing, and epidemiological study program, other courts have also recognized that PFOA and related PFAS chemicals present risks to those exposed. And in response, these courts also have certified cases to proceed on class-wide bases to pursue common, equitable, and injunctive relief. For example, courts in Vermont, New Hampshire, and New York certified class actions seeking class-wide medical monitoring in response to PFAS chemical exposures. *See, e.g.*, *Sullivan v. Saint-Gobain Performance Plastics Corp.*, No. 5:16-cv-125, 2019 WL 8272995 (D. Vt. Aug. 23, 2019) (attached as Ex. A); *Hermens v. Textiles Coated Inc.*, Nos. 216-2017-CV-524 and 216-2017-CV-525 (N.H. Super. Ct. July 20, 2019) (attached as Ex. B); *Burdick v. Tonoga, Inc.*, 112 N.Y.S.3d 342, 347–48 (N.Y. App. Div. 2019). And the Second Circuit recently confirmed that a proposed class can proceed with class-wide medical monitoring claims based on the fact that defendants' actions caused PFOA accumulation in the prospective class members' blood. *Benoit v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 491, 494, 496, 501–02 (2d Cir. 2020) (explaining that the proposed class of "Accumulation Plaintiffs" suffered an injury because the accumulation of PFOA in their blood causes an increased risk of serious health problems even if the plaintiffs are otherwise asymptomatic) (New York law).

Here, Mr. Hardwick is asking this Court to follow and expand upon this well-established precedent to certify a larger, nationwide class.  This would allow Mr. Hardwick and the class to pursue common equitable and injunctive relief in the form of a larger, more comprehensive scientific program to assess, analyze, test, and study the nationwide impacts of Defendants' multiple PFAS.  In this regard, Mr. Hardwick respectfully requests that the Court certify a class consisting of "any individual residing within the United States at the time of class certification for one year or more since 1977 with 0.05 parts per trillion (ppt) of PFOA and at least 0.05 ppt of any other PFAS in their blood serum" to pursue the common injunctive and equitable relief claims asserted in his Complaint.[2]  This will allow the Court to resolve all of the common claims in one broad stroke.

## FACTUAL BACKGROUND

**A.      Defendants Contaminated Mr. Hardwick's Blood and Body with PFAS.**

Over his lifetime, Mr. Hardwick was exposed to PFAS chemicals, and he now has at least 0.05 ppt of PFOA and 0.05 ppt or more of at least one other PFAS chemical in his blood serum. (Bilott Decl., attached as Ex. C, ¶ 16.)[3]  PFAS did not enter Mr. Hardwick's blood through any act of nature.  There is no natural background level of PFAS.  (*See* Agency for Toxic Substances & Disease Registry ("ATSDR"), *Toxicological Profile for Perfluoroalkyls, Draft for Public*

---

[2] The following individuals are excluded from the class:  (a) Defendants' legal representatives, employees, officers and/or directors; (b) the Judge to whom the case is assigned, the Judge's staff, and the Judge's immediate family; (c) any class counsel or their immediate family; and (d) any individual who has already released or filed claims for any diagnosed or manifest disease or manifest sickness that such individual attributes to Defendants' release of PFAS as described in the First Amended Complaint as to such specific released or filed claims.  (ECF No. 96, ¶ 84.)

[3] Attached to this motion is the Declaration of Robert Bilott. The documents attached as exhibits to his Declaration are relevant, authenticated, and admissible.  *See* Fed. R. Evid. 402.  Most of the documents come directly from Defendants' files.  And many of the other documents are business and public records, most of which have already been admitted at trials involving PFAS or in related public court filings.

4

*Comment* 2 (2018), https://tinyurl.com/y8rs794a (hereinafter "ATSDR Profile").)  Nor is there

any "normal" or "acceptable" level or rate of PFAS in human blood.  (*See id.*)  Instead, PFAS is

a class of synthetic chemicals developed in the 1930s and 1940s and put into large-scale

manufacture and use by the early 1950s.  (ATSDR, *PFAS, An Overview of the Science and

Guidance for Clinicians on Per- and Polyfluoroalkyl Substances (PFAS)* 3 (2019),

https://tinyurl.com/y5bg5gn4 (hereinafter "ATSDR Guidance"); Bilott Decl., ¶ 18, Exs. 1–2.)

Prior to the commercial development and large-scale manufacture and use of PFAS,

PFAS was not found, detected, or present in human blood.  (*See* ATSDR Profile; Bilott Decl.,

¶ 18, Ex. 3 at 3MA00257430, Ex. 4 at 3MA10067218.)  Thus, the only "normal" or "natural"

"background" level of any PFAS in human blood is none—zero.  Yet, blood serum testing and

analysis by Defendants, independent scientific researchers, and governmental entities has

confirmed that PFAS is now present in approximately 99% of the population of the United

States.  (*See* EPA, *Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA)* 9

(2016), https://tinyurl.com/y89y52v5.)

The PFAS entered Mr. Hardwick's blood and body, and the bodies and blood of the other

prospective class members, without their consent or knowledge, because of the conduct of

Defendants 3M Company ("3M"), E. I. du Pont de Nemours and Company ("DuPont"), The

Chemours Company L.L.C. ("Chemours"), Archroma Management, LLC ("Archroma"),

Arkema, Inc. ("Arkema"), Arkema France, S.A. ("Arkema France"), AGC Chemicals Americas,

Inc. ("AGCCA"), Daikin Industries, Ltd. ("Daikin Industries"), Daikin America, Inc. ("Daikin

America"), and Solvay Specialty Polymers, USA, LLC ("Solvay") (collectively, "Defendants").

Each of the Defendants marketed, developed, distributed, sold, manufactured, released, trained

users on, produced instructional materials for, and otherwise handled or used one or more PFAS

materials in a way that caused the contamination of Mr. Hardwick's and the potential class members' blood and bodies.  (*E.g.*, Bilott Decl., ¶ 18, Ex. 2 at US00001669, Ex. 5 at 3MA00193738, Ex. 6 at EID951571–80, Ex. 7, Ex. 8 at 1–2, Ex. 9 at ROWE009353–59, Ex. 10 at ROWE009742–49, Ex. 11 at 1, Ex. 12 at 1–2, Ex. 13 at 1–2, Ex. 14 at 1, Ex. 15 at 1–4, Ex. 16 at ROWE035866, Ex. 17 at 7175, Ex. 18; Chemours, *The Chemours Company Reaches Agreement with North Carolina DEQ and Cape Fear River Watch* 1 (2018), https://tinyurl.com/yaoozvj2; *Fact Sheet: 2010/2015 PFOA Stewardship Program*, EPA, https://tinyurl.com/y8lam3xn (last updated Aug. 9, 2018) (hereinafter "EPA Fact Sheet").) Because PFAS is biopersistent and bioaccumulative, the PFAS has accumulated into their blood and bodies and will remain there for many, many years.  (ATSDR Guidance, 5.)

### B.     Defendants Have Known for Decades about the Dangers of PFAS.

PFAS is not a benign addition to Mr. Hardwick's or the proposed class members' body chemistry.  PFAS is toxic, persistent, and bioaccumulative—and Defendants have known it for decades.

By the end of the 1960s, some of the Defendants performed animal toxicity testing that indicated that exposure to PFAS, including at least PFOA, resulted in various adverse health effects.  (Bilott Decl., ¶ 18, Ex. 19 at EID122848–50, Ex. 20 at EID924561.)  These tests involved multiple species of laboratory animals—and indicated that PFAS had toxic effects to the liver, testes, adrenals, and other organs and bodily systems.  (*Id.*)

Defendants have also known for decades that PFAS is both biopersistent and bioaccumulative.  By the end of the 1960s, research and testing performed by some of the Defendants indicated that PFAS, including at least PFOA, was resistant to environmental degradation and would persist in the environment essentially unaltered because of its unique chemical structure.  (*Id.* ¶ 18, Ex. 21 at 3M_MN04855117–18, 3M_MN04855124–27.)  And by

the end of the 1970s, Defendants' research and testing indicated that one or more PFAS, including at least PFOA and PFOS, would bind to proteins in the blood of animals and humans for the same reason.  (*Id.* ¶ 18, Ex. 22 at EID510227–28, Ex. 23 at EID924746, Ex. 24 at 369, Ex. 25 at EID924645, Ex. 26 at 3MA10065463, 3MA10065471–72, 3MA10065474, 3MA10065476, 3MA10065498–99, 3MA10065507.)  Defendants learned that PFAS would not only remain and persist over long periods, but that it would continue to accumulate and build up in the blood and bodies of the exposed individuals with each additional exposure, no matter how small.  (*Id.* ¶ 18, Ex. 26 at 3MA10065463, 3MA10065471–72, 3MA10065474, 3MA10065476, 3MA10065498–99, 3MA10065507.)

Despite this knowledge, Defendants, through their manufacture, use, and dissemination of the chemicals, released PFAS into the environment through numerous sources, including the air, surface waters, ground waters, soils, and landfills.  (*E.g.*, *id.* ¶ 18, Ex. 5 at 3MA00193738, Ex. 27 at 3.)  Defendants also released PFAS into the environment through their involvement in the creation and development of consumer and commercial products and materials—and their development of training and instructional materials related to PFAS.  (*E.g.*, *id.* ¶ 18, Ex. 2 at US00001669, Ex. 5 at 3MA00193738, Ex. 6 at EID951571–80, Ex. 7 at 14, Ex. 16 at ROWE035866; EPA Fact Sheet.)

Also by the end of the 1970s, some of the Defendants, including at least DuPont and 3M, were aware that PFAS, including at least PFOA and PFOS, had been detected in the blood of workers at PFAS manufacturing facilities *and* in the blood of the general population of the United States.  (Bilott Decl., ¶ 18, Ex. 2 at US00001669, Ex. 3 at 3MA00257421, 3MA00257430, Ex. 4 at 3MA10067216–18, Ex. 28 at 3MA10034962, Ex. 29 at 3M_MN05382159, Ex. 30 at 3MA10035028–32, Ex. 31 at EID232297–98, Ex. 32 at

EID107196, Ex. 33 at EID107138, EID107148.) Even worse, DuPont and 3M knew that it had been detected in people not known to be working at or living near facilities manufacturing or using PFAS. (*Id.*) This finding indicated to those Defendants that if they continued to manufacture and use PFAS, it would inevitably result in continued and increased levels of PFAS getting into the environment and into human blood across the United States, even in areas nowhere near facilities manufacturing or using PFAS.

By the end of the 1980s, additional research and testing performed by some Defendants indicated that at least one PFAS, PFOA, had caused Leydig cell (testicular) tumors in a chronic cancer study in rats. (*Id.* ¶ 18, Ex. 34 at EID917956–58, Ex. 35 at EID107384–85, Ex. 36 at EID510258, Ex. 37 at WJB000004–05, WJB000014, Ex. 38 at 3M_MN02323182.) This resulted in at least one Defendant, DuPont, classifying PFOA internally as a confirmed animal carcinogen and possible human carcinogen. (*Id.*) This classification was important. Defendants understood that when they knew that a chemical caused cancer in animal studies, that they must also *presume* that the chemical presented a cancer risk to humans. (*Id.* ¶ 18. Ex. 36 at EID510258, Ex. 37 at WJB000002–05, Ex. 39 at EID797573.) This presumption was required unless the precise mechanism by which the tumors were caused in animals was known—and it was known that such mechanism would not occur in humans. (*Id.*) So because Defendants' scientists had not determined the precise mechanism by which any PFAS caused tumors, Defendants were required to presume (by at least that point in time) that PFAS presented a potential cancer risk to exposed humans. (*Id.* ¶ 18, Ex. 37 at WJB000002–05, Ex. 39 at EID797573, Ex. 40 at 209.) This basic premise was confirmed in the published, peer-reviewed literature available to all Defendants. (*Id.*)

Defendants' research and testing in the 1980s also confirmed that workers exposed to PFAS, including at least PFOA, reported elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects.  (*Id.* ¶ 18, Ex. 41 at EID079375, Ex. 42 at EID102511, EID102517–18, Ex. 43 at EID107201, Ex. 44 at EID521383.)  None of the Defendants published this data, provided it to governmental entities as required by law, or otherwise publicly disclosed it at that time.  Instead, Defendants chose to just keep the information to themselves.

Defendants, including at least 3M and DuPont, also understood in the 1980s that PFAS, and particularly the longer-chain PFAS, such as PFOA and PFOS, had a disturbingly long half-life in humans.  (*Id.* ¶ 18, Ex. 2 at US00001669–70, Ex. 6 at EID951571–73, Ex. 7 at 12, Ex. 45 at GK001456–57.)  So they knew that once PFAS was in the human body and blood, it would stay there.  (*Id.*)  And assuming an individual did not have *any* additional exposure, years would pass before even half of the PFAS would be eliminated from the body.  (*Id.* ¶ 18, Ex. 6 at EID951573–74, Ex. 45 at GK001456–57.)  Defendants understood that this long half-life meant that PFAS would build up and accumulate in the blood and bodies of exposed individuals over time, particularly if *any* level of exposure continued.  (*Id.*)

By the end of the 1990s, additional research and testing performed by some Defendants, including at least 3M and DuPont, indicated that at least one PFAS, PFOA, had caused a triad of tumors (Leydig cell (testicular), liver, and pancreatic) in a second chronic cancer study in rats.  (*Id.* ¶ 18, Ex. 46 at 3MA00194569–70, Ex. 47 at EID101658, Ex. 48 at USEPA 15643.)  But Defendants still could not identify the precise mechanism of action that caused each of the tumors.  (*Id.* ¶ 18, Ex. 46 at 3MA00194570–72, 3MA00194579.)  So just like the first study, scientific principles of carcinogenesis classification required Defendants to presume that the

PFAS likewise presented cancer risks to exposed humans.  (*Id.* ¶ 18, Ex. 37 at WJB000002–05, Ex. 39 at EID797573.)[4]

**C.    Faced with Regulatory Scrutiny and Increased Public Knowledge about PFAS, Defendants Misled Regulators and Denied the Dangers of their Chemicals.**

In the late 1990s and early 2000s, the EPA and other state and local public health agencies and officials started to learn of PFAS exposure in the United States.  (*Id.* ¶ 18, Ex. 50 at 1–3.)  Defendants responded to this increased regulatory and public interest by repeatedly assuring regulators (and the general public) that PFAS exposure presented no risk of harm and carried no legal, toxicological, or medical significance.  (*Id.* ¶ 18, Ex. 12 at 2, Ex. 51 at 3M_WM00839235, Ex. 52 at EID166246, Ex. 53 at GK003126–27, Ex. 54 at EID825916–21, EID825932–33, EID825936, Ex. 55 at EID826779, Ex. 56 at EID715945–48, Ex. 57 at 1, Ex. 58 at 2, Ex. 59 at ROWE025095.)  Based on Defendants' studies from the preceding decades alone, that was not true.  For example, in the late 1990s, when 3M first reported finding an average of approximately 30 ppb PFOS in blood serum in the general US population, its own scientists had internally estimated that a "safe" level for PFOS in human serum would be only *1.05 ppb*—but 3M never shared that critical information with regulatory authorities or the public.  (*Id.* ¶ 18, Ex. 61 at 3M_BELL01940053.)  Instead, 3M falsely assured everyone that the chemicals in their blood posed no risk or threat of any harm.[5]  (*Id.*)

After the EPA and other entities began asking Defendants to stop manufacturing and using certain PFAS, Defendants just switched to "new" PFAS compounds.  (*Id.* ¶ 18, Ex. 16 at

---

[4] Since then, yet a *third* study has confirmed carcinogenic effects.  (Bilott Decl., ¶ 18, Ex. 49.)

[5] Indeed, 3M assured the EPA and the public in 1999 that "no identifiable health risk to humans would be expected to occur at the PFOS levels found in blood bank or commercial serum samples."  (Bilott Decl., ¶ 18, Ex. 2 at US00001671.)  Yet 3M noted that PFOS had been found "in serum samples from the general population, averaging 30 ppb in blood bank samples from diverse locations in the U.S."  (*Id.* at US00001672.)

ROWE035866, Ex. 62 at 1–2, Ex. 63 at 1.) Defendants began manufacturing or increased their ongoing manufacture of PFAS with six or fewer carbons atoms, such as GenX (collectively "short-chain PFAS"). (*Id.*)

Short-chain PFAS, however, may present risks similar to many of the original long-chain PFAS. (*Id.* ¶ 18, Ex. 64 at 13–14, Ex. 65 at 943–48, Ex. 66 at 1–3, Ex. 67 at 1–5, Ex. 68 at 1, 8, Ex. 69 at 037002-1, 037002-9.) Some Defendants, including at least DuPont and 3M, are aware that one or more short-chain PFAS has been found in human blood. (*Id.* ¶ 18, Ex. 9 at ROWE009354–55, ROWE009397, ROWE009406, Ex. 10 at ROWE009742–44, Ex. 70 at 003-2007-0000203–04, Ex. 71 at 8042.) And by the mid-2010s, at least DuPont and Chemours knew that short-chain PFAS caused the same triad of tumors (Leydig (testicular), liver, and pancreatic) in a chronic rat cancer study. (*Id.* ¶ 18, Ex. 65 at 943–48, Ex. 72 at 1–2.) But Defendants still do not know the precise mechanism of action that caused those tumors. So again, just like with long-chain PFAS, Defendants are required to presume that these short-chain PFAS also present a cancer risk to exposed humans. (*Id.* ¶ 18, Ex. 37 at WJB000002–05, Ex. 39 at EID797573.)

Despite knowing of risks posed by short-chain PFAS, and despite the protests and objections of even some of their own employees, (*id.* ¶ 18, Ex. 73 at 3M_BELL02747275, Ex. 74 at 3M_BELL03267721–22, Ex. 75 at 3M_BELL01663669–70), Defendants repeatedly assured and represented to governmental entities and the public (and continue to do so) that the presence of PFAS, including short-chain PFAS, in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance. (*E.g.*, Bilott Decl., ¶ 18, Ex. 76 at 019-0401-0000002–05, Exs. 77–78, Ex. 79 at 2–5, 7, Ex. 81 at 6; Liz Bowman, *FluoroCouncil Cos. to Phase out Long-Chain Chemicals by Year's End*, Am. Chemistry Council (Jan. 20, 2015), https://tinyurl.com/y9uo6c69; *FluoroCouncil Supports*

*Science-Based Policy for Long-Chain Perfluorinated Substances*, Am. Chemistry Council (May 1, 2015), https://tinyurl.com/ybp3mw4s.)  And until recently, several Defendants represented to the public through the website of their lobbying organization, the FluoroCouncil, that: "The newer, short-chain chemistries currently in use are well studied. . . . The science supports the conclusion that the newer FluoroTechnology is not expected to present a significant risk to humans and the environment."  (Bilott Decl., ¶ 18, Ex. 82 at 4.)

By 2010, additional research and testing performed by some Defendants, including at least 3M and DuPont, revealed many potential adverse health risks to workers from PFAS exposures.  These health risks included increased cancer, hormone changes, lipid changes, and thyroid and liver problems.  (*Id.* ¶ 18, Ex. 83 at 2–5, Ex. 84 at EID645650, EID645660, Ex. 85 at 1, Ex. 86 at 1086, 1091–92, 1095, Ex. 87 at 15–21.)  In fact, Defendants' own scientists, lawyers, and advisors often recommended that Defendants conduct further studies to assess the extent to which PFAS exposures were causing those effects, or to take steps to address the impacts to exposed communities.  (*Id.* ¶ 18, Ex. 86 at 1095, Ex. 87 at 21, Ex. 88 at EDD0072900, Ex. 89 at 1–2.)

In 2011 and 2012, after studying data and blood samples of around 69,000 people, the C8 Science Panel publicly announced its findings that PFOA exposures had probable links with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol.  (*Probable Link Evaluation of Pregnancy Induced Hypertension and Preeclampsia*, C8 Science Panel (Dec. 5, 2011), https://tinyurl.com/y8y5z9cb; *Probable Link Evaluation of Cancer*, C8 Science Panel (Apr. 15, 2012), https://tinyurl.com/y9uly6dg; *Probable Link Evaluation of Thyroid Disease*, C8 Science Panel (July 30, 2012), https://tinyurl.com/yb4l46qo; *Probable Link Evaluation of Autoimmune*

*Disease*, C8 Science Panel (July 30, 2012), https://tinyurl.com/y9osclfj; *Probable Link Evaluation for Heart Disease (including high blood pressure, high cholesterol, coronary artery disease)*, C8 Science Panel (Oct. 29, 2012), https://tinyurl.com/ydc2zunu.)

Despite these findings, Defendants continued to assure and represent to governmental entities, their customers, and the public that the presence of PFAS in human blood presents no risk of harm and is of no legal, toxicological, or medical significance. (Bilott Decl., ¶ 18, Ex. 90 at MDL00122362, Ex. 91 at 2.) Defendants also claimed that the work of the C8 Science Panel was inadequate to prove that any amount of PFAS in human blood has any adverse effects upon or poses any risk to humans. (*Id.* ¶ 18, Ex. 90 at MDL00122362, Ex. 92 at MDL00117029–33, Ex. 93 at MDL00112647–52, Ex. 94 at 1, Ex. 95 at 3, Ex. 96 at 37–39, 44–45, 49; *Hearing on The Devil They Knew*, 116th Cong. 1–2, 7 (2019) (written responses to committee questions of Denise Rutherford), https://tinyurl.com/yd6st3om.) Those claims, of course, are simply not true.

In addition to lying to regulators and the public about the nature of PFAS and the harms it creates, Defendants have also controlled, minimized, trivialized, manipulated and otherwise influenced the information on PFAS. For example, Defendants have censored information on PFAS in peer-reviewed journals, released by governmental entities, and made available to the public. (Sharon Lerner, *Lawsuit Reveals How Paid Expert Helped 3M "Command the Science" on Dangerous Chemicals*, The Intercept (Feb. 23, 2018, 9:16 AM), https://tinyurl.com/ydywot7d; Bilott Decl., ¶ 18, Ex. 57 at 1, Ex. 97 at 003-0001-0019350–52, Ex. 98 at 1–2, Ex. 99 at EID722942–46, Ex. 100 at EID731484–85, EID731491, Ex. 101 at 1–2, Ex. 102 at 1–2, Ex. 103 at 1–3, Ex. 104 at 3M_MN01525833–37, Ex. 105 at 022-0046-0000565–66, Ex. 106 at 1–2, Ex. 107 at 146–47, Ex. 108 at 1–2, Ex. 109, Ex. 110 at 1–4, Ex. 111 at 1–2, Ex. 112, Ex. 113 at 1–2, Ex. 114 at 1910, Ex. 115 at 2–6, Ex. 116 at DPZ0332751–89, Ex. 117 at

13

3MA02513755–58, 3MA02513762, Ex. 118 at 2, 7, 62.)  Defendants have consistently attacked, challenged, discredited, and otherwise attempted to undermine scientific studies, findings, statements, and any other information that even *implies* that any PFAS in any human's blood creates any potential adverse health effects.  (*Id.*)

Defendants have also refused to conduct nationwide studies on how PFAS affects humans.  In doing so, Defendants want to create a Catch-22 to avoid responsibility for any PFAS-related liability.  On one hand, Defendants claim no diagnostic medical testing is needed because they claim there is insufficient evidence that any of the PFAS found in human blood across the United States has any adverse health effects.  Yet, on the other hand, Defendants refuse to conduct whatever studies they claim are necessary to generate such sufficient evidence, despite having the resources, knowledge, and ability to do so.  Defendants claim that no study has been large enough, involved enough people, or found enough cases of any particular disease to be sufficient to prove any health effects caused by any PFAS—all while simultaneously refusing to fund or sponsor any such study that could ever meet their own self-created "standards" of causation and "proof."  In short, Defendants have sat back, insisting on satisfaction of an alleged burden of proof of "causation" requiring incredible resources and extensive studies, while refusing to provide the very funding and resources they know virtually no one—other than Defendants themselves—has the ability to provide.

Despite these tremendous obstacles, the C8 Science Panel and C8 Medical Programs effectively addressed, class-wide, the issues surrounding the links between PFOA exposure and disease in impacted humans.  (*C8 Probable Link Reports*, *supra* p. 12–13; C8 Med. Monitoring Program, *supra* p. 2.)  Indeed, the independent epidemiologists of the C8 Science Panel (overseeing testing and new studies and evaluations of tens of thousands of class members)

confirmed probable links between exposure to that particular PFAS chemical and at least six diseases. (*Id.*) And the independent medical doctors of the C8 Medical Panel have recommended and implemented a common, class-wide medical monitoring and testing program to detect those diseases among this same exposed population. (*Id.*) Other epidemiological studies also have shown associations between various other PFAS and serious diseases and medical conditions, including pregnancy-induced hypertension and pre-eclampsia, liver damage, increases in cholesterol, increased risk of thyroid disease, increased risk of decreased fertility, negative impacts to the immune system, decreases in birth weight, and decreased antibody response to vaccines. (ATSDR Profile, 5–6.)

Confronted with all this evidence establishing that PFAS is biopersistent, bioaccumulative, and toxic to animals and humans, Defendants concealed what they knew, misled the public and regulators, and denied the harms posed by their chemicals, all while refusing to perform or fund the very studies they claimed were needed or necessary to confirm what their chemicals do to humans. Defendants continue these tactics today.

**D.        The Scientific Community Recognizes the Immediate Need for More Studies.**

There is no debate in the scientific community that we need more PFAS studies now, including studies on the cumulative, synergistic impact of PFAS on the body's immune system. This is especially true—and disturbingly relevant—amid the current COVID-19 pandemic. Evidence now shows that PFAS can decrease the antibody response to vaccinations—making vaccines less effective. (*See* Bilott Decl., ¶ 17.)

Many studies have confirmed this frightening fact: "PFAS chemicals . . . are harmful to nearly every human organ, and the immune system is particularly vulnerable." (Tasha Stolber, *PFAS Chemicals Harm the Immune System, Decrease Response to Vaccines, New EWG Review Finds*, Envtl. Working Grp. (June 21, 2019), https://tinyurl.com/y3cbrzvj; Bilott Decl., ¶ 18, Exs.

119–21.)  The risk of a compromised immune system due to PFAS is heightened for children, whose "developing immune system may be particularly vulnerable to immunotoxicity in the earliest stages of life." (*Id.*)  For example, studies have found links between PFAS in children and weakened responses to vaccinations for tetanus, diphtheria, and measles. (*Id.* (collecting studies and explaining that "early life PFAS exposure" "shows damage to the immune system and decreased response to vital vaccines"); *see also* BFR, *New Study Shows: One-Year-Old Children Demonstrate Lower Concentration of Vaccine Antibodies with High PFOA Concentration in the Blood* 1 (2020), https://tinyurl.com/y8txt82h.)  There is now a growing— and troubling—body of work emphasizing that PFAS create "deficient antibody responses in children." (Philippe Grandjean, *et al.*, *Estimated Exposes to Perfluorinated Compounds in Infancy Predict Attenuated Vaccine Antibody Concentrations at Age 5-Years*, 14 J. Immunotoxicology 188, 188 (2017), https://tinyurl.com/yb787coo.)

But the impact of PFAS on the immune system is not limited to just children.  Studies also show that PFAS levels in the general public may decrease responses to vaccines. (*See* Bilott Decl., ¶ 18, Ex. 122 at 1; *see also* Letter from Daniel T. Kildee, et al. to Andrew Wheeler, Acting Adm'r of the EPA, 1 (July 17, 2018) (identifying "decreased antibody response to vaccines" as a risk resulting from "exposure to PFOS and PFOA").)  Worse still, studies have linked PFAS to a "reduced immunity from a flu vaccine." (Stolber, *supra* (citing Claire Looker, *et al.*, *Influenza Vaccine Response in Adults Exposed to Perfluorooctanoate & Perfluorooctanesulfonate*, 138(1) Toxicology Sci. 76, 76 (2014), https://tinyurl.com/yalxlojy).)  That is terrifying news while the United States struggles with COVID-19 and its leaders, like Ohio Governor Mike DeWine, warn that "[u]ntil there is a vaccine, this monster—as I've referred to it—is going to be working around us." (Maija Zummo, *DeWine: Until There's a Vaccine, Life in Ohio Isn't Opening Up*

*Normally*, Scene (Apr. 15, 2020 at 1:51 PM), https://tinyurl.com/yatdmf8s.)  This means that creating an effective and long-term COVID-19 vaccine necessarily includes better understanding the effects of PFAS on the immune system.

United States Senators agree.  In a recent letter from nineteen Senators to the United States Department of Health and Human Services, the Senators explained that "Americans need to be armed [against COVID-19] with the most complete information as possible."  (Letter from Jeanne Shaheen, et al. to Andrew Wheeler, Acting Adm'r of the EPA, 1 (June 26, 2020), *available at* https://tinyurl.com/ycxl49nr.)  This includes understanding "the relationship between PFAS exposure and the incidence of COVID-19," which "is one area where more research is needed."  (*Id.*)  The Senators stressed that it is "vital to gain a better understanding of how exposure to PFAS can impact the risks of contracting COVID-19, as well as the risks of COVID-19 complications or even death."  (*Id.*)

But even before the pandemic, experts were calling for increased PFAS research.  For example, experts with Harvard Law School, whose "research is used to develop vaccines and cures for cancer," urged the EPA to reject a rule that would limit their research.  (Letter from Wendy B. Jacobs, *et al.*, Emmett Envtl. L. & Pol'y Clinic, to Andrew Wheeler, Acting Adm'r of the EPA, 2 (Aug. 7, 2018).)  These experts emphasized the need for the EPA "to address new and emerging public health risks" through epidemiological studies, including the immunotoxicity of PFAS.  (*Id.* at 8 (citing Philippe Grandjean, *Delayed Discovery, Dissemination, and Decisions on Intervention in Environmental Health: A Case Study on Immunotoxicity of Perfluorinated Alkylate Substances*, 17 Envtl. Health 1, 1 (2018), https://tinyurl.com/y8raxte8).)

Even Defendant 3M's own Dr. Denise Rutherford explained in written testimony to Congress that more research is needed to understand the adverse health risks of PFAS on

17

humans. (*See Hearing on The Devil They Knew—PFAS Contamination and the Need for Corporate Accountability, Part II Before the Subcomm. on Env't of the H. Comm. on Oversight & Reform*, 116th Cong. 1–5 (2019) (written responses to committee questions of Denise Rutherford, Senior VP of Corp. Affairs, 3M), https://tinyurl.com/yd6st3om (trying to discredit current research and explaining that "[a] broad range of methodological perspectives and tools . . . are needed to make [a causation] determination."); *see also PFAS—Per- and Polyfluoroalkyl Substances, Section 7.1.5*, Interstate Tech. & Reg. Council (last updated Apr. 14, 2020), https://tinyurl.com/ydyhhte2 (detailing the need for more PFAS studies to fill the gaps in the emerging research).)

In sum, the scientific community agrees that, although the C8 Science Panel and C8 Medical Programs helped to address issues of PFOA risk, additional and larger studies are needed to better understand the cumulative effects of all PFAS on humans—and the effects of this PFAS on human immune systems and our body's response to vaccines. Given the current pandemic, this call to action is now more urgent than ever.

**E.      Policymakers Agree that PFAS Represents a Significant Public Health Problem.**

After years of being misled and deceived by Defendants, policymakers throughout the world now recognize PFAS as a significant public health problem that requires immediate action.

In May 2019, following widespread acceptance within the worldwide scientific community of the work of the independent C8 Science Panel and C8 Medical Program, the parties to the Stockholm Convention on Persistent Organic Pollutants (the "Stockholm Convention") agreed to eliminate, with limited exceptions, the production and use of PFOA, its salts, and PFOA-related compounds. (*Report of the Conference* 16–17 (2019); *Chemicals listed in Annex A*, Stockholm Convention, https://tinyurl.com/yalfyydx (last visited July 28, 2020).) The Stockholm Convention has 184 parties, including the European Union and countries ranging

18

from Australia to Uruguay. (*Status of ratification*, Stockholm Convention, https://tinyurl.com/y95lydzq (last visited July 28, 2020).)

On April 8, 2020, the European Commission adopted a regulation implementing the decision under the Stockholm Convention. (European Comm'n Delegated Reg. C(2020)1973/F1, https://tinyurl.com/y7wqdlec.) The regulation requires the member states of the European Union to eliminate, with limited exceptions, the production, use, and export of PFOA, its salts, and PFOA-related compounds. (*See id.*)

Similarly, Canada has listed PFOS, PFOA, and long-chain perfluorocarboxylic acids ("LC-PFCAs") to the country's list of toxic substances. (*List of toxic substances managed under Canadian Environmental Protection Act*, Gov't of Can., https://tinyurl.com/yakzdzug (last modified Jan. 21, 2020).) Canada has committed to "virtually eliminate PFOS" and has tightly limited the manufacture, use, sale, and import of PFOA and LC-PFCAs. (*Toxic substances list: PFOS*, Gov't of Can., https://tinyurl.com/ybbfeen5 (last modified Mar. 2, 2020); *Toxic substances list: long-chain perfluorocarboxylic acids*, Gov't of Can., https://tinyurl.com/yaot36lx (last modified Mar. 2, 2020).)

In the United States, the EPA also has finally recognized the urgent need to address PFAS health threats. In 2016, the EPA released extensive analyses of the threats posed to human health by PFOA and PFOS (citing the work of the C8 Science Panel), which led to the EPA adopting health advisories for PFOA and PFOS (individually or combined) in drinking water of no more than 70 parts per trillion ("ppt"). (EPA, *Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA)* 10 (2016), https://tinyurl.com/y89y52v5; EPA, *Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS)* 11 (2016), https://tinyurl.com/yac9wyk9.) These advisory levels, however, remain mere unenforceable

19

guidelines while Defendants continue to thwart EPA's efforts to move forward with formal regulatory limits and standards for PFAS. *Drinking Water Health Advisories for PFOA and PFOS*, EPA, https://tinyurl.com/grwoj94 (last updated Feb. 13, 2019).)

In February 2019, following widespread public outcry at the continuing lack of progress setting any enforceable federal safety limits for PFAS, the EPA unveiled a new "PFAS Action Plan," in which it promised to try to expedite action on PFAS. (EPA, *EPA's Per- and Polyfluroalkyl Substances (PFAS) Action Plan* 1 (2019), https://tinyurl.com/yynmjccc.) In this Action Plan, the EPA again recognizes the urgent need to expand toxicity information for PFAS, develop new tools to characterize PFAS in the environment, address PFAS in drinking water using regulatory and other tools, and develop new tools and materials to communicate about PFAS. (*Id.*) To date, however, the EPA has not been successful on acting on its own urgent call. Instead, constant corporate lobbying (trying to stop all PFAS regulation), bureaucratic inefficiencies and roadblocks, and budgeting and staffing shortfalls continue to prevent the EPA from formally adopting or enforcing any PFAS drinking water limits.

Given the EPA's failure to move forward in any meaningful way, much of the research and regulatory activity involving PFAS in the United States has advanced at the state level. In Ohio, for example, Governor Mike DeWine directed the Ohio EPA and the Ohio Department of Health ("ODH") to analyze the levels of PFAS in Ohio's drinking water. (*Governor DeWine Orders Analysis of PFAS in Ohio Drinking Water*, Governor of Ohio (Sept. 27, 2019), https://tinyurl.com/y8j6m9n6.) Pursuant to that mandate, the Ohio EPA and ODH announced an action plan for addressing PFAS in drinking water. (*Ohio Releases Statewide PFAS Action Plan for Drinking Water*, Governor of Ohio (Dec. 2, 2019), https://tinyurl.com/yatprwek.)

Ohio leaders have moved quickly to develop the plan.  As former ODH Director Dr. Amy

Acton explained: "The science is still evolving regarding PFAS chemicals, but we know that

certain people like unborn babies, infants and children are at higher risk for negative health

effects if exposed to them."  (*Id.*; *see also* Bilott Decl., ¶ 18, Exs. 119–21.)  Among other

objectives, the plan calls for the Ohio EPA to coordinate sampling of water systems serving

approximately 90% of Ohio's population—and for the ODH to evaluate the sampling results

while helping local officials and private water system owners respond to potential PFAS

contamination.  (Ohio EPA & ODH, *Ohio Per- and Polyfluoroalkyl Substances (PFAS) Action

Plan for Drinking Water* 4 (2019), https://tinyurl.com/ya2jd4hs.)

Likewise, in Michigan, Governor Gretchen Whitmer created the Michigan PFAS Action

Response Team ("MPART") as a temporary body to investigate sources and locations of PFAS,

while also protecting drinking water and public health.  (*Executive Order 2019-03*, Office of

Gov. Whitmer (Feb. 4, 2019), https://tinyurl.com/yc3o5l2q.)  Since its formation, MPART has

identified PFAS in several counties, cities, and towns throughout Michigan.  (*Id.*)  And in 2019,

Governor Whitmer converted MPART into a permanent entity that will continue to address

PFAS contamination in Michigan—both in humans and the environment.  (*Id.*)

States have also established or proposed their own enforceable PFAS drinking water

standards that are more protective than the still-unenforceable EPA guidelines.  New Jersey, for

example, has established maximum contaminant levels ("MCLs") for PFNA (13 ppt), PFOA (14

ppt), and PFOS (13 ppt).  (N.J. Dep't of Health, *Drinking Water Facts: Per- and Polyfluoroalkyl

Substances (PFAS) in Drinking Water* 2 (2020), https://tinyurl.com/ycybuc7k.)  California has

established response levels of 10 ppt for PFOA and 40 ppt for PFOS—and notification levels of

5.1 ppt for PFOA and 6.5 ppt for PFOS.  (Cal. Water Bds., *Media Release, Response Levels*

*Lowered for Water Systems Statewide as PFAS Investigation Continues* 1 (2020),

https://tinyurl.com/y7jr9v3t.)  Vermont established a combined MCL for PFOA, PFOS, PFHxS,

PFHpA, and PFNA of 20 ppt.  (Vt. Dep't of Health, *PFAS in Drinking Water* 2 (2019),

https://tinyurl.com/ybnnmb8r; Vt. Dep't Envtl. Conservation, https://tinyurl.com/yaygjlzr (last

visited July 28 2020)).)  New Hampshire established MCLs for PFHxS (18 ppt), PFNA (11 ppt),

PFOS (15 ppt), and PFOA (12 ppt).  (N.H. Code Admin. R. Env-Dw 705.06.)[6]  And Michigan is

in the process of creating MCLs for several PFAS, including PFNA (6 ppt), PFOA (8 ppt), PFOS

(16 ppt), and GenX (370 ppt).  (*Michigan moves forward on drinking water standards for PFAS*,

Mich. Dep't of Env't., Great Lakes, & Energy (Oct. 11, 2019), https://tinyurl.com/v8uql73.)

New York also just announced the adoption of new MCLs for PFOA (10 ppt) and PFOS (10 ppt)

on July 30, 2020.  (*Governor Cuomo Announces First in the Nation Drinking Water Standard*,

https://tinyurl.com/yy6x8fxz (last visited July 30, 2020).)

## F.    A Nationwide Approach is needed to Study the Health Effects of PFAS and to Address PFAS Contamination.

Constant industry lobbying and budget cuts have effectively stopped the EPA from

moving forward to address the PFAS threat in any meaningful, comprehensive way.  And despite

their recognition of the urgent health threat and considerable efforts to address the widespread

PFAS contamination in their jurisdictions, individual states are simply not equipped financially

or scientifically to confront and address this problem in a comprehensive, nationwide manner.

(*See, e.g.*, *Governor DeWine Orders Analysis of PFAS in Ohio Drinking Water*, Governor of

Ohio (Sept. 27, 2019), https://tinyurl.com/y8j6m9n6.)  Considerable study is still needed to

---

[6] Amazingly, Defendant *3M actually sued to stop* New Hampshire from enforcing its laws designed to protect its citizen from PFAS.  (Bilott Decl., ¶ 18, Ex. 123 at 1–2, 4–7, 25–26.)  It is hard to imagine a more blatant and shameful display of unabashed contempt for those daring to try to take action to protect people from PFAS exposures.

confirm all of the adverse health effects and risks caused by PFAS accumulating in human blood and bodies all across this country.

In the ATSDR Profile, for example, the United States Department of Health and Human Services observed numerous areas where additional research is needed to better confirm the cumulative effects of PFAS on human health.  (*See* ATSDR Profile, 633–38.)  Although studies are available, "there is a need for additional studies to address data gaps."  (*Id.* at 634.)  The Department of Defense agrees—explaining that "PFAS is a national issue that requires national solutions."  (*Dep't of Defense Remediation Plan for Cleanup of Water Impacted with Perfluorooctane Sulfonate or Perfluorooctanoic Acid* (June 2020), https://tinyurl.com/y856uthh.)

Likewise, the National Institute of Environmental Health Sciences ("NIEHS") notes that, in general, possible human health effects of chemical compounds are hard to study; this is especially true for PFAS given the thousands of variations in PFAS chemicals."  (*Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, Nat'l Inst. of Envtl. Health Scis., https://tinyurl.com/y9ocy4ay (last visited July 28, 2020).)  While the NIEHS acknowledges that awareness about the potential health effects of PFAS has grown, additional studies are still needed because "many questions remain unanswered."  (*Id.*)

Dr. Linda S. Birnbaum, the former director of the NIEHS and the National Toxicology Program ("NTP"), recently confirmed the need for additional research in several PFAS-related areas.  For example, she stressed the need for more research about the health effects of human exposure to lesser-studied types of PFAS, including mixtures of PFAS.  (*Hearing on Examining the Federal response to the risks associated with per- and polyfluoroalkyl substances (PFAS) Before the S. Comm. on the Env't & Pub. Works*, 116th Cong. 4–5, 12–13 (2019) (statement of Linda S. Birnbaum, Dir. NIEHS & NTP, Nat'l Institutes of Health), https://tinyurl.com/y7jsobqa;

*Hearing on The Federal Role in the Toxic PFAS Chemical Crisis Before the Subcomm. on Fed. Spending Oversight & Emergency Mgmt. of the S. Comm. on Homeland Sec. & Governmental Affairs*, 115th Cong. 5, 11–12 (2018) (statement of Linda S. Birnbaum, Dir. NIEHS & NTP, Nat'l Institutes of Health), https://tinyurl.com/y7ofcdmx.)

Other doctors agree.  In October 2017, Dr. Patrick N. Breyesse, the director of the ATSDR and the Centers for Disease Control and Prevention's ("CDC") National Center for Environmental Health, described PFAS as "one of the most seminal public health challenges for the next decades."  (Christopher Knaus, *Toxic firefighting chemicals 'the most seminal public health challenge,'* The Guardian (Oct. 18, 2017), https://tinyurl.com/ybezp4u9.)  Dr. Breyesse explained that "hundreds of millions of Americans will be drinking water with levels of these chemicals above levels of concern."  (*Id.*)  And in a March 24, 2020 presentation for the International Society for Exposure Science, Dr. Breyesse continued his call to action on PFAS; emphasizing that more studies are needed to understand the full scope of the public health challenges of PFAS.  Like Dr. Birnbaum, Dr. Breyesse stressed that scientists need to better understand how mixtures of PFAS affect human health.  (Bilott Decl., ¶ 17.)  Dr. Breyesse further explained that additional studies are required to understand the connections between PFAS and cancer, cardiovascular health, immune capacity, and children's developmental health.  (*Id.* at 50:57 to 52:16.)  But the ATSDR and the CDC cannot undertake these studies alone.  As Dr. Breyesse noted, these studies require collaboration and extensive funding—something these agencies simply do not have.  (*See id.* at 52:16 to 53:02.)

The global scientific community also agrees.  In a statement published in Environmental Health Perspectives, scientists and researchers across the world urged governments to limit the production and use of PFAS and, among other things, require PFAS manufacturers to conduct

more extensive toxicological testing of their chemicals. (Arlene Blum, *et al.*, *The Madrid Statement on Poly- and Perfluoroalkyl Substances (PFASs)*, 123 Envtl. Health Persp. A 107, A 107 (2015), https://tinyurl.com/yczd5ycx.)

Elected officials and policymakers at the state level also have identified the pressing need for additional studies. (*E.g.*, *Health*, Mich. PFAS Action Response Team, https://tinyurl.com/ycrhlqbb (last visited July 28, 2020) (identifying the need for additional research about the health effects of PFAS exposure).) State officials recognize that additional research is needed to better understand the effects of new, short-chain PFAS on human health. (*E.g.*, *Health Effects and Recommendations, Frequently Asked Questions*, Mich. PFAS Action Response Team, https://tinyurl.com/y8wfdab4 (last visited July 28, 2020) ("New PFAS have been developed and are in use and may be less persistent in the environment. However, more scientific research is needed to determine if these new PFAS could be a health concern.").)

So have many scientific experts in courts across the country. These scientists have now consistently testified that "PFASs pose a substantial present and potential hazard to human health" that threaten "virtually all Americans." (Bilott Decl., ¶ 18, Ex. 124.)

But well-developed scientific studies are expensive. For example, the collection of raw blood samples for the C8 Science Panel studies on just one PFAS chemical (PFOA), in one community, cost approximately $70 million—and the new epidemiological studies of that data by the independent scientists cost another $33 million. (*See* DuPont, Annual Report, § F-24 (Form 10-K) (Dec. 31, 2011), https://tinyurl.com/yd9zghhm.) And given the EPA's failure to promulgate enforceable MCLs for PFAS, states are already expending considerable sums to develop their own MCLs and to address PFAS contamination in drinking water and other natural resources. (*E.g., Hearing on The Devil They Knew—PFAS Contamination and the Need for*

*Corporate Accountability Before the Subcomm. on Env't of the H. Comm. on Oversight & Reform*, 116th Cong. 4 (2019) (statement of Steve Silver, Exec. Dir. of MPART), https://tinyurl.com/ydyrjs23 (explaining that Michigan "is proceeding to develop [its] own standards because the USEPA has not acted in a timely manner" and that Michigan "has already allocated $50 million over the past two years to investigate and remediate PFAS contamination and to identify responsible parties"); *id*, 116th Cong. 2 (statement of Robert R. Scott, Comm'r of the N.H. Dep't of Envtl. Servs.), https://tinyurl.com/y9dzhd6h (testifying that New Hampshire just promulgated enforceable drinking water standards, a task "better performed at a federal level with the national assets afforded to EPA"); *id.*, 116th Cong. 2–3 (statement of Catherine R. McCabe, Comm'r of the N.J. Dep't of Envtl. Prot.), https://tinyurl.com/y8n7rqdl (testifying that because of the lack of any national regulatory standard, New Jersey established an MCL for PFNA and proposed MCLs for PFOS and PFOA).) Yet even these states that are doing everything they can on PFAS lack the resources to engage in the extensive and nationwide research needed to properly evaluate all of the human health effects of PFAS exposure. (*See, e.g.*, *id.* (statements of Silver, Scott, and McCabe).)

Stakeholders, policymakers, and elected officials at the state and federal levels have realized this problem. And as a result, they have all urged Congress and the EPA to take immediate action on PFAS by funding and conducting more studies and issuing enforceable, national standards. Below is a just sampling of the various demands to Congress and the EPA that comprehensive, nationwide action be taken to address PFAS:

- The Association of State Drinking Water Administrators ("ASDWA") wrote to the EPA Administrator and to the Director of the CDC and the ATSDR on January 12, 2018, requesting that, among other things, the EPA, CDC, and ATSDR "[c]onduct more health effects research and develop consistent health effects determinations (risk levels) for known and unknown PFAS." (Bilott Decl., ¶ 18, Ex. 125 at 2.)

26

- On March 16, 2018, nine members of Congress wrote to the chairman and the ranking member of the Subcommittee on Interior, Environment, and Related Agencies of the House Committee on Appropriations urging the subcommittee to more robustly fund the ATSDR "so that the agency may better understand the health impacts of increasingly prevalent drinking water issues across the country" relating to PFAS contamination. (*Id.* ¶ 18, Ex. 126 at 2.)  These congressional members also requested the subcommittee to "include report language to require EPA to publish a maximum contaminant level goal and promulgate a national primary drinking water regulation for perfluorinated compounds (including perfluorooctanesulfonic acid and perfluorooctanoic acid) under the Safe Drinking Water Act [SDWA]." (*Id.*)

- The Ohio Environmental Council petitioned the EPA on April 10, 2018, to promulgate regulations under the Clean Water Act and the SDWA setting enforceable limits on PFOA (14 ppt) and other PFAS (70 ppt) in water supplies.  (*Id.* ¶ 18, Ex. 127 at 5.)

- The New Jersey Department of Environmental Protection wrote to the EPA Administrator on June 21, 2018, requesting that the EPA add PFAS to the national hazardous substance list, set enforceable drinking water standards for PFAS, and conduct additional research to develop and provide toxicity and risk information for a broader range of PFAS compounds.  (*Id.* ¶ 18, Ex. 122 at 4–5.)

- Several members of Congress wrote to the Acting Administrator of the EPA on July 17, 2018, to urge the EPA to reevaluate the agency's PFOA and PFOS health advisories in light of the 2018 ATSDR Profile.  The Profile established the minimal risk level for PFOA and PFOS at 10 ppt, seven times less than the EPA health advisory levels.  (*Id.* ¶ 18, Ex. 128 at 1.)

- A group of US Senators wrote to the Acting Administrator of the EPA on February 1, 2019, to urge the agency to establish enforceable federal drinking water standards for PFOA and PFOS.  Enforceable federal standards are critical to addressing public concerns about PFAS, the Senators wrote, because such standards would "allow for states to focus their efforts and limited resources on implementation and compliance assurance." (*Id.* ¶ 18, Ex. 129 at 1.)

- The ranking members of the Senate Committees on Environment and Public Works, Health, Education, Labor and Pensions, Homeland Security and Governmental Affairs, and Armed Services wrote to the Administrator of the EPA on March 6, 2019, requesting documents relating to the EPA's PFAS Action Plan because the plan failed to "include a commitment to promulgate a drinking water standard for PFOA and PFOS" and the EPA's failure to timely release its groundwater cleanup guidelines for PFOA and PFOS. (*Id.* ¶ 18, Ex. 130 at 1.)

- The ranking member of the Senate Committee on Environment and Public Works wrote to the EPA Administrator encouraging him to reject the proposals of other agencies to weaken the EPA's PFAS groundwater cleanup standards and to adopt guidelines that are sufficiently protective of human health and the environment.  (*Id.* ¶ 18, Ex. 131 at 1–2.)

- The Northeast Committee on the Environment, which comprises the environmental commissioners of Connecticut, Maine, Massachusetts, New Hampshire, New York, Rhode Island, and Vermont, wrote to the chairman and the ranking member of the Senate Committee on Environment and Public Works to identify five PFAS-related issues requiring immediate federal action. (*Id.* ¶ 18, Ex. 132 at 1–2.)  The commissioners said that the EPA should (1) establish a national MCL that fully protects the public from PFAS exposure in drinking water as soon as possible, (2) regulate PFAS as a class, and not as individual chemicals, (3) amend its regulations to treat PFAS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), (4) expedite the development and dissemination of analytical methods and treatment technologies that extend beyond drinking water, and (5) minimize or eliminate the use of PFAS in commercial and industrial applications. (*Id.*)

- The attorneys generals for twenty states, the District of Columbia, and Guam wrote to the leadership of the Senate and House of Representatives urging Congress to, among other things, designate certain PFAS as hazardous substances under CERCLA, direct the United States Geological Survey ("USGS") to conduct a nationwide sampling effort and survey of human and environmental exposure to PFAS, and establish a medical screening process for individuals who may have been exposed to PFAS. (*Id.* ¶ 18, Ex. 133 at 2–4.)

- The Governors of fifteen states wrote to the chairman and ranking members of the House and Senate Armed Services Committees urging them to include in the final version of the 2020 National Defense Authorization Act ("NDAA") provisions addressing PFAS contamination. (*Id.* ¶ 18, Ex. 134 at 2.)  The Governors requested that the NDAA (i) require the EPA to set an enforceable, nationwide drinking water standard for PFOA and PFOS, (ii) require the EPA to list PFAS as hazardous substances under CERCLA, (iii) authorize the USGS to develop advanced testing methods capable of detecting PFAS and to conduct nationwide sampling for PFAS. (*Id.*)

- The Ranking Member of the Senate Environment and Public Works Committee wrote the Administrator of the EPA for information about the EPA's plan to address PFAS in Superfund sites. (*Id.* ¶ 18, Ex. 135 at 1.)  In a 2019 hearing, the EPA identified 180 Superfunds containing PFAS.  The EPA did not explain, however, the level of contamination at each site, the specific PFAS chemicals found at each site, or how the EPA intended to address the contamination. (*Id.*)  In addition to requesting information about the EPA's plan to address the contamination, the Ranking Member also asked the Administrator to describe whether the EPA has the authority under CERCLA to order or conduct the cleanup and whether the EPA's authority would change if PFOS and PFOA were designated as hazardous substances under CERCLA. (*Id.* at 3.)

- Members of Congress wrote to the chairman and the ranking member of the House Armed Service Committee on May 26, 2020, urging them to "take this crisis [of PFAS contamination] seriously and ensure strong provisions on PFAS clean-up are included in any final FY2021 National Defense Authorization Act." (*Id.* ¶ 18, Ex. 136 at 2.)

- On June 10, 2020, the attorneys generals for twenty-one states and the District of Columbia wrote the EPA Administrator to comment on the agency's Preliminary Regulatory Determinations for Contaminants on the Fourth Drinking Water Contaminant List. (*Id.* ¶ 18, Ex. 137 at 1.) The attorneys generals explained that they support the EPA's preliminary determination to set National Primary Drinking Water Regulations ("NPDWRs") for PFOA and PFOS—and that they agree those chemicals meet the statutory criteria for regulation under the SDWA. (*Id.* at 3.) The attorneys generals encouraged the EPA to set a NPDWR and MCL for a combined concentration of PFOA and PFOS "that is much lower than the current federal Health Advisory Level of 70 ppt and is appropriately protective of human health." (*Id.* at 15.) They further requested that the EPA evaluate approaches to regulate PFAS under the SDWA as a class, rather than as individual chemicals. (*Id.* at 18.) And the attorneys generals urged the EPA to promulgate final NPDWRs "as soon as possible to protect public health, but no later than 18 months from the time the final determination to regulate is made." (*Id.* at 3.)[7]

## G. Defendants Have Impeded Efforts to Regulate and Study PFAS at the Federal Level.

Despite the widespread and largely bipartisan call for immediate action on PFAS, neither the EPA nor Congress has been able to move forward to comprehensively study or address PFAS contamination in any way that Defendants agree sufficiently addresses the issue of whether PFAS cause disease or present any health threat to humans. Nor has the Federal Government conducted any studies on the effects of PFAS on human health in a manner sufficient (according to Defendants) to confirm the severity and scope of this massive public health threat. Instead,

---

[7] This widespread call-to-action on PFAS is consistent with the current response to the COVID-19 pandemic. "It is the policy of the United States to take proactive measures to prepare for and respond to public health threats." (Donald J. Trump, *Presidential Memo. on Expanding State-Approved Diagnostic Tests* (Mar. 13, 2020), https://tinyurl.com/y89jrzfw.) These measures have included expansive testing and the use of the Defense Production Act ("DPA") to secure all health and medical resources and services needed to combat the health crisis. (*See, e.g.*, Donald J. Trump, *Executive Order on Delegating Authority under the DPA with Respect to Food Supply Chain Resources During the Nat'l Emergency Caused by the Outbreak of COVID-19* (Apr. 28, 2020), https://tinyurl.com/y77zwkoh; Alice M. Ollstein, *Trump Invokes DPA for Testing Swabs, Weeks After Reported Shortages*, Politico (Apr. 19, 2020), https://tinyurl.com/ybtn564z.) In fact, Defendant 3M knows well the importance of taking proactive measures to protect Americans during a health crisis. (Donald J. Trump, *Presidential Memo. on Order Under the DPA Regarding 3M Co.* (Apr. 2, 2020), https://tinyurl.com/y955uoym (ordering the production of N-95 respirators).) The requested relief that the proposed class seeks here will similarly address the PFAS health crisis that Defendants created.

the EPA issued only unenforceable health advisories for PFOA and PFOS in drinking water—and even that was now more than four years ago. (*Drinking Water Health Advisories for PFOA and PFOS*, EPA, https://tinyurl.com/grwoj94 (last updated Feb. 13, 2019).)

Since then, the EPA has not updated the advisories or promulgated *any* enforceable limits for PFOA, PFOS, or any other type of PFAS in drinking water. (*See id.*) Numerous bills to address PFAS contamination have been introduced in Congress. (*See* Bilott Decl., ¶ 18, Ex. 138 at 12–15.) Yet after considerable pushback and lobbying, few bills have made it through to become law (or to provide any research funding that Defendants say is sufficient to confirm the health impacts of PFAS). (*See id.*) In short, all of the efforts to date through the executive and legislative branches of government to address the massive public health threat caused by Defendants' PFAS contamination have failed, leaving resort to judicial relief as the only option.

These total failures of the legislative and executive branches on PFAS are not surprising. Defendants continue to spread misinformation about PFAS through extensive lobbying and public relations campaigns. (*See, e.g.*, Bilott Decl., ¶ 18, Ex. 82 at 1–6, Ex. 139.) Indeed, Defendants continue to use trade organizations and lobbying groups to promote their false narrative—pretending that there is no evidence to justify any regulations or laws on any PFAS chemical—including PFOA—and that each of the thousands of PFAS is unique and, therefore, must be studied and regulated separately.[8] Through such "manufacturing of doubt" and alleged

---

[8] The scientific community expressly contradicts this argument by Defendants. *See, e.g.*, Carol F. Kwiatkowski, *et al.*, *Scientific Basis for Managing PFAS as a Chemical Class*, Envtl. Science & Tech. Letters, at D (June 30, 2020), https://tinyurl.com/yb4bv8eh (explaining why "some manufacturers" are wrong for "propos[ing] that fluoropolymers should not be grouped with other PFAS for regulatory purposes").) Researchers now explain that there is "a scientific basis for managing as one chemical class the thousands of chemicals known as PFAS." (*Id.* at A.) These researchers believe that singular treatment of all PFAS chemicals is warranted because long-chain and short-chain PFAS share common physicochemical, environmental, and toxicological properties—and believe they cause the same or similar health risks in humans. (*Id.* at A–D.)

uncertainty, Defendants push the narrative that, even if one believed that there was enough evidence to suggest that PFOA, PFOS, or other long-chain PFAS pose risks to human health, there is still not enough evidence to suggest that newer short-chain PFAS pose those same risks. (*See, e.g.*, *id.* ¶ 18, Ex. 82 at 1–6, Exs. 140–41, Ex. 142 at 1–2.)

Yet, to this date, Defendants claim to promote a "science-based" approach to addressing PFAS. (*E.g.*, *ACC Testifies on PFAS Chemistries at Senate EPW Hearing*, Am. Chemistry Council (May 22, 2019), https://tinyurl.com/y9t24kfe.) But rather than support independent studies that could address the data gaps they claim exist on PFAS, Defendants fund research that supports their narrative—and only their narrative—while attacking any contradictory data and research. (*See, e.g.*, *ACC Responds to EWG's Report on 'Forever Chemicals' in America's Drinking Water*, Am. Chemistry Council (Jan. 22, 2020), https://tinyurl.com/y7m7ube2; *FluoroCouncil Supports Science-Based Policy for Long-Chain Perfluorinated Substances*, Am. Chemistry Council (May 1, 2015), https://tinyurl.com/ybp3mw4s; *Scientific Leadership*, Am. Chemistry Council, https://tinyurl.com/yc2ufc3j (last visited July 28, 2020).) Defendants even went so far as to try to improperly subpoena all of the confidential medical data reviewed by the C8 Science Panel so that they could have their paid litigation experts publish papers to attack, malign, and undermine the results and credibility of this world-class independent work as junk science. (Bilott Decl. ¶ 18, Exs. 143–44.) In doing so, Defendants have made clear that they continue to intend to perpetuate the completely false narrative that no credible scientific links have been established between any PFAS and any human disease—while attacking anyone who dares say otherwise.[9] (*Id.*)

---

[9] Defendants eventually withdrew their subpoena, but only after the plaintiffs in the multi-district litigation ("MDL") moved for a protective order and explained to the court that Defendants' request was in flagrant violation of multiple orders entered by the West Virginia Circuit Court of

## PROCEDURAL HISTORY

Mr. Hardwick now brings this lawsuit to force Defendants to do what they have been avoiding for decades: confirm the cumulative and synergistic effects of their PFAS on human health and monitor those individuals whose blood and bodies have been contaminated. Mr. Hardwick brings this lawsuit on behalf of himself and a class of "all individuals residing within the United States at the time of class certification for one year or more since 1977 with at least 0.05 parts per trillion (ppt) or more of PFOA and 0.05 ppt of any other PFAS chemical in their blood," all of whom seek the same common injunctive and equitable relief in this regard.

The harm in this case is significant and extensive, and the need for class certification is pressing.  Mr. Hardwick and the potential class members have an increased risk of disease because of the contamination of their blood and bodies.  While some risks are known (such as those related to PFOA), others are not.  For example, additional study is needed to understand the synergistic effects of exposure to multiple types of PFAS.  Mr. Hardwick and the potential class members seek urgent and comprehensive medical monitoring and studies about the effects of PFAS on human health.  *Cf. In re Fernald Litig.*, No. C-1-85-149, 1989 WL 267039, at *10 (S.D. Ohio Sept. 29, 1989) (finding that the public interest is served by establishing medical monitoring and an epidemiological study "as soon as possible" rather than "prolonging their implementation until after a trial on the merits and any appeals have run their course").  Given the COVID-19 pandemic and the association between PFAS exposure and decreased human immune response, the need for more studies is even more pressing.

---

Wood County in *Leach v. E. I. du Pont de Nemours & Co.*, No. 01-C-608, which shield such data from discovery.  (Bilott Decl., ¶ 18, Ex. 143 at 1, Ex. 145 at 1.)

Defendants initially tried to get Mr. Hardwick's case dismissed on three grounds:

(1) failure to state a claim; (2) lack of subject matter jurisdiction; and (3) and lack of personal

jurisdiction.  (Or. & Opinion, [ECF No. 128] at PageID #841.)  The Court denied all of those

Motions.  (*Id.*)  In doing so, the Court rejected Defendants' argument that accumulation of

Defendants' PFAS in human blood and bodies does not create an identifiable injury.  Instead, the

Court found Mr. Hardwick's alleged injury sufficient to support his claims that:  PFAS are toxic,

bioaccumulative and persistent; Defendants created, released, and exposed Mr. Hardwick to

PFAS; and the exposure, accumulation and persistence of PFAS in Mr. Hardwick increased his

risk of disease.  (*Id.* at PageID #849.)  Mr. Hardwick shares this same injury and claims with the

entire proposed class.  (First Am. Compl., [ECF No. 96] ¶¶ 70–73, 131.)

The Court also explained that Mr. Hardwick's requested injunctive relief—scientific

study and related medical testing and monitoring—are available remedies to combat Defendants'

tortious conduct.  (Or. & Opinion, [ECF No. 128] at PageID #851–55.)  The proposed class asks

for the same, common relief in this regard.  (First Am. Compl., [ECF No. 96] ¶¶ 132–33.)

Finally, the Court found that Mr. Hardwick's allegations supported personal jurisdiction over

each Defendant.  (Or. & Opinion, [ECF No. 128] at PageID #866.)

Upset with the Court's decision, Defendants tried to transfer the case away from this

Court to the MDL on aqueous film-forming foams (AFFF) in South Carolina.  (Bilott Decl. ¶ 18,

Ex. 146 at 1.)  Defendants attempted to characterize this case as just "an individual action for

medical monitoring by a single firefighter allegedly exposed to PFAS contained in AFFF

products."  (*Id.*)  But the Judicial Panel on Multidistrict Litigation (JPML) saw through

Defendants' veiled attempt to escape this Court and denied the transfer request.  In doing so, the

JPML recognized this case for what it really is:  a class action about PFAS (not AFFF).  (*Id.*)

So defeated once again with the JPML, Defendants tried a new delay tactic. In the parties' Rule 26(f) Report, Defendants insisted that Mr. Hardwick not be permitted to move for class certification until at least September 30, 2020. (Rule 26(f) Report, [ECF No. 147] at PageID #1407.) During a later conference call with counsel, Defendants took this position further, insisting that Mr. Hardwick not be permitted to move for class certification until at least February 1, 2021. Perhaps recognizing the unreasonableness of their position, Defendants dropped their "filing window" argument and asked the Court in their May 22, 2020 letter briefing to grant them 180 days to respond to a motion for class certification if Mr. Hardwick filed his motion before January 31, 2021, and 90 days to respond if Mr. Hardwick filed his motion after that date. (Bilott Decl., ¶ 18, Ex. 147 at 1.) In his letter briefing, Mr. Hardwick asked the Court to reject any artificial delay to class certification and allow him to file his motion as soon as possible. (*Id.* ¶ 18, Ex. 148 at 1.) The Court agreed with Mr. Hardwick, explaining that Rule 23 "directs the Court to decide class certification '[a]t an early practicable time after a person sues." (Order on Timing of Anticipated Class Cert. Mot., [ECF No. 157] at PageID #1432.) As a result, Mr. Hardwick could "file his motion for class certification as soon as he is prepared to do so." (*Id.*) The Court further held that Defendants would have ninety days to respond to Mr. Hardwick's Motion for Class Certification—and not "twice this amount of time . . . depending on when [the motion] is filed," as Defendants had requested. (*Id.*)

## ARGUMENT

"Federal Rule of Civil Procedure 23 controls certification for class actions." *Cmty. Refugee & Immigration Servs. v. Registrar, Ohio Bureau of Motor Vehicles*, 334 F.R.D. 493, 501 (S.D. Ohio 2020). Rule 23 contains two steps to certify a class. A district court must first determine whether the proposed class meets all the requirements of Rule 23(a). *In re Am. Med.*

*Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).  Rule 23(a) contains four factors: "(1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation."  *Cmty. Refugee*, 334 F.R.D. at 502.  If those four conditions are satisfied, the district court must then determine whether the proposed class "falls within at least *one* of the subcategories of Rule 23(b)."  *In re Am. Med. Sys.*, 75 F.3d at 1079.  As long as the district court works within this Rule 23 framework, it "has broad discretion in deciding whether to certify a class."  *Id.*

"The district court, however, is not permitted to inquire into a case's merits at the class certification stage."  *Cmty. Refugee*, 334 F.R.D. at 502 (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974)).  This prevents a district court from "turn[ing] the class certification proceedings into a dress rehearsal for the trial on the merits.'"  *In re Whirlpool Corp. Front-Loading Washer Prod. Liability Litigation*, 722 F.3d 838, 851–52 (6th Cir. 2013) (quoting *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 811 (7th Cir. 2012)).  For example, at the class-certification stage, a named plaintiff is *not* required to show "that all or most class members were in fact injured."  *Rikos Procter & Gamble Co.*, 799 F.3d 497, 505 (6th Cir. 2015) (relying on *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011)).  Instead, the named plaintiff must show only "that there is a common question that will yield a common answer for the class (to be resolved later at the merits stage), and that that common answer relates to the actual theory of liability in the case."  *Id.*

Applying these principles, Mr. Hardwick's proposed class satisfies the four factors in Rule 23(a)—and it falls within Rule 23(b)(2).  As a result, it is respectfully submitted that the Court should certify the class.

I. **The Proposed Class Meets the Requirements of Rule 23(a).**

Plaintiff has the burden to adequately define the proposed class. *McGee v. East Ohio Gas Co.*, 200 F.R.D. 382, 387 (S.D. Ohio 2001). But "[h]ow narrowly or broad a class may be defined depends largely on the relief sought." *Coleman v. Gen. Motors Acceptance Corp.*, 220 F.R.D. 64, 90 (M.D. Tenn. 2004) (relying on 2 Newberg on Class Actions § 6:15 (5th ed.)). When, as here, the proposed class is seeking only injunctive, equitable, and declaratory relief (rather than compensatory damages), the class definition does not require much precision (if any at all). *See Cole v. Memphis*, 839 F.3d 530, 541–42 (6th Cir. 2016) (explaining that a Rule 23(b)(2) class need not satisfy the implicit "ascertainability" requirement). Instead, when "attempting to define a (b)(2) class," the proposed class "may in some instances be quite broad in scope." *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974).

Mr. Hardwick provides a sufficient class definition to satisfy the modest requirement of Rule 23(b)(2). *See Cole*, 839 F.3d at 541–42. Mr. Hardwick asks to represent a class of "any individual residing within the United States at the time of class certification for one year or more since 1977 with at least 0.05 parts per trillion (ppt) or more of PFOA and at least 0.05 ppt or more of any other PFAS chemical in their blood serum." This proposed class defines a particular group and a particular harm—*i.e.*, persons with a specific level of PFOA and PFAS in their blood. This satisfies the low threshold for classes seeking injunctive relief under Rule 23(b)(2). *See Weathers*, 499 F.2d at 1200; *Coleman*, 220 F.R.D. at 90; *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538–39 (6th Cir. 2012) (requiring only a reference to some "objective criteria"). With an adequately defined class, the Court can move to the four factors in Rule 23(a).

### A. The Class is So Numerous that Joinder of All Members is Impracticable.

Rule 23(a) requires a showing of numerosity. Fed. R. Civ. P. 23(a)(1). A plaintiff meets this requirement if he shows that the class is "so numerous that joinder of all members is impracticable." *Id.* In other words, numerosity is about numbers. And although "[t]here is no bright line numerical test" to satisfy this test, *Cmty. Refugee*, 334 F.R.D. at 503 (citing *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 523 n.24 (6th Cir. 1976)), "[w]hen a class size reaches substantial portions, . . . the numerosity requirement is usually satisfied by numbers alone." *Id.* (citing *Am. Med. Sys.*, 75 F.3d at 1079).

For example, a potential class easily meets this requirement by "sheer numbers" alone if it includes "more than several hundred" class members. *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 570 (6th Cir. 2004) (meeting numerosity requirement with 800 class members); *see also Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006) (finding that numerosity is satisfied because "[t]he proposed class includes thousands of individuals"). In contrast, a proposed class fails to satisfy the numerosity requirement when it involves a shockingly small number of potential class members; such as five, seven, two, or ten class members. *Cash v. Swifton Land Corp.*, 434 F.2d 569, 571 (6th Cir. 1970) (collecting cases). And even "where the exact size of the class is not known," the numerosity requirement is still satisfied where "general knowledge and common sense indicate that the class is large." *Phillips v. Philip Morris Cos.*, 298 F.R.D. 355, 362–63 (N.D. Ohio 2014); *see also Senter*, 532 F.2d at 523 (allowing the district court to "consider reasonable inferences drawn from the facts before him at [this] stage").

Mr. Hardwick's proposed class easily meets this requirement. Defendants' own blood serum testing and analysis confirmed what independent scientific researchers and the government found—that nearly every American's blood and/or body is contaminated by PFAS:

"PFAS materials are clinically demonstrably present in approximately 99% of the current population of the United States."[10]  (First Am. Compl., [ECF No. 96] at PageID #574, ¶ 55.) As a result, the proposed class is numerous enough to satisfy Rule 23(a)(1) by sheer numbers alone.[11]

**B.      There are Questions of Law and Fact Common to the Class.**

Rule 23(a) also requires commonality.  Fed. R. Civ. P. 23(a)(2).  A plaintiff meets this requirement if there "are questions of law or fact common to the class."  *Id.*  The commonality requirement, however, "is qualitative rather that quantitative, that is, there need be only a single issue common to all members of the class."  *In re Am. Med. Sys.*, 75 F.3d at 1080 (quoting 1 Newberg on Class Actions § 3.01 (3d ed. 1992)).  At this stage, "the commonality requirement will be satisfied as long as the members of the class have allegedly been affected by a general policy of the [d]efendant and the general policy is the focus of the litigation."  *Cmty. Refugee*, 334 F.R.D. at 503 (quoting *Bovee v. Coopers & Lyband*, 216 F.R.D. 596, 608 (S.D. Ohio 2003)). In contrast, the plaintiff "need not show that all class members have been injured in precisely the same way or were in fact injured at all."  *Id.* (citing *Rikos*, 799 F.3d at 505); *see also Bovee*, 216 F.R.D. at 608 (explaining that "[t]he mere fact that questions peculiar to individual class members could remain" does not defeat commonality); *Putnam*, 169 F.R.D. at 94 (explaining

---

[10] This means that the proposed class contains more than 330 million Americans.  *See* U.S. Census Bureau, *U.S. & World Population Clock*, https://www.census.gov/popclock/ (last visited July 28, 2020).

[11] There are, of course, other considerations that courts can evaluate under Rule 23(a)(1).  These considerations include, among other things, whether the class members "are geographically scattered."  *Kutschback v. Davies*, 885 F. Supp. 1079, 1084 (S.D. Ohio 1995).  But this just provides additional support that the proposed class is numerous enough.  The proposed class is geographically scattered across the United States.

that "[t]he fact that there are factual differences between the members of the class . . . is of no consequence" to the commonality requirement).

In other words, commonality focuses on Defendants' conduct—not the proposed class members individually.  A common question, then, is "one that is 'capable of class wide resolution—which means determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'"[12] *Cmty. Refugee*, 334 F.R.D. at 504 (quoting *Dukes*, 564 U.S. at 350).  This requires the plaintiff to simply "enumerate questions of law or fact common to the class" that, when answered, "will advance the litigation." *Bovee*, 216 F.R.D. at 608 (citing *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir.1998) (en banc)).  This is exactly the focus and effect of Mr. Hardwick's common legal and factual questions:

    a.    Whether Defendants owed a duty to Plaintiff and members of the class to refrain from acts and/or omissions reasonably likely to result in PFAS in the blood of Plaintiff and the members of the class, and the biopersistence and bioaccumulation of such PFAS in such blood serum;

    b.    Whether Defendants knew, anticipated, foresaw, and/or should have known, anticipated, and/or foreseen that it was unreasonably dangerous to engage in acts and/or omissions that resulted in the presence, persistence, and accumulation of PFAS in the blood and/or bodies of humans;

    c.    Whether Defendants knew, anticipated, foresaw, and/or should have known, anticipated, and/or foreseen that their acts and/or omissions were likely to result in Plaintiff and the class members having persistent and accumulating PFAS in their blood and/or bodies;

    d.    Whether Defendants' acts and/or omissions proximately caused PFAS to contaminate, persist in, and accumulate in the blood and/or bodies of Plaintiff and the class members;

---

[12] This requirement creates a *much* lower burden than the Rule 23(b)(3) predominance showing. *See Phillips v. Philip Morris Cos.*, 298 F.R.D. 355, 363 (N.D. Ohio 2014) (citing *Cleary v. Philip Morris USA, Inc.*, 265 F.R.D. 289, 292 (N.D. Ill. 2010) ("While this fact, alone, may not be sufficient to satisfy the more demanding predominance standard, the common conduct of [defendant] satisfies the less demanding Rule 23(a) commonality requirement.")).

    e.      Whether the presence, persistence, and accumulation of PFAS in Plaintiff's and class members' blood and/or bodies and any resultant subcellular or other impact and/or effect, is injurious, offensive, and/or otherwise harmful to Plaintiff and the class members;

    f.      Whether Defendants' conduct is resulting in irreparable harm to Plaintiff and the class members;

    g.      Whether Defendants' conduct warrants injunctive and/or declaratory relief; and

    h.      Whether a reasonable physician would order medical monitoring under the circumstances.

(*See* First Am. Compl., [ECF No. 96] at PageID #582–83, ¶ 93.)

This Court routinely finds that these types of questions satisfy the commonality requirement.  *See, e.g.*, *Bovee*, 216 F.R.D. at 608–09.  For example, this Court in *Bovee* found that similar questions "easily satisfied" Rule 23(a)(2) when the questions focused on the defendants' conduct.  *Id.*  Those questions included:  did the defendants' conduct violate a legal duty; did the defendants act knowingly and/or recklessly; did the defendants participate in common conduct; and did the defendants' conduct cause the class to suffer damages.  *Id.* (collecting cases).  These are the same type of common questions that Mr. Hardwick seeks to have answered here.

Other courts have certified class actions involving similar questions about PFAS contamination.[13]  For example, in *Sullivan v. Saint-Gobain Performance Plastics Corp.*, the

---

[13]  Federal courts have granted class certification for medical monitoring and research classes in other factual contexts, too.  *See, e.g.*, *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410 (3d Cir. 2016) (affirming class certification for former NFL players, including testing, medical benefits, treatment, counseling, and research for neurological injuries); *In re Oil Spill by the Oil Rug Deepwater Horizon*, 295 F.R.D. 112 (E.D. La. 2013) (certifying a class following exposure from an oil spill, including access to general medical services and the expansion of a research library and outreach program); *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1 (D. Mass. 2010) (certifying a class for medical monitoring of certain smokers with no apparent symptoms of lung cancer); *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 278 (S.D. Ohio 1997) (certifying a nationwide medical monitoring class related to pacemakers).

district court certified two classes relating to PFAS exposure: plaintiffs with property damage, and plaintiffs with identifiable levels of PFAS in their blood. No. 5:16-cv-125, 2019 WL 8272995 (D. Vt. Aug. 23, 2019) (attached as Ex. A). For the latter, the class members asked for "the cost of future medical testing to determine whether a member suffers from health problems such as certain cancers associated with exposure to PFOA." *Id.* at *3. The district court agreed that class-wide adjudication was appropriate because "[t]he common *answers* to questions of liability" about the defendants' use of PFOA would apply to all plaintiffs. *Id.* at *5–6. This commonality also included, among other things, whether "asymptomatic people exposed to PFOA will benefit from medical monitoring and early detection of the illness." *Id.* at *6.

The court reached the same result in *Hermens v. Textiles Coated Inc.*, Nos. 216-2017-CV-524 and 216-2017-CV-525 (N.H. Super. Ct. July 20, 2019) (attached as Ex. B). *Hermens* certified the same two classes as *Sullivan*—a property damage class and a medical monitoring class. *Id.* at 6; *see also id.* at 7 (noting that New Hampshire's rules on certifying a class track the federal rules). The court likewise explained that common questions and answers about the medical monitoring claims applied for the entire class, such as whether exposure to PFOA increases certain health risks. *Id.* at 15–16. The court also distinguished the proposed classes from run-of-the-mill personal injury cases, which often fail class certification because they involve disparate claims and distinct damages. *Id.* at 15. In contrast, the class in *Hermens* alleged the *same* claims and asked for the *same* relief—medical monitoring. *See id.*

This is the same situation here. Mr. Hardwick's proposed class excludes all personal injury claims. (First Am. Compl., [ECF No. 96] at PageID #590, ¶ 132 ("[N]either Plaintiff nor the Class are seeking any compensatory damages for personal injuries[.]").) Instead, Mr. Hardwick asks this Court to answer the same general causation and liability questions that

supported class certification in both *Sullivan* and *Hermens*.  (*Id.* at PageID #582–83, ¶ 93.)  And

Mr. Hardwick asks for the same type of uniform relief applied across the entire class—a single,

common, class-wide medical monitoring program and scientific studies/scientific panel.[14]  (*Id.* at

PageID #590–91, ¶ 133.)  As *Sullian* and *Hermens* recognize, these type of common questions

with common relief are best answered class-wide.

Many other courts, including the Second Circuit, support the reasoning in *Sullivan* and

*Hermens*.  *See Benoit*, 959 F.3d at 501–02, 508–09.  In *Benoit*, for example, the Second Circuit

recognized that medical monitoring is an available remedy for a proposed class of plaintiffs,

referred to as "Accumulation Plaintiffs," whose alleged injury was that they "have accumulated

levels of PFOA in their blood."  *Id.* at 501 ("We conclude that . . . allegations of the physical

manifestation of or clinically demonstrable presence of toxins in the plaintiff's body are

sufficient to ground a claim for personal injury and that for such a claim, if proven, the plaintiff

may be awarded, as consequential damages for such injury, the costs of medical monitoring.").

Likewise, in *Burdick v. Tonoga, Inc.*, the New York court certified what it called a "body

invasion class" of plaintiffs, all of whom had elevated PFOA accumulation in their blood.  110

N.Y.S.3d 219, 2018 WL 3355239, at *10, 13 (N.Y. Sup. Ct. July 3, 2018) (table) (attached as

---

[14] There is also growing support in academia for the remedy Mr. Hardwick and the class ask for.
In fact, this type of case—where Defendants actively hid their misconduct and the harmfulness
of PFAS for decades (and still are)—is perfect for this type of class-wide relief:

> If a plaintiff was injured by a toxin or product, where the defendant chose
> to hide its head in the sand rather than test, she cannot prove this was the
> case.  She may lose even where there is evidence the defendant engaged in
> misconduct to prevent or hide research into its products.  This Article
> proposes a second-best solution to this problem: a knowledge remedy
> which requires a defendant found to have engaged in misconduct to fund
> independent studies into what risks its products impose.

(Bilott Decl., ¶ 18, Ex. 149 at 1361, 1378–82 (discussing medical monitoring)).

Ex. D), *aff'd*, 112 N.Y.S.3d 342, 347–48 (N.Y. App. Div. 2019) (allowing the class to "recover medical monitoring costs" even though the class contained symptom-free and disease-free plaintiffs). The court found "the following issues [,] [which are] relevant to medical monitoring[,] common to all class members: whether defendant was negligent in releasing PFOA from its facility into the surrounding air, soil and water; whether PFOA is hazardous to human health; and whether medical monitoring is available for the diseases linked to PFOA exposure." *Id.* at *13.

And most recently, the New Jersey Court of Appeals just affirmed class certification against Hoffman-La Roche for its alleged contamination of ground water. *Sutton v. Hoffman-La Roche Inc.*, Nos. A-5545–49 (N.J. Super. Ct. App. Div. May 27, 2020) (attached as Ex. E). The court rejected the defendants attempt to "finely parse" the plaintiffs' claims.[15] *Id.* at 20. Instead, the court explained that "[c]ommonality was properly found because the claims shared by the class arise out of a common set of circumstances: defendants' chemical releases . . . commingled and spread off the [defendants' property]"—and contaminated the plaintiffs' property. *Id.* Indeed, the court faced many common questions, including "whether defendants are liable to the members of the class for their release of abnormally hazardous substances." *Id.* at 19.

---

[15] Because the class asked for monetary damages, it was also required to show that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." *Sutton*, at 28. A showing of predominance is *much* higher than the mere commonality showing Mr. Hardwick is required to meet here. *See supra* pp. 38–39. But even under that heavier burden, the court in *Sutton* still rejected the defendants' argument that the court would have to perform a plaintiff-by-plaintiff inquiry about individual contamination and damages. *Sutton*, at 29. Even though the court admitted that it may, at some point, need to assess individual damage evidence, class certification was still proper because the "plaintiffs' causes of action overlap substantially and require common proof relying primarily on evidence of the four defendants in creating the contamination, including their historical operations, disposal practices and chemical usage." *Id.* at 31; *see also id.* at 32–33 (listing the many common questions, such as whether Roche released hazardous chemicals into the groundwater, whether Roche was negligent in doing so, and whether other companies contributed).

Resolving these common questions are also critical to this class.  Regardless of the ultimate answers, these questions will resolve the class-wide issues "in one stroke."  *See Young*, 693 F.3d at 543–43.  This includes whether Defendants were negligent, whether Defendants are liable, and whether the requested relief is appropriate.  The answers to these common questions will absolutely "advance the litigation."  *Sprague*, 133 F.3d at 397.  As a result, any one of these common questions "easily satisfies" the commonality requirement in Rule 23(a)(2).

### C.      Mr. Hardwick's Claims are Typical of the Class Claims.

Rule 23(a) also requires typicality.  Fed. R. Civ. P. 23(a)(3).  A plaintiff meets this requirement if "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  *Id.*  A named plaintiff's claim is typical "if it arises from the same . . . practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory."  *In re Am. Med. Sys.*, 75 F.3d at 1082 (quoting 1 Newburg, *supra*, § 3–13).  Or more simply, typicality means that the interests of the named plaintiff align with the interests of the class.  *Id.*  This alignment ensures that, "in pursuing his own claims, the named plaintiff will also advance the interests of the class members."  *Id.*

This typicality requirement closely tracks commonality.  Indeed, both "requirements are closely related because they both help determine whether the claim of the named plaintiff and those of the class as so interrelated that the interests of the absent class members will be protected."  *Cmty. Refugee*, 334 F.R.D. at 504.  So just like commonality, typicality requires "a common element of fact or law."  *Id.* (citing *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007).  But also like commonality, typicality does *not* require the plaintiff's claims or underlying facts to be identical to those of the class.  *See Bovee*, 216 F.R.D. at 609.

44

Mr. Hardwick's claims are typical of the class claims because they arise from the same tortious conduct:  Defendants' marketing, manufacturing, and releasing of PFAS—causing widespread contamination.  And Defendants treated Mr. Hardwick no different than every other potential class member—they contaminated Americans without distinction.  (*See* First Am. Compl., [ECF No. 96] at PageID #575–79, ¶¶ 60–77.)  *See also Cmty. Refugee*, 334 F.R.D. at 505 (finding typicality where "there is no indication that" Defendant treated different class members differently).  This is highlighted by the uniform call-to-action by organizations and states across the county (and the world).  *See supra* pp. 15–29.  No matter where someone lives, what they do, or the choices they have made, Defendants' PFAS have contaminated the blood of all the proposed class members just like it has contaminated Mr. Hardwick's blood.  As a result, Mr. Hardwick satisfies Rule 23(a)(3) because his claims are identical to the claims of the proposed class.  Or as the Sixth Circuit puts it, "as goes the claim of the named plaintiff, so go the claims of the class."  *See Sprague*, 133 F3d at 399; *see also Sutton*, at 22 ("In cases where the named plaintiffs and putative class members are impacted by the same unlawful conduct, typicality is generally satisfied.").

### D.     Mr. Hardwick Will Fairly and Adequately Represent the Interests of the Class.

An additional requirement of Rule 23(a) is adequacy.  Fed. R. Civ. P. 23(a)(4).  A plaintiff meets this requirement if "the representative parties will fairly and adequately protect the interests of the class."  *Id.*  Adequacy involves a two-step inquiry:  (1) the class "representative [has] common interests with the unnamed members of the class," and (2) he "will vigorously prosecute the interests of the class through qualified counsel."  *Young*, 693 F.3d at 543.  Both requirements are satisfied here.

### 1. The interests of Mr. Hardwick and the proposed class are identical.

This first requirement brings no new analysis. Instead, "[t]he common interest requirement overlaps with the commonality and typicality requirements." *Cmty. Refugee*, 334 F.R.D. at 505. Just like those requirements, the "common interest" requires that the named plaintiff and "the class members have interests that are not antagonistic to one another." *Id.* (quoting *In re Dry Max Pampers Litig.*, 724 F.3d 713, 721 (6th Cir. 2013)). This requirement is satisfied if "there is no indication of a conflict of interest." *Beattie*, 511 F.3d at 563. For example, a "common interest" exists when the named plaintiff and the class all "suffered the same injury." *Id.* In such a situation, "there is every reason to believe that [the plaintiff] will vigorously prosecute the interests of the class." *Id.*

This is the exact situation here. As explained above, Mr. Hardwick and the proposed class share the same legal claims that arise from the same tortious conduct by Defendants. They also share the same goal: common, uniform, class-wide injunctive and equitable relief in the form of studies, testing, analysis, and monitoring—not money damages for any personal injuries, property damage, or other relief that could vary among the individual class members. (*See* First Am. Compl., [ECF No. 96] at PageID #590–91, ¶¶ 131–33.) This is enough to satisfy the "common interest" requirement. *See Beattie*, 511 F.3d at 563; *see also* 7A Wright & Miller, Fed. Prac. & Proc. Civ. § 1769 (3d ed. 2019) ("[T]he representatives and the class members must share common objectives and legal or factual positions to establish adequacy of representation.").

### 2. Counsel will vigorously prosecute the proposed class.

Rule 23(a)(4) also requires qualified counsel that will protect the interests of the class. *See Cmty. Refugee*, 334 F.R.D. at 506. This means that "the class attorney must be qualified,

experienced and generally able to conduct the proposed litigation." Wright & Miller, *supra*, § 1769.1 (internal quotation marks omitted). This Court recognizes that class counsel "must have sufficient financial and personal involvement to encourage them to prosecute the action vigorously, and adequate resources and legal representation to meet the demands of maintaining the action." *Cmty. Refugee*, 334 F.R.D. at 506.

The proposed class counsel checks all these boxes. Mr. Hardwick asks the Court to appoint the undersigned lawyers, with the law firms of Taft Stettinius & Hollister LLP, Douglas & London, PC, and Levin Papantonio PA, as class counsel. Such counsel are on the plaintiffs' steering committee in the DuPont C8 MDL pending before this Court (involving much of the same tortious conduct). Indeed, Mr. Bilott and Mr. London are Co-Lead Counsel of that steering committee. Each attorney also has many years of experience litigating complex mass torts— including PFAS-related litigation.[16] And all of these law firms have invested significant time and resources in the C8 MDL (which led to a $671 million settlement of about 3,600 claims). These same attorneys and law firms also currently serve in top leadership positions, including Co-Lead Counsel, Advisory Counsel, and Co-Chairs of various key committees, in the nationwide AFFF MDL pending in federal court in South Carolina involving claims related to PFAS-based firefighting foams, in which all of these defendants also are parties. The Taft firm also served as class counsel for tens of thousands of people in the first PFAS exposure cases in West Virginia (which generated the C8 Science Panel and the C8 Medical Panel), and class

---

[16] *See also* Robert A. Bilott, TAFT LAW, https://www.taftlaw.com/people/robert-a-bilott (last visited July 27, 2020); David J. Butler, TAFT LAW, https://www.taftlaw.com/people/david-j-butler (last visited July 30, 2020); Gary J. Douglas, DOUGLAS & LONDON, https://www.douglasandlondon.com/attorneys/gary-j-douglas/ (last visited July 30, 2020); Ned McWilliams, LEVIN PAPANTONIO PA, https://www.levinlaw.com/attorney-profiles/ned-mcwilliams (last visited July 27, 2020).

counsel for thousands of people in New Jersey exposed to PFAS.  (*See* Affidavits of Proposed

Class Counsel (attached as Exs. J–L); *see also* Bilott Decl., Ex. C, ¶¶ 2–16.)  All of these firms

are currently helping a variety of parties all across the country, including individuals, water

providers, and states—who have been negatively impacted by Defendants' PFAS.  These firms

are committed to doing the same in this class action.  And these attorneys have spent their

careers litigating these type of claims.  Mr. Hardwick's attorneys will prosecute this action

vigorously and competently.

As a result, the requirements of Rule 23(a)(4) are satisfied because Mr. Hardwick will

fairly and adequately represent the interests of the class—and the four factors in Rule 23(a) are

also satisfied.  Mr. Hardwick respectfully requests, therefore, that the Court appoint the

undersigned attorneys as class counsel for the proposed class.

## II.  The Proposed Class Meets the Requirements of Rule 23(b)(2).

If a proposed class meets the requirements in Rule 23(a), a district court may certify a

class if it also meets "at least *one* of the subcategories of Rule 23(b)."  *In re Am. Med. Sys.*, 75

F.3d at 1079.  Rule 23(b)(2) permits class certification when "the party opposing the class has

acted or refused to act on grounds that apply generally to the class, so that final injunctive relief

or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ.

P. 23(b)(2).  In other words, "[t]he key to the (b)(2) class is the indivisible nature of the

injunctive or declaratory remedy."  *Cmty. Refugee*, 334 F.R.D. at 507 (quoting *Dukes*, 564 U.S.

at 360).

This type of "mandatory" class under Rule 23(b)(2) means that the alleged wrongful

conduct "is such that it can be enjoined or declared unlawful only as to all of the class members

or as to none of them."  *Id.* (quoting *Dukes*, 564 U.S. at 360).  Put differently, the class claim "is

susceptible to a single proof and subject to a single injunctive remedy." *Senter*, 532 F.2d at 525. Class actions "will usually satisfy this requirement" when the proposed class seeks "to define the relationship between the defendant and the 'world at large.'" *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 317 (3d Cir. 2011) (citation omitted), *accord Huguley v. Gen. Motors Corp.*, 925 F.2d 1464 (6th Cir. 1991) (table) (citing *Laskey v. United Auto. Workers*, 638 F.2d 954, 956 (6th Cir. 1981) ("[C]ourts should generally certify classes pursuant to 23(b)(2) when the class members are seeking injunctive relief[.]")).

The proposed class meets this standard and falls squarely within Rule 23(b)(2). Mr. Hardwick and the proposed class ask for injunctive and equitable/declaratory relief only, which would provide equal relief to every member of the class. (*See* First Am. Compl., [ECF No. 96] at PageID #590–91, ¶¶ 130–33.) As explained above, Defendants treated Mr. Hardwick no different than every other potential class member: they contaminated everyone with equal impunity. But despite this, Mr. Hardwick and the proposed class ask the Court for no compensatory damages. Instead, they just want the Court to declare Defendants' relationship between PFAS and the "world at large"—*i.e.*, that Defendants' PFAS materials are dangerous and can cause human disease and that Defendants are responsible for releasing that harm upon the class—and to order appropriate monitoring, testing, and scientific studies with respect to such dangers. (*See id.* at PageID #576–77, ¶¶ 63–67.)

More specifically, Mr. Hardwick and the proposed class want the court to order the creation and funding of a program to design, implement, and administer appropriate medical and scientific studies, testing, and analysis for Mr. Hardwick and all the potential class members, which are necessitated by the contamination of their blood and bodies by Defendants' PFAS. This program would be overseen by the Court and encompass nationwide medical and

49

epidemiological studies focused on studying, evaluating, reviewing, identifying, publishing, and notifying Mr. Hardwick and the class of the causal connection(s) between any single or combination of PFAS in human blood and bodies and any injury, human disease, adverse human health impacts, or other health risks.

As a result, if Mr. Hardwick prevails and the requested equitable/injunctive relief is ordered, the scientific monitoring and analysis program would be designed to benefit the entire class simultaneously. Of course, the opposite could also be true (if the Court ultimately agrees with Defendants on the merits and decides that no such relief is appropriate). But either way, the relief either applies to everyone—or no one. That is the quintessential characteristic of a Rule 23(b)(2) class. *See Senter*, 532 F.2d at 525. Thus, because the proposed class satisfies the requirements in Rule 23(a) and Rule 23(b)(2), Mr. Hardwick respectfully requests that the Court certify the class and appoint his proposed class counsel.

### III. The Court Has Jurisdiction Over Unnamed, Non-Ohio Class Members.

There are no jurisdictional concerns for this proposed nationwide class action. In their motions to dismiss, Defendants argued that the Court lacks specific jurisdiction over non-Ohio class members. (*See, e.g.*, Archroma Mgmt.'s Mot. to Dismiss, [ECF No. 69] at PageID #322; 3M Co.'s Mot. to Dismiss, [ECF No. 68] at PageID #302–05.) Although the Court denied the motions to dismiss, it "decline[d] Defendants' invitation to determine whether this Court has jurisdiction over non-Ohio putative class members." (Op. & Order, [ECF No. 128] at PageID #857.)

In response to this motion for class certification, however, Defendants are likely to raise the same argument, which centered on the Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017) ("*BMS*"). *BMS* addressed CAFA's new mass

action procedure and determined that state courts lack specific jurisdiction over nonresident

plaintiffs who did not suffer any harm in that state.  137 S. Ct. at 1782.  Defendants ask the Court

to expand *BMS* to reach the long-established class action procedure under Federal Rule 23 and

dismiss all non-Ohio class members.

Defendants are wrong about *BMS*.  Mr. Hardwick explained why *BMS* does not apply in

his response to Defendants' motions to dismiss.  (Plaintiff's Combined Mem. in Opp., [ECF No.

94] at PageID #552–55.)  To start, *BMS* addressed personal jurisdiction over individual named

plaintiffs who brought a mass action in California state court.  It did not address federal

jurisdiction over absent, unnamed class members in federal court.  *BMS*, 137 S. Ct. at 1778.

*BMS* also said nothing about two critical issues here:  (1) whether specific jurisdiction in a

Rule 23 class action is determined by reference to the absent class members (it is not), or

(2) whether Rule 23 provides enough due process safeguards for defendants in class action

litigation (it does).  (*See* ECF No. 94 at PageID #554 (explaining that "class actions possess

additional due process safeguards not applicable in mass tort actions.").)  With these major

differences, Mr. Hardwick clarified that most courts have declined to extend the holding of *BMS*

to class actions.  (*Id.* at PageID #553.)  Simply put, class actions are not mass actions.  The Court

can reject Defendants' nonresident-jurisdictional arguments for this reason alone.

But Defendants' arguments about *BMS* were also misleading.  For example, DuPont

argued that "[w]hile *Bristol-Myers Squibb* was a mass tort action, courts consistently apply

*Bristol-Myers Squibb* to dismiss for lack of specific jurisdiction claims brought on behalf of out-

of-state putative class members regardless of the nature of the claims."  (DuPont's Mot. to

Dismiss, [ECF No. 73] at PageID #367 n.2.)  This is simply not true.  Instead, "a significant

supermajority of cases—fifty of the sixty-four rulings on the issue from June 2017 through

September 2019, and four out of every five judges—have rejected the argument that *Bristol-Myers Squibb* constrains court's jurisdiction over defendants with respect to unnamed class members."  Daniel Wilf-Townsend, *Did Bristol-Myers Squibb Kill the Nationwide Class Action*, 129 Yale L.J. Forum 205, 205 (2019); *id.* at 229 (providing a table cataloging all cases discussing the application of *Bristol-Myers Squibb* to unnamed out-of-state class members).  So a clear result has emerged post-*BMS*:  "a strong supermajority of the federal district court judges who have considered the issue have ruled in favor of letting class actions proceed largely as they did before *BMS*."  *Id.* at 226.

And since the motion to dismiss briefing (and the publication of Wilf-Townsend's survey), Mr. Hardwick's positon has become even stronger—while Defendants lost the last foothold in their *BMS* argument.  Defendants relied mainly on cases out of the Northern District of Illinois to support their *BMS* interpretation.  (*See* DuPont's Mot. to Dismiss, [ECF No. 73] at PageID #367 n.2 (two of four cases from N.D. Ill.); Solvay Specialty Polymers USA Mot. to Dismiss, [ECF No. 71] at PageID #341–42 (five of seven cases from N.D. Ill.); Archroma Mgmt.'s Mot. to Dismiss, [ECF No. 69] at PageID #322 (only case from N.D. Ill.).)  To be fair, this was no surprise.  Of the fourteen cases that have extended *BMS* to block jurisdiction over nonresident class members, "eleven came from the Northern District of Illinois, and four were from the same judge, Judge Harry Leinenweber."  Wilf-Townsend, *supra*, at 213.  In fact, the Northern District of Illinois was the only district in the country that unanimously applied *BMS* to class actions.  *Id.* (explaining that twenty districts were unanimous in *not* applying *BMS* to class actions—and two districts were split on the issue).

The Seventh Circuit recently reversed the Northern District of Illinois.  *Mussat v. IQVIA, Inc.*, 953 F.3d 441 (7th Cir. 2020).  The Seventh Circuit's decision is significant for at least four

reasons.  It is the first federal court of appeals to address whether *BMS* applies to class actions, it answered the question head on, and it was unanimous.  *Id.* at 445–48.  The decision is also significant because it leaves just three stray cases—out of more than sixty—that support Defendants' argument.

The Seventh Circuit explained that "[c]lass actions, in short, are different from many other types of aggregate litigation, and that difference matters in numerous ways for the unnamed members of the class." *Id.* at 446–47.  And so, the court "[saw] no reason why personal jurisdiction should be treated any differently from subject-matter jurisdiction and venue." *Id.* at 447.  For both of those issues, courts have never considered the status of absent class members. *Id.* (concluding that unnamed class members need not show general or specific personal jurisdiction).  The Seventh Circuit also rejected arguments that Rule 4(k) or due process concerns required a different result. *See id.* at 447–48 (quoting *BMS*, 137 S. Ct. at 1784).  The Seventh Circuit denied the defendants' request to hear the case en banc. *Mussat v. IQVIA, Inc.*, No. 19-1204 (May 12, 2020).

This Court should apply the Seventh Circuit's reasoning in *Mussat* and join the "strong supermajority" (and now near unanimity) of district courts that refuse to apply *BMS* to class actions.  In fact, this Court recently did just that, explaining that it "is persuaded by the reasoning in the Seventh Circuit's recent decision in *Mussat*." *Progressive Health & Rehab Corp. v. Medcare Staffing, Inc.*, No. 2:19-cv-710, 2020 WL 3050185, at *3–5 (S.D. Ohio June 8, 2020) (attached as Ex. F.).  So just as the Seventh Circuit and this Court have both said, the unnamed class members need not show either general or specific jurisdiction.[17] *Id.* at *4–5 (analyzing

---

[17] Other courts around the country have also quickly adopted the Seventh Circuit's reasoning. *See, e.g., Munsell v. Colgate-Palmolive Co.*, No. CV 19-12512-NMG, 2020 WL 2561012, at *8 (D. Mass. May 20, 2020) (attached as Ex. G); *Murphy v. Aaron's, Inc.*, No. 19-CV-00601, 2020

*Mussat*).  As a result, this Court's decision explaining that Mr. Hardwick established personal jurisdiction over each Defendant remains all that the Court needs to do.  (Op. & Order, [ECF No. 128] at PageID #866.)  There are no additional concerns about jurisdiction.

## CONCLUSION

The proposed class satisfies the requirements of Rule 23(a) and Rule 23(b)(2).  As a result, Mr. Hardwick respectfully requests that the Court certify a nationwide class of "any individual residing within the United States at the time of class certification for one year or more since 1977 with at least 0.05 parts per trillion (ppt) of PFOA and at least 0.05 ppt or more of any other PFAS chemical in their blood serum" to pursue the common claims of the class for equitable, injunctive, and declaratory relief.   Mr. Hardwick also respectfully requests that the Court appoint the undersigned counsel, from the law firms of Taft Stettinius & Hollister LLP, Douglas & London, PC, and  Levin Papantonio PA, as class counsel.

---

WL 2079188, at *12 (D. Colo. Apr. 30, 2020) (attached as Ex. H); *Lacy v. Comcast Cable Commc'ns, LLC*, No. 3:19-CV-05007, 2020 WL 1469621, at *2 (W.D. Wash. Mar. 26, 2020) (attached as Ex. I).

Respectfully submitted,

/s/ David J. Butler
David J. Butler (0068455), Trial Attorney
TAFT STETTINIUS & HOLLISTER LLP
65 East State Street, Suite 1000
Columbus, Ohio 43215
Telephone: (614) 221-2838
Facsimile: (614) 221-2007
dbutler@taftlaw.com

Robert A. Bilott (0046854)
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Telephone: (513) 381-2838
Facsimile: (513) 381-0205
bilott@taftlaw.com

Gary J. Douglas (pro hac vice *pending*)
DOUGLAS & LONDON, PC
59 Maiden Lane, 6th Floor
New York, NY 10038
Telephone: (212) 566-7500
Facsimile: (212) 566 7501
gdouglas@douglasandlondon.com

Ned McWilliams (pro hac vice)
LEVIN PAPANTONIO P.A.
316 South Baylen Street
Pensacola, FL 32502
Telephone: (850) 435-7138
nmcwilliams@levinlaw.com

*Attorneys for Plaintiff Kevin Hardwick*

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the above was served through the Court's CM/ECF system this 31st day of July, 2020, on all counsel of record.

*/s/ David J. Butler*