### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**KEVIN D. HARDWICK,**

**Plaintiff,**                                   **Case No. 2:18-cv-1185**
                                                **JUDGE EDMUND A. SARGUS, JR.**
**v.**                                           **Magistrate Judge Elizabeth Preston Deavers**

**3M COMPANY, et al.,**

**Defendants.**

### OPINION AND ORDER

This matter is before the Court on Plaintiff's Motion for Class Certification (ECF No.

164), Defendants' Memorandum in Opposition (ECF No. 200,[1] 201[2]), and Plaintiff's Reply in

Support of his Motion (ECF No. 210).  For the reasons that follow, the Court **GRANTS IN**

**PART AND DENIES IN PART** Plaintiff's Motion and **CERTIFIES** the following class:

> Individuals subject to the laws of Ohio, who have 0.05 parts per trillion (ppt) of
> PFOA (C-8) and at least 0.05 ppt of any other PFAS in their blood serum.

## I.     INTRODUCTION

Mr. Hardwick filed this action as a related case to the multidistrict litigation ("MDL") *In*

*Re: E. I. Du Pont de Nemours and Company C-8 Personal Injury Litigation*, 2:13-md-02433,

pending before this Court.  The MDL dealt with ammonium perfluorooctanoate acid ("PFOA" or

"C-8") which is a man-made substance that is in the per- and polyfluoroalkyl ("PFAS") group of

chemicals.  PFAS are often referred to as "forever chemicals" because of their unique chemical

stability.  Government agencies estimate that unlike most chemicals ingested, PFOA and

numerous of the PFAS accumulate in a human body for years, as opposed to hours, and in the

---

[1] ECF No. 200 is a redacted version, with personal identifiers of individuals removed.
[2] ECF No. 201 is an unredacted version that is filed under seal.

environment for millennia.  Agency for Toxic Substances and Disease Registry, 2018,

*Toxicological Profile for Perfluoroalkyls. Draft for Public Comment*, June 2018,

https://www.atsdr.cdc.gov/ toxprofiles/tp200.pdf.

The C-8 MDL originated from a class action in West Virginia that encompassed

approximately 70,000 people.  *Leach v. E. I. du Pont de Nemours & Co.*, No. 01-C-698 (Wood

County W. Va. Cir. Ct.) ("*Leach Case*").  This class of individuals participated in an

epidemiological study, which under the terms of a class action settlement, ultimately permitted

approximately 3,500 class members to file personal injury cases against DuPont.  At the same

time, under the Settlement Agreement, approximately 67,000 class members were barred from

asserting claims against DuPont for the C-8 they ingested in their water.

The 3,500 cases ultimately became the C-8 MDL, five of which were tried to juries.

Currently, all of the individual C-8 MDL cases have either been tried or were part of two global

settlements, with the exception of one case that is still on appeal.  This purported class action

remains.

At the heart of the instant lawsuit is Mr. Hardwick's allegation that Defendants,

manufacturers and distributers of PFAS, knew for decades that these chemicals presented a

serious risk of disease and harm, engaged in a systematic effort to conceal and deny the dangers

of PFAS, misled regulators and the public, and made billions of dollars in profits while

contaminating millions of people without their knowledge.  Defendants deny these allegations on

numerous grounds.

Issues abound in the briefing before the Court as to the impact of PFAS on the health of

the public.  With discovery only permitted to support the parties' positions on class certification,

the parties offer expert testimony, Congressional Hearing transcripts and documents,

governmental agency studies, private chemical industry/economic development groups' studies, and environmental and health watchdog groups' studies. *See e.g.*, Agency for Toxic Substances and Disease Registry, *Per- and Polyfluoroalkyl Substances (PFAS) and Your Health, Multi-Site Health Study*, https://tinyurl. com/1lq6kr5p; Environmental Protection Agency, *Research on Per and Polyfluoroalkyl Substances (PFAS)*, https://www.epa.gov/ chemicalresearch/research-and-polyfluoroalkyl-substances-pfas#1; *Hearing on The Devil They Knew—PFAS Contamination and the Need for Corporate Accountability, Part II*, Subcomm. on Env't of the H. Comm. on Oversight & Reform, 116th Cong. 1–5 (2019) (written responses to committee questions of Denise Rutherford, Senior VP of Corp. Affairs, 3M), https://tinyurl.com/yd6st3om; Liz Bowman, *FluoroCouncil Cos. to Phase out Long-Chain Chemicals by Year's End*, Am. Chemistry Council (Jan. 20, 2015); National Institute of Environmental Health Sciences, *PFAS Research*, https://www.niehs.nih.gov /research/programs/pfas/index.cfm.

Generally, Defendants take the position the dose determines the harmful effects of PFAS because "[a] fundamental principle of toxicology is that the dose makes the poison." (Defs' Mem. in Opp. at 29, ECF No. 201.) Defendants contend that Plaintiff offers no method to measure the health effects of the PFAS he has in his blood and body. Thus, Defendants conclude that even if "some real-world dose of some PFAS could have health effects," on individuals, "the age, gender, weight, genetic predispositions, medical history, lifestyle, and existing health issues would have a big impact in determining whether any particular class member might face increased health risks." *Id*. at 30.

Plaintiff contends that "dose" is irrelevant in this case "because PFOA and PFAS harm humans at any level, and thus, there needs to be a scientific panel to study and address those issues." (Pl's Reply at 13, ECF No. 210.) He maintains that the class is defined in a way that requires each member to have above a specific amount of PFOA and PFAS in his or her blood, thus the individual

3

attributes of a class member are irrelevant: "No matter where someone lives, what they do, or

the choices they have made, Defendants' PFAS have contaminated the blood of all the proposed

class members just like it has contaminated Mr. Hardwick's blood," causing them to "all face the

same persistent, continuing, and accumulating contamination of their blood and bodies with

Defendants' chemicals—and the associated risks and threats of developing various diseases,

including cancer." (Pl's Mot. for Class Cert. at 45, ECF No. 164.)

The parties *agree* that PFOA and other PFAS have entered the bodies of nearly every

American. The parties *disagree* as to whether the PFAS is harmful, and if it is, the

appropriateness of a nationwide class to monitor the harmful effects. Defendants call the

proposed class "the most ambitious class imaginable." (Defs' Mem. in Opp. at 1, ECF No. 201.)

Plaintiff responds that "Defendants engaged in the most ambitious contamination scheme in

American history. PFAS did not exist before Defendants created it—and now PFAS has

contaminated the blood of nearly every American. So the size of the proposed class simply

reflects the astonishing breadth of Defendants' misconduct." (Pl's Reply at 1, ECF No. 210.)

## II.     BACKGROUND

### A.     PFAS

PFAS are man-made chemicals described by the United States Environmental Protection

Agency as follows:

> Per- and polyfluoroalkyl substances (PFAS) are a group of man-made chemicals
> that includes PFOA, PFOS and GenX chemicals. Since the 1940s, PFAS have been
> manufactured and used in a variety of industries around the globe, including in the
> United States. PFOA and PFOS have been the most extensively produced and
> studied of these chemicals. Both are very persistent in the environment and in the
> human body. Exposure to certain PFAS can lead to adverse human health effects.

https://www.epa.gov/pfas/pfas-what-you-need-know-infographic.

**B.      This Lawsuit**

Plaintiff Kevin D. Hardwick brings claims for negligence, battery, declaratory judgment,

and conspiracy.  He asks for equitable relief in the form of the establishment of a panel of

scientists to study the effects of PFAS on the human body and for medical monitoring of the

class of those individuals whose PFOA and other PFAS level causes them to be at an increased

risk of injuries including cancers.  Plaintiff describes the nature of this case as follows:

> This is a national class action brought on behalf of Plaintiff individually, and on
> behalf of all others similarly situated, for injunctive, equitable, and declaratory
> relief, by Plaintiff and other class members for injuries arising from the intentional,
> knowing, reckless and/or negligent acts and/or omissions of Defendants in
> connection with contamination of the blood and/or bodies of Plaintiff and other
> class members with synthetic, toxic per- and polyfluoroalkyl substances
> (collectively "PFAS"), including but not limited to perfluorooctanoic acid
> ("PFOA") and perfluorooctane sulfonic acid ("PFOS") and related chemicals,
> including but not limited to those that degrade to PFOA and/or PFOS, and including
> but not limited to C3-C-15 PFAS chemicals, such as perfluorohexanesulfonate
> (PFHxS), perfluorononanoate (PFNA), perfluorobutanesulfonate (PFBS),
> perfluorohexanoate (PFHxA), perfluoroheptanoate (PFHpA),
> perfluoroundecanoate (PFUnA), perfluorododecanoate (PFDoA), HFPA Dimer
> Acid (CAS # 13252-13-6/C3 Dimer Acid/P-08-
> 508/FRD903/GX903/C3DA/GenX), and HFPA Dimer Acid Ammonium Salt
> (CAS# 62037-80-3/ammonium salt of C3 Dimer Acid/P-08-
> 509/FRD902/GX902/GenX), which resulted and continues to result from
> Defendants using Plaintiff and the other class members as part of a massive,
> undisclosed human health experiment without the knowledge and/or consent of
> Plaintiff or the other class members.

(Am. Compl. ¶ 1, ECF No. 96.)

> Plaintiff seeks to have the following class certified:

> [A]ny individual residing within the United States at the time of class certification
> for one year or more since 1977 with 0.05 parts per trillion (ppt) or more of PFOA
> and at least 0.05 ppt or more of any other PFAS in their blood serum.

Mr. Hardwick names as Defendants the alleged dominant firms that currently, or in the

past, manufactured and distributed PFAS:  3M Company, E. I. du Pont de Nemours and

Company, the Chemours Company, Archroma Management L.L.C., Arkema, Inc., Arkema

France, S.A., Daikin Industries Ltd., Daikin America, Inc., SolvaySpecialty Polymers, USA, LLC, and Asahi Glass Company, Ltd.

### 1.      Allegations

In the Amended Complaint, Plaintiff alleges that "Defendants have each marketed, developed, distributed, sold, manufactured, released, trained users on, produced instructional materials for, and/or otherwise handled and/or used one or more PFAS materials, including in Ohio and this District, in such a way as to cause the contamination of Plaintiff's and the class members' blood and/or bodies with PFAS, and the resultant biopersistence and bio-accumulation of such PFAS in the blood and/or bodies of Plaintiff and other class members." (Am. Comp. ¶ 29.)

The Amended Complaint provides a history of PFAS substances, which "were first developed in the late 1930s to 1940s and put into large-scale manufacture and use by the early 1950s." *Id*. ¶ 28.  Plaintiff alleges that PFAS are unique chemicals because of their biopersistent and bioaccumulative qualities.  The pleading contains allegations that PFAS cause significant adverse health effects, "including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medially-diagnosed high blood pressure, high cholesterol and is known to cause permanent subcellular injuries." *Id*. ¶ 53.

Plaintiff avers that each Defendant learned of various studies and data indicating that exposure to PFAS have significant negative impacts on human health, including "increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts, which such Defendants' own scientists, lawyers, and advisors recommended be studied further to assess the extent to which PFAS exposures were causing those effects." *Id*. ¶ 43.  Plaintiff further states that Defendants "knew and shared among themselves all relevant information relating to the

presence, biopersistence, and bioaccumulation of PFAS in human blood and associated

toxicological, epidemiological, and/or adverse health effects and/or risks." *Id*. ¶ 54.

      Mr. Hardwick alleges that in spite of these studies and data and Defendants' knowledge

of them, "Defendants repeatedly assured and represented" to "the United States Environmental

Protection Agency ('USEPA') and other state and local public health agencies and officials" that

exposures to PFAS "presented no risk of harm and were of no legal, toxicological, or medical

significance of any kind." *Id*. ¶ 44.

      Plaintiff further alleges that, although Defendants were aware of the dangers and risks of

PFAS, they not only withheld that information from the public and regulators, but that they also

actively misled the public and regulators about such dangers and risks. Mr. Hardwick maintains

that Defendants made efforts to conceal this data and to manipulate public, regulatory, and

scientific perception and knowledge of the injurious nature of PFAS. Specifically, Plaintiff

states that "Defendants, through their acts and/or omissions, controlled, minimized, trivialized,

manipulated, and/or otherwise influenced the information that was published in peer-review

journals, released by any governmental entity, and/or otherwise made available to the public

relating to PFAS materials in human blood and any alleged adverse impacts and/or risks

associated therewith, effectively preventing Plaintiff or the class members from discovering the

existence and extent of any injuries/harm as alleged herein." *Id*. ¶ 58.

      He avers that "Defendants encouraged the continued and even further increased

use and release into the environment of PFAS, including into Ohio and this District, by their

customers and others, including but not limited to the manufacture, use, and release, of aqueous

fire-fighting foams containing or made with PFAS and/or emergency responder protection gear

or equipment coated with materials made with or containing PFAS, and tried to encourage and

foster the increased and further use of PFAS, including in Ohio and this District, in connection with as many products/uses/and applications as possible, despite knowledge of the toxicity, persistence, and bioaccumulation concerns associated with such activities." *Id*. ¶ 61.

Mr. Hardwick alleges that, although there is evidence and data to the contrary, "[t]o this day, Defendants deny that the presence of any PFAS in Plaintiff's or any class member's blood, at any level, is an injury or presents any harm or risk of harm of any kind, or is otherwise of any legal, toxicological, or medical significance"; they deny that "any scientific study, research, testing, or other work of any kind has been performed that is sufficient to suggest to Plaintiff or any class member that the presence of any PFAS material in their blood, at any level, is of any legal, toxicological, medical, or other significance"; that "Defendants, to this day, affirmatively assert and represent to governmental entities, their customers, and the public that there is no evidence that any of the PFAS found in human blood across the United States causes any health impacts or is sufficient to generate an increased risk of future disease sufficient to warrant diagnostic medical testing, often referring to existing studies or data as including too few participants or too few cases or incidents of disease to draw any scientifically credible or statistically significant conclusions." *Id*. ¶¶ 63–65.

Mr. Hardwick specifies that because "[t]here is no naturally-occurring 'background,' normal, and/or acceptable level or rate of any PFAS in human blood, as all PFAS detected and/or present in human blood is present and/or detectable in such blood as a direct and proximate result of the acts and/or omissions of Defendants." *Id*. ¶ 56. Plaintiff continues, averring that "Defendants have collectively reaped billions of dollars in profits from the acts and/or omissions that caused, permitted, allowed, and/or otherwise resulted in the PFAS contamination of

Plaintiff's and the other class members' blood and/or bodies and resultant biopersistence and bioaccumulation of such PFAS in such blood and/or bodies." *Id*. ¶ 78.

Plaintiff alleges that the "presence, accumulation, toxic invasion, and/or persistence of PFAS in human blood, including that of Plaintiff and the other class members, is injurious and physically harmful and results in unwanted, unconsented-to, and deleterious alterations, changes, and/or other presently-existing physical injury and/or adverse impacts to the blood and/or bodies of Plaintiff and the other class members, including but not limited to subcellular injuries, including but not limited to biopersistence and bioaccumulation within the body." *Id*. ¶ 57.

## 2.      Relief Sought

"Plaintiff and the Class seek equitable and/or injunctive relief" and "neither Plaintiff nor the Class are seeking any compensatory damages for personal injuries through any class-wide claims." (Am. Compl. ¶ 132, ECF No. 96.)  The injunctive relief specifically sought is "the establishment of an independent panel of scientists, including but not limited to epidemiologists, toxicologists, medical doctors, and/or exposure-risk assessors, to be jointly selected by the parties (the "PFAS Science Panel") and tasked with independently studying, evaluating, reviewing, identifying, publishing, and notifying/informing the Class of Sufficient Results." *Id*. ¶ 133.  He asks for the equitable relief of the establishment of a panel of scientists to study the harmful effects that the PFAS has in his body and medical monitoring for those individuals who have an increased risk of disease as part of that relief.

## 3.      Nationwide Approach Requested

Mr. Hardwick highlights the nationwide scope of the harm – that is, Defendants did not direct their release of PFAS to any particular state, but instead "contaminated nearly every person in the United States, including Plaintiff Kevin Hardwick, with PFAS they created." (Pl's Mot. for Cert. at 1,

ECF No. 164.)  Plaintiff contends that states and the federal government have all consistently recognize the urgent health threat of PFAS.

### C.      Motions to Dismiss

Defendants moved jointly to dismiss this case in its entirety for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction.  Each Defendant moved separately for dismissal based on lack of personal jurisdiction.  After these motions were filed, Plaintiff amended the complaint and the parties jointly moved to apply the motions to dismiss to the Amended Complaint.  (ECF No. 101.)

The Court issued an Opinion and Order on September 30, 2019, denying all of the defendants' motions.  (ECF No. 128.)  Two defendants moved for reconsideration of that decision (ECF No. 131), which was fully briefed (ECF Nos. 133, 140).  On August 2, 2020, this Court denied the Motion for Reconsideration.  (ECF No. 166.)

On September 1, 2020 one defendant filed a Motion for Leave to Appeal the Personal Jurisdiction Orders.  (ECF No. 188.)  That motion was fully briefed.  (ECF Nos. 189, 194.)  This Court denied the motion on February 17, 2021.  (ECF No. 206.)

### D.      Class Certification

Plaintiff filed a Motion for Class Certification, requesting "an order certifying a nationwide class under Federal Rule of Civil Procedure 23(b)(2) and to appoint class counsel under Rule 23(a)."  (ECF No. 164.)  After two extensions of time were granted (ECF Nos. 193, 197), Defendants filed an Unopposed Motion to File a Redacted Version of the Joint Memorandum in Opposition in order to file portions of Plaintiff's personal medical information (ECF No. 198), which this Court granted (ECF No. 199).  Defendants, therefore, filed under seal a Joint Memorandum in Opposition to Plaintiff's Motion for Class Certification (ECF No. 201) and also filed a redacted version of that memorandum (ECF No. 200).  After an extension of

10

time was given to Plaintiff (ECF No. 205), he filed his Reply in Support of his Motion for Class Certification (ECF No. 210).

Plaintiff and Defendants have supplemented their briefing numerous times. (ECF Nos. 214, 216, 217, 221, 229–32.)

Defendants argue that this Court should deny Plaintiff's request for class certification because certification would violate the United States Constitution, and Mr. Hardwick has failed to satisfy Rule 23 of the Federal Rules of Civil Procedure.

### III. United States Constitution

The Court first addresses Defendants' contention that a class cannot be certified because doing so would violate the United States Constitution. Specifically, Defendants contend that (A) "this court lacks Article III jurisdiction because Hardwick lacks standing," (B) "certification would violate Article III because the proposed class contains numerous uninjured parties," and (C) "certifying this class would violate defendants' and absent class members' Seventh Amendment" and due process rights. (Mem. in Opp. at 70–83, ECF No. 201.)

### A. Article III Standing

Article III standing is "the threshold question in every federal case," and if the plaintiff lacks standing, the federal court lacks jurisdiction. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Constitutional standing consists of three elements: (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990).

11

Defendants admit that "[a]t the motion-to-dismiss stage, the parties litigated standing, and the Court found that Hardwick had alleged the three standing elements—injury-in-fact, traceability, and redressability."  (Def's Mem. in Opp. at 70, ECF No. 200.)  Defendants posit:

> The Court based its Article III holding on the allegations of "an increased risk of disease" to Hardwick because of the PFAS in his blood; traceable to "each Defendant"; and redressable with "damages and medical monitoring."[3] *See* MTD Op. 16–21.
>
> At that time, though, the Court could consider only the pleadings. Because the case has moved "beyond the pleading stage" to class certification, "the Court must now look beyond the allegations of the complaint and assess whether record evidence supports" standing. *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 680 (S.D. Fla. 2004) (citation omitted); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

*Id*. at 71.

Plaintiff disagrees that he must produce evidence at this stage in the litigation, before any merits discovery has been conducted.  Plaintiff also contends that the statements of Mr. Hardwick's testimony are taken out of context and do not stand for the propositions for which Defendants use them.

As both the Supreme Court and the Sixth Circuit have explained, a plaintiff must provide allegations or evidence to support standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 462 (6th Cir. 2019) ("At summary judgment, the current stage of this litigation, [the plaintiff] cannot rely on allegations alone but must set forth evidence demonstrating his standing.").  In deciding whether to certify a class, the trial court must undertake a "rigorous analysis" to ensure "that the prerequisites of Rule 23(a) and 23(b) have

---

[3] The Court did not base its Article III holding on the redressability of Plaintiff's claims with "damages and medical monitoring" as Defendants assert.  The Court was very clear throughout its decision that "[n]either Mr. Hardwick nor the class seeks compensatory damages" but instead "only declaratory, equitable, and/or injunctive relief."  (Op. & Order at 21, ECF No. 128.)

been satisfied." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982) (Rule 23(a); *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (explaining that "the same analytical principles govern Rule 23(b)."). "Although this analysis sometimes requires the trial court to 'probe behind the pleadings,' at other times, 'the issues are plain enough from the pleadings'—suggesting that admissible evidence is not always required." *Lyngaas v. Ag*, 992 F.3d 412, 428 (6th Cir. 2021) (quoting *Falcon* at 160).

Finally, the only case upon which Defendants rely does nothing to help their position. Specifically, the Southern District of Florida in *In re Terazosin Hydrochloride* looked beyond the allegations to determine standing in litigation because the case had "proceeded far beyond the pleading stage" and the parties had "engaged in extensive discovery," neither of which is true here. 220 F.R.D. at 680–81. Accordingly, the Court finds that its assessment of Defendants' arguments made in the decision on Defendants' motions to dismiss under Rule 12(b) largely remain unchanged. Because the parties have submitted evidence, however, the Court will review this new evidence in conjunction with its previous decision on this issue.

### 1. Injury in Fact

As this Court previously explained, *Hirsch v. CSX Transportation, Inc.*, 656 F.3d 359 (6th Cir. 2011) is on point and binding with regard to whether Mr. Hardwick alleges an injury in fact. *Hardwick v. 3M Co.*, 2019 WL 4757134, at *6. In *Hirsch* a putative class comprising individuals exposed to the allegedly toxic substances, brought, *inter alia*, a negligence claim against the defendants "primarily seeking the establishment of a judicially administered medical monitoring program, punitive damages and attorney's fees." *Id.* (citing *Hirsch v. CSX Transp., Inc.*, No. 1:07-cv-3512, slip op. at 2 (N.D. Ohio Oct. 22, 2008)). Some of the class had "not alleged any symptoms but have alleged exposure to potentially toxic materials arising from the derailment (the "no injury" Plaintiffs)." *Id.* (citing *Hirsch* trial court at 11). The *Hirsch* trial

court found that "physical injury is not required to demonstrate damages" in an Ohio tort claim.

*Id.* The Sixth Circuit explained:

> While physical injury is not required to demonstrate damages entitling a plaintiff to medical monitoring relief, a plaintiff must demonstrate that because of defendant's actions, he has incurred an increased risk of disease or illness. "It is sufficient for the Plaintiffs . . . to show by expert medical testimony that they have increased risk of disease which would warrant a reasonable physician to order monitoring." *Day v. NLO*, 851 F. Supp. [869, at] 881 [(S.D. Ohio 1994)]. *See also Hansen v. Mountain Fuel Supply,* 858 P.2d at 979 ("Because the injury in question is the increase in risk that requires one to incur the cost of monitoring, the plaintiff need not prove ... probability of actually experiencing the toxic consequences of exposure. It is sufficient that the plaintiff show the requisite increased risk.").
>
> Thus, a claim for medical monitoring relief must sufficiently allege that defendant's conduct created an increased risk of disease or illness.

*Id.*

On review, the Sixth Circuit explained what made the negligence claim in that case "conceptually unique is that the Plaintiffs—though no doubt distraught from the stress of a train crash and evacuation—have, even by their own admission, as of now not suffered any discernable compensable injury.  Rather, their alleged injuries consist solely of the increased risk of—and corresponding cost of screening for—certain diseases that, according to Plaintiffs, are more likely to occur as a result of the train crash.  *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 363 (6th Cir. 2011).  The appellate court stated that, assuming that Ohio would recognize such an injury, the remedy could be a medical monitoring program that would spare the Plaintiffs these expenses.  *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 363 (6th Cir. 2011).  Since *Hirsch* was issued, the Sixth Circuit has relied upon it as "a case in which this court addressed the evidentiary requirements for medical monitoring damages under Ohio law."  *Baker v. Chevron U.S.A. Inc.*, 533 Fed. Appx. 509, 517 (6th Cir. 2013).

2.      **Traceability**

Plaintiff must show that there is "a fairly traceable connection between [his] injury and the complained-of-conduct of the defendant[s]." *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 796 (6th Cir. 2009).  Defendants argue first that Mr. Hardwick failed to establish traceability because "[a]t this stage of the case, Hardwick must, with evidence, trace his claim of injury to particular defendants."  (Defs' Mem. in Opp. at 73–74, ECF No. 210) (citing *Allen v. Wright*, 468 U.S. 737, 758 (1984)).  *Allen v. Wright*, however, is unhelpful here.  That is, "[t]he illegal conduct challenged" in *Allen v. Wright* was "the IRS's grant of tax exemptions to some racially discriminatory schools."  *Id*. at 757.  The Court explained that traceability was not met because of the indirectness of the injury, explaining that "[t]he line of causation between that conduct and desegregation of respondents' schools is attenuated at best."  *Id*. at 752.

Importantly too, the *Allen* Court was concerned with the role of the judiciary in dictating the actions of the government, stating that "[t]he idea of separation of powers that underlies standing doctrine explains why our cases preclude the conclusion that respondents' alleged injury 'fairly can be traced to the challenged action' of the IRS."  *Id*. at 759. Summarizing, the Court opined:

> When transported into the Art. III context, that principle, grounded as it is in the idea of separation of powers, counsels against recognizing standing in a case brought, not to enforce specific legal obligations whose violation works a direct harm, but to seek a restructuring of the apparatus established by the Executive Branch to fulfill its legal duties.  The Constitution, after all, assigns to the Executive Branch, and not to the Judicial Branch, the duty to "take Care that the Laws be faithfully executed." U.S. Const., Art. II, § 3. We could not recognize respondents' standing in this case without running afoul of that structural principle.

*Id*. at 738–39

Mr. Hardwick suffers from no similar impediments.  This action is filed against private entities, not the government agencies that direct or monitor those businesses.  Further, there is a

15

direct line of causation alleged here (*i.e.*, Defendants have each marketed, developed, distributed, sold, manufactured, released, trained users on, produced instructional materials for, and/or otherwise handled and/or used one or more PFAS materials, including in Ohio and this District, in such a way as to cause the contamination of Plaintiff's and the class members' blood and/or bodies with PFAS, and the resultant biopersistence and bio- accumulation of such PFAS in the blood and/or bodies of Plaintiff and other class members.) (Am. Compl., ECF No. 96.) Moreover, Plaintiff alleges that Defendants knew for decades that these chemicals presented a serious risk of disease and harm, engaged in a systematic effort to conceal and deny the dangers of PFAS, misled regulators and the public, and made billions of dollars in profits while contaminating millions of people without their knowledge. These are "specific legal obligations whose violation works a direct harm" if they are proven by Plaintiff.

Second, Defendants contend that "[l]ikewise defeating traceability is Hardwick's inability to exclude the possibility that the 'independent role of third-party actors' not before the court may have caused his alleged injury." (Defs' Mem. in Opp at , ECF No. 201) (citing *United States v. Carroll*, 667 F.3d 742, 745 (6th Cir. 2012)). Defendants are not arguing that they did not engage in the complained of conduct, *i.e.*, manufacturing and/or releasing PFAS into the environment in such a way that it infiltrated Plaintiff's blood and body. Instead, they seem to be saying that others independent third-parties might have engaged in that conduct as well, and it was the PFAS they dispersed that caused Plaintiff's injury. The law Defendants cite, however, is not helpful to this position.

In *U.S. v. Carroll*, the case relied upon by Defendants, the Sixth Circuit explained that it was the third-party actor that was the party who caused the injury, not the entity sued. Specifically, in *Carroll* the government sued a group of bankruptcy trustees for administrative

costs associated with processing tax refunds. The bankruptcy court explained that the harm suffered was not caused by the bankruptcy trustees, who were only carrying out the directive of the bankruptcy court:

> Causation requires the plaintiff to show that its injury is "fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court." [*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)]. *Lujan* is instructive. Environmental groups sued the Secretary of the Interior, seeking to enjoin him from promulgating a rule that made a provision of the Endangered Species Act inapplicable to federal activities in foreign countries. *Id.* at 558–59. The claimed injury—the extinction of endangered species—stemmed less from the Secretary's actions and more from the independent activities of foreign governments and private citizens. In that setting, it is "substantially more difficult" to establish standing because the harm to the plaintiff "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume to either control or to predict." *Id.* at 562; *see also Kardules v. City of Columbus,* 95 F.3d 1335, 1352–55 (6th Cir.1996) (finding no causation where plaintiff sued a city and claimed that city policies had unfairly convinced voters to reject a proposed ballot initiative).
>
> The independent role of third-party actors poses a similar, indeed greater, problem here. The government sued a group of bankruptcy trustees, but the harm it suffered—administrative costs associated with processing tax refunds—flows not from the trustees' actions but from the bankruptcy court's orders. When an entity does not like a court order, the answer is not to sue the lawyer or party who recommended the order; it is to appeal the order or, if utterly necessary, to sue the court. Bankruptcy trustees do not control bankruptcy courts.

*U.S. v. Carroll*, 667 F.3d at 745.

In the case at bar, there are no such issues. Plaintiff's claim of injury does not depend on the unfettered choices made by independent actors not before the courts. Defendants do not claim that there are regulators who approved Defendants' manufacture of PFAS or some other entity that wielded broad and legitimate the power to determine whether Defendants could manufacture and release the PFAS. Defendants do not contend that they hold a middle-man position, acting pursuant to the direction of other parties who should be before this Court

A sister district court explained traceability clearly and persuasively in a recent opinion the Court finds helpful.

> Fiat-Chrysler points out that in their complaint, [the plaintiffs] acknowledge that events outside of Fiat-Chrysler's control may contribute to the CP4 pump's failure. For instance, Plaintiffs suggest that inadvertent misfuelling (gasoline instead of diesel), running out of fuel, or a late fuel-filter change might result in inadequate lubrication between the CP4 pump's cam and roller, thus contributing to the pump's failure. But, Fiat-Chrysler argues, none of those actions are attributable to it—those are consumer actions. The complaint also alleges that water or gasoline might contaminate diesel fuel before it reaches the gas station. Also not Fiat-Chrysler's fault.
>
> Fiat-Chrysler stresses that both [the plaintiffs] put many thousands of miles on their vehicles before their pump broke, apparently implying that any number of post-manufacturing events could have caused the CP4 pumps in their vehicles to fail. In fact, says Fiat-Chrysler, [one plaintiff] pleads that he was denied warranty coverage "based on alleged fuel contamination." In Fiat-Chrysler's view, all of this shows that [the plaintiffs'] injuries are not traceable to its conduct.
>
> Fiat-Chrysler is correct that as part of their burden to establish subject-matter jurisdiction, [the plaintiffs] must show that their injuries are "fairly traceable" to its conduct. *Mosley v. Kohl's Dep't Stores, Inc.*, 942 F.3d 752, 756 (6th Cir. 2019); *see also Turaani v. Wray*, 988 F.3d 313, 316 (6th Cir. 2021) (finding no Article III standing where injury was the result of a third-party's actions, not the defendant's). And Fiat-Chrysler is correct that if [the plaintiffs] put gasoline in their vehicles or fueled up at a station selling contaminated diesel, those actions would not be traceable to Fiat-Chrysler.
>
> Those points having been given their due, it remains that [the plaintiffs] have adequately alleged traceability.
>
> To start, the law helps their cause. Article III's traceability requirement is not overly demanding. *See Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 713 (6th Cir. 2015) ("[T]he causation need not be proximate."). . . .
>
> So even if actions not attributable to Fiat-Chrysler contributed to [the plaintiff's vehicle's] CP4 pump failing, to the extent that those actions are part of normal vehicle use, Plaintiffs have adequately pled that their injuries stem from the CP4. And if their injuries stem from the CP4, they are fairly traceable to Fiat-Chrysler, the company that chose to use the CP4 in its vehicles.

*Withrow v. FCA US LLC*, 19-13214, 2021 WL 2529847, at *5 (E.D. Mich. June 21, 2021)

(internal record cites deleted).

This law supports the Court's conclusion that traceability is not defeated even if actions not attributable to Defendants or not under the control of Defendants contributed to Plaintiff's injury. As the *Withrow* court explained, to the extent the injury can be contributed to Defendants, Plaintiff has adequately shown that his injuries are fairly traceable to Defendants.

**3.    Redressability**

Finally, in its prior decision this Court explained that Plaintiff pleads traditional tort claims and seeks medical testing and monitoring as a remedy, which is a within the scope of this Court's "equitable powers to remedy past wrongs," and "is broad, for breadth and flexibility are inherent in equitable remedies.' " *Milliken v. Bradley*, 433 U.S. 267, 281 (1977). Indeed, "requesting oversight of further scientific study in some fashion in an Ohio tort claim with medical monitoring as the remedy is not exceptional. . . . [and] it is not new to this Court. Thirty years ago in *In re Fernald Litigation,* this Court heard a case in which the plaintiffs 'sought an order requiring defendants to establish a fund to pay the costs of medical monitoring for all class members and epidemiology to determine the adverse health affect caused by defendants' operation of the [Feed Material Production Center].'" *Hardwick v. 3M Co.*, 2:18-CV-1185, 2019 WL 4757134, at *11 (S.D. Ohio Sept. 30, 2019) (citing *In re Fernald Litig.*, C-1-85-149, 1989 WL 267039, at *1 (S.D. Ohio Sept. 29, 1989)). Nothing provided by Defendants moves this Court to reconsider this finding at this stage of the litigation.

Accordingly, the Court finds that the constitutional standing of Plaintiff is no hindrance to his request for class certification.

**B.    Standing of Proposed Class Members**

Defendants maintain class members with no present illness would have no cognizable injury. Defendants maintain that, "[j]ust as the only named Plaintiff's lack of standing defeats

class certification, so does a class that is defined to include significant numbers of members who lack standing." (Mem. in Opp. at 77, ECF No. 201.) In other words, the "'[m]illions of would-be class members, like Hardwick, will have no illness or disease they or any expert (or even the proposed science panel) might even possibly attribute to their PFAS exposures." Id.

The Court below addresses the issue of non-Ohio putative class members, indicating that it is not inclined to consider a nationwide class with individuals injured in states that do not recognize the type injury afflicting Mr. Hardwick. The Court explains this in detail below. Thus, at this stage of the proceedings, where the Court has certified an Ohio injury class only, there is no potential standing issue of the out of state class members.

### C.    Seventh Amendment and Due Process

Defendants last contend that certification of a nationwide class would violate the Seventh Amendment's right to a jury trial and the Fourteenth Amendment's right to due process. This Court disagrees.

It is "the class treatment of claims for money damages" by a mandatory (non opt-out) class implicates the Seventh Amendment. *Coleman v. Gen. Motors Acceptance Corp.,* 296 F.3d 443, 448 (6th Cir. 2002). Here, Plaintiff has made clear that the putative Rule 234(b)(2) class does not seek money damages.

As to Defendants' due process argument, they appropriately have withdrawn it. (Defs' Notice of Supp. Authority at 2, ECF No. 214) (attaching *Lyngaas v. Ag*, 992 F.3d 412, 433 (6th Cir. 2021)). The parties' arguments as to the due process rights of the putative class members turned completely on whether this Court were to apply *Bristol-Myers Squibb Co. v. Superior Ct. of California*, 137 S. Ct. 1773 (2017), an issue on which the Sixth Circuit had not spoken.

*Bristol-Myers Squibb* "held that a state court in a *mass* action must have personal jurisdiction over the defendant as to each plaintiff[.]" *Lyngaas v. Ag*, 992 F.3d 412, 433 (6th Cir.

2021) (emphasis in original). Application of *Bristol-Myers Squibb* to federal class actions "would require the district court to have personal jurisdiction over the defendant as to each unnamed class member." *Id*.

In their briefing, Defendants presented arguments to support their position that *Bristol-Myers Squibb* applied to this action. Plaintiff took the contrary position. Since that briefing, the Sixth Circuit has determined that *Bristol-Myers Squibb* does not apply to class actions, as Plaintiff asserted. *See Lyngaas v. Curaden AG*, 992 F.3d 412, 432–38 (6th Cir. 2021). Thus, due process is no deterrent to class certification in this case.

## IV.    RULE 23

Rule 23 of the Federal Rules of Civil Procedure governs class actions.

### A.    Standard

Within the framework of Rule 23 of the Federal Rules of Civil Procedure, a trial court has broad discretion in deciding whether to certify a class. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996) (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981). A district court must conduct a "rigorous analysis" into whether the prerequisites of Rule 23 are satisfied before certifying a class. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 505 (6th Cir. 2015) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)) (internal quotations omitted).

A plaintiff bears the burden of showing that he or she is entitled to certification. *In re Am. Med. Sys., Inc.*, 75 F.3d at 1086. A district court may certify the proposed class only if it concludes, based on the record before it, that the four factors set forth in Rule 23(a) are satisfied. In addition, the plaintiff must satisfy one of the three sub-sections of Rule 23(b); here Plaintiff

21

moves for an injunctive and declaratory relief class under Rule 23(b)(2).  *Powers v. Hamilton County Pub. Defender Comm'n,* 501 F.3d 592, 619 (6th Cir.2007).

**B.      Rule 23(a)**

Defendants contend that Plaintiff is not entitled to have his proposed class certified because he has failed to meet the requirements of Rule 23(a).  As the Sixth Circuit regularly explains, "'[i]n order to obtain class certification, [a] plaintiff must first satisfy Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation." *Coleman v. Gen. Motors Acceptance Corp.,* 296 F.3d 443, 446 (6th Cir. 2002) (quoting *Golden v. City of Columbus*, 404 F.3d 950, 965 (6th Cir. 2005)); *see also* Fed. R. Civ. P. 23(a).

**1.      Rule 23(a)(1) - Numerosity**

Rule 23(a) requires that the class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  There is no bright line numerical test by which the district court can determine when the numerosity requirement is satisfied.  *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 523 n.24 (6th Cir. 1976) ("Impracticability of joinder is not determined according to a strict numerical test but upon the circumstances surrounding the case.") (citing *Cash*, 434 F.2d at 571).  When class size reaches substantial proportions, however, the numerosity requirement is usually satisfied by numbers alone.  *Am. Med. Sys.*, 75 F.3d at 1079.

Plaintiff asserts that the putative class meets Rule 23(a)(1)'s numerosity requirement by numbers alone.  Defendants do not disagree, nor does this Court.  The putative class here meets the requirement by numbers alone because it includes "more than several hundred" class members.  *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 570 (6th Cir. 2004) (meeting numerosity requirement with 800 class members); *see also Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006) (finding that numerosity is satisfied because "[t]he proposed class

includes thousands of individuals"). And, even "where the exact size of the class is not known," as is the case here, the numerosity requirement is still satisfied where "general knowledge and common sense indicate that the class is large." *Phillips v. Philip Morris Cos.*, 298 F.R.D. 355, 362–63 (N.D. Ohio 2014); *see also Senter*, 532 F.2d at 523 (allowing the district court to "consider reasonable inferences drawn from the facts before him at [this] stage").

### 2. Rule 23(a)(3) - Typicality

Rule 23(a) further requires Plaintiff to demonstrate that the claims of the named representatives are typical of claims of the class. Fed. R. Civ. P. 23(a)(3). A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Powers*, 501 F.3d at 618 (quoting *Am. Med. Sys.*, 75 F.3d at 1082) (internal quotation marks omitted)). This requirement ensures that this Court may properly attribute a collective nature to the challenged conduct. *Id.* "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague*, 133 F.3d at 399. The representative's interests must be aligned with those of the representative group such that the representative's pursuit of its own claims advances the interests of the class. *Id.*

To meet his burden, Plaintiff contends:

Mr. Hardwick's claims are typical of the class claims because they arise from the same tortious conduct: Defendants' marketing, manufacturing, and releasing of PFAS—causing widespread contamination. And Defendants treated Mr. Hardwick no different than every other potential class member—they contaminated Americans without distinction. (See First Am. Compl., [ECF No. 96] at PageID #575–79, ¶¶ 60–77.) *See also Cmty. Refugee*, 334 F.R.D. at 505 (finding typicality where "there is no indication that" Defendant treated different class members differently).

This is highlighted by the uniform call-to-action by organizations and states across the county (and the world). *See supra* pp. 15–29. No matter where someone lives, what they do, or the choices they have made, Defendants' PFAS have contaminated

the blood of all the proposed class members just like it has contaminated Mr. Hardwick's blood. As a result, Mr. Hardwick satisfies Rule 23(a)(3) because his claims are identical to the claims of the proposed class. Or as the Sixth Circuit puts it, "as goes the claim of the named plaintiff, so go the claims of the class." *See Sprague*, 133 F3d at 399; *see also Sutton*, at 22 ("In cases where the named plaintiffs and putative class members are impacted by the same unlawful conduct, typicality is generally satisfied.").

(Mot. at 45, ECF No. 164.)

Defendants disagree, arguing that resolving Mr. Hardwick's claims will not necessarily resolve other class members' claims because Mr. Hardwick is a firefighter, has used and sold Aqueous Film-Forming Foams ("AFFF"[4]), does not have every type of PFAS in his blood, and does not know enough about the case and/or has insufficient time to pursue it. Plaintiff replies that "[n]one of these purported issues distinguish Mr. Hardwick's claims from those of the potential class members." (Reply at 33, ECF No. 210.) This Court agrees.

Mr. Hardwick's claims are not based on his occupation. As proposed by Plaintiff, each member of the class must have a certain level of PFOA and another PFAS within his or her body. What Mr. Hardwick, or any potential class member, performs as an occupation or profession does not affect whether Defendants breached a duty of care or engaged in conduct that caused PFAS to contaminate his or her blood and body without his or her consent. By definition, all potential class members will already have a certain amount of PFOA and another PFAS in their blood. Whether firefighters may carry a higher risk of PFAS exposure than some other occupations, or whether Mr. Hardwick has used materials containing PFAS, is irrelevant to the that inquiry.

---

[4] AFFF contains PFAS, which are fluorosurfactants that repel oil, grease, and water. As ingredients in AFFF, the chemicals help firefighters extinguish fuel fires from gasoline, kerosene, cooking oils, paint.

Further, the proposed class does not require the members to have the exact type of PFAS in their blood, nor does the remedy proposed.  Mr. Hardwick and the class members' claims are all based on one injury:  the contamination of their blood and bodies with PFAS.  Neither Mr. Hardwick nor any of the class members are seeking monetary damages that would require any individualized analysis or any determination of whether a class member is currently suffering from an illness or disease related to their PFAS exposure.

Plaintiff and the class are pursuing the same legal theory.  Each class member's claims similar inasmuch as the question is whether Defendants engaged in conduct that caused PFOA and other PFAS to contaminate the blood and bodies of Mr. Hardwick and the potential class members without their consent.  Because the proposed class representative seeks to prosecute the same claims for himself and for the absent class members, under identical legal theories, typicality is established.

### 3. Rule 23(a)(4) - Fair Representation

Rule 23 requires that the class representative, "fairly and adequately protect the interest of the class."  Fed. R. Civ. P. 23(a)(4).  Adequacy of representation is divided into the adequacy of the class representative and the adequacy of class counsel.

#### a. Class Representatives

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent.  A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Young*, 693 F.3d at 543; *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).  In such a situation, "there is every reason to believe that [the plaintiff] will vigorously prosecute the interests of the class." *Beattie*, 511 F.3d at 563.  The Sixth Circuit has cautioned, however, that

25

"because few people are ever identically situated, it is easy to paint an image of the class representative's interests as peripherally antagonistic to the class.  That depiction does not make the plaintiff an inadequate representative."  *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 429 (6th Cir. 2012).

Plaintiff contends that he shares the same legal claims that arise from the same alleged tortious conduct by Defendants.  Mr. Hardwick also maintains that he and the putative class share the same goal: "common, uniform, class-wide injunctive and equitable relief in the form of studies, testing, analysis, and monitoring—not money damages for any personal injuries, property damage, or other relief that could vary among the individual class members."  (Pl. Mot. for Class Cert. at 46.)

Defendants disagree, contending that Mr. Hardwick's interests conflict with the class because of differences in (i) "present-versus-future injury"; (ii) "research versus money" relief; (iii) "[t]ype and level of PFAS" in the blood; and (iv) potential claims by other firefighters against Mr. Hardwick.  (Defs' Mem. in Opp. at 65–69, ECF No. 201.)

As to Defendants' first argument, they contend that "Hardwick is litigating this case on the premise that it matters not one whit whether he has any disease or has shown any symptoms allegedly linked to any kind of PFAS."  *Id.* at 65.  This is the main argument Defendants made on motion for dismissal for failure to state a claim and again in their briefing currently before the Court.  But as the Court explained in its prior decision, and supra in its analysis of constitutional standing, the injury Mr. Hardwick alleges is the increased risk of illness because of the presence of PFOA and at least one other PFAS in his blood – and injury that is recognized under the law of Ohio and other states.  This is the same alleged injury that is shared with every member of the class.

Defendants next assert that the "second conflict [is] the relief Hardwick seeks," (research versus money) which "are quintessential examples of conflicts that preclude adequacy." (Defs' Mem. in Opp. at 66, ECF No. 201.) Specifically, Defendants contend that Mr. Hardwick "disclaims seeking any medical monitoring or monetary relief, putting him in conflict with class members seeking or wanting to seek money, monitoring, or other relief." *Id*. Plaintiff responds that he has not disclaimed medical monitoring, indeed that is what he has asked for as part of the injunctive relief he requests. Mr. Hardwick has never sought money damages in this case.

Third, Defendants argue that Mr. Hardwick's interests conflict with those of the class because other class members with different types and levels of PFAS in their blood will have a right to different medical monitoring. Defendants also assert that a medical monitoring program "cannot comprise the general population." (Defs' Mem. in Opp. at 67, ECF No. 201.) Yet, here, Mr. Hardwick requests a class-wide medical monitoring program that would provide services to those who have a defined level of PFAS in their blood as does he. Mr. Hardwick's proposed medical monitoring program would not comprise the general population, but only the proposed class.

Finally, Defendants maintain that Mr. Hardwick's type of exposure creates conflicts with other firefighters given that he has demonstrated and sold AFFF to other firefighters. Defendants claim that the firefighters exposed to PFAS from the AFFF Hardwick sold to them, will have possible claims against him and that Harwick could "face questions about his knowledge, or his failure to obtain knowledge from MSDSs [(Material Safety Data Sheets)] and other information available to him, that many class members would not face." (Defs' Mem. in Opp. at 62, ECF No. 201.) Plaintiff responds correctly that this is purely speculative. Plaintiff is not, nor ever has been, employed by any of the defendants. What Mr. Hardwick might have known about AFFF

27

is not relevant to whether Defendants engaged in conduct that caused PFOA and other PFAS to contaminate his and the potential class members blood and bodies without their consent.

### b. Class Counsel

In assessing the adequacy of representation, this Court must also consider whether the Class representative will vigorously prosecute the class members' interest through qualified counsel. *In re Cincinnati Radiation Litig.*, 187 F.R.D. 549, 553 (S.D. Ohio 1999). This Court recognizes that class counsel "must have sufficient financial and personal involvement to encourage them to prosecute the action vigorously, and adequate resources and legal representation to meet the demands of maintaining the action." *Cmty. Refugee*, 334 F.R.D. at 506.

Mr. Hardwick asks the Court to appoint Robert A. Bilott and David J. Butler from Taft Stettinius & Hollister LLP, Gary J. Douglas of Douglas & London PC, and Ned McWilliams from Levin Papantonio PA. The Court concludes that the proposed class counsel meet all of the Rule 23 requirements. All of these attorneys, as well as others from their firms, had leadership positions in the DuPont C-8 MDL pending before this Court and have many years of experience litigating complex mass torts, including PFAS-related litigation. All of these law firms have invested significant time and resources in the C-8 MDL and in this case, and counsel has shown sophisticated legal skill. The Court finds the individual attorneys and their firms are highly competent and have the resources to continue to vigorously prosecute this case.

### 4. Rule 23(a)(2) – Commonality

Rule 23(a) also requires commonality. Fed. R. Civ. P. 23(a)(2). A plaintiff meets this requirement if there "are questions of law or fact common to the class." *Id.*

The class-action was designed as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v.*

28

> *Yamasaki*, 442 U.S. 682, 700–01.  Class relief "is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class."  *Id.* at 701. For in such cases, "the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23."  Ibid.

*In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1080 (6th Cir. 1996) (citing *Falcon*, 457 U.S. at 155) (parallel citations omitted).  "The commonality test 'is qualitative rather than quantitative, that is, there need be only a single issue common to all members of the class.'"  *Id.*  A common question is one that is "capable of class wide resolution—which means determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 564 U.S. at 350.  Conclusory allegations of commonality are insufficient to satisfy the burden of proof on certification.  *Falcon,* 457 U.S. at 157.  The class representatives must enumerate questions of law or fact common to the class, "the resolution of which will advance the litigation."  *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (*en banc*)).

Plaintiff contends that the following questions will produce one stroke answers that are central to the validation of his legal claims and will advance this litigation:

> a. Whether Defendants owed a duty to Plaintiff and members of the class to refrain from acts and/or omissions reasonably likely to result in PFAS in the blood of Plaintiff and the members of the class, and the biopersistence and bioaccumulation of such PFAS in such blood serum;

> b. Whether Defendants knew, anticipated, foresaw, and/or should have known, anticipated, and/or foreseen that it was unreasonably dangerous to engage in acts and/or omissions that resulted in the presence, persistence, and accumulation of PFAS in the blood and/or bodies of humans;

> c. Whether Defendants knew, anticipated, foresaw, and/or should have known, anticipated, and/or foreseen that their acts and/or omissions were likely to result in Plaintiff and the class members having persistent and accumulating PFAS in their blood and/or bodies;

29

d. Whether Defendants' acts and/or omissions proximately caused PFAS to contaminate, persist in, and accumulate in the blood and/or bodies of Plaintiff and the class members;

e. Whether the presence, persistence, and accumulation of PFAS in Plaintiff's and class members' blood and/or bodies and any resultant subcellular or other impact and/or effect, is injurious, offensive, and/or otherwise harmful to Plaintiff and the class members;

f. Whether Defendants' conduct is resulting in irreparable harm to Plaintiff and the class members;

g. Whether Defendants' conduct warrants injunctive and/or declaratory relief; and

h. Whether a reasonable physician would order medical monitoring under the circumstances.

(Mot. for Class Cert. at 39–40, ECF No. 164.)

Defendants respond:

Hardwick identifies a series of questions that he claims to be common ones for purposes of commonality. *Id.* at 39–40. He does not, however, back those *ipse dixit* statements with actual evidence that the liability and relief questions in this case have common class-wide answers.  And the record assembled by Defendants refutes even Hardwick's assertions of commonality . . . .

Though Hardwick purports to identify "common legal and factual questions," none of them are amenable to common, class-wide *answers*. And as the Supreme Court has made clear, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.'" *Dukes*, 564 U.S. at 350; *see also id*. (commonality requires that "determination of [supposed common questions'] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke").

(Defs' Mem. in Opp. at 39, 40, ECF No. 201.)

In this assessment of commonality, the Sixth Circuit has directed:

We start from the premise that there need be only one common question to certify a class. *See Sprague*, 133 F.3d at 397.  Here the district court identified two primary questions that will produce in one stroke answers that are central to the validity of the plaintiffs' legal claims: (1) whether the alleged design defects in the Duets

proximately cause mold or mildew to develop in the machines and (2) whether Whirlpool adequately warned consumers who purchased Duets about the propensity for mold growth in the machines.

A quick review of the elements of plaintiffs' legal claims under Ohio law explains why the district court found these two questions common to all members of the liability class.

*In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, 722 F.3d 838, 853 (6th Cir. 2013).  This case applies the same analysis; that is, (a) determine whether there is a common question that will produce in one stroke answers that are central to the validity of the Plaintiffs' legal claims, and (b) review the common aspects of the elements of Plaintiff's legal claims.

### a.    Common Questions / One Stroke Answers Apt to Drive Resolution

As Defendants correctly state, what matters to class certification is not only the raising of common questions, but also the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.  Defendants are also correct in asserting that dissimilar claims lumped together are no basis for class certification.  In *Dukes*, the Supreme Court found that there was no commonality because the plaintiffs

wish to sue about literally millions of employment decisions at once. Without some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*.

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011) (emphasis in original).

In the case *sub judice*, there is no such obstacle.  This Court need not engage in any individual determination as to the reasons why each individual class member was treated a particular way.  Instead,

Mr. Hardwick presents many questions that, regardless of the class member, will require the same evidence to answer. For example, Mr. Hardwick asks whether

31

Defendants knew, or should have known, that PFOA was unreasonably dangerous. Each Defendant either knew this—or it did not.

Whether 3M Company, or DuPont, or any other defendant knew that PFOA was unreasonably dangerous does not change depending on the class member.

[Or,] "whether Defendants knew, or should have known, that their actions were likely to result in PFOA contaminating Americans' blood." (*Id.* at PageID #582–83 ¶ 93(c).) Again, each Defendant either knew this—or it did not.

(Pl's Mot. for Class Cert. at 39–40, ECF No. 164) (citing First Am. Compl., ECF No. 96.)

Mr. Hardwick makes the comparison of PFAS litigation to tobacco and asbestos class actions from the 1980s and 90s.

[T]his proposed class action is much like the tobacco and asbestos class actions of the 1980s and 90s. To be sure, those class actions, like this one, were labeled "highly unusual." *See, e.g.*, *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1009–10 (3d Cir. 1986) (certifying a nationwide class). They both followed the discovery of industry-wide tortious conduct that created new, common, and widespread injuries. *See, e.g.*, *Scott v. Am. Tobacco Co.*, 725 So.2d 10, 13 (La. App. 4 Cir. 1998) (explaining that no reported case had ever determined the addictive qualities of nicotine). As a result, plaintiffs confronted the asbestos and tobacco industries as a whole. *See, e.g.*, *In re Sch. Asbestos Litig.*, 789 F.2d at 1000, 1011 (explaining that class certification "must be decided against the background of the asbestos scene, an unparalleled situation in American tort law" while approving the district court's "willingness to attempt to cope with an unprecedented situation in a somewhat novel fashion"); *Scott*, 725 So.2d at 15 ("Plaintiffs assert that the defendants' liability is caused by the singular act of the tobacco industry in selling a defective product after concealing the addictive nature of nicotine.").

Yet despite the breadth of the injury caused by those industries, courts still certified and affirmed classes. *Id.* ("A class action is the most effective way to efficiently and economically handle this claim" about "the tobacco industry."). In doing so, courts identified sufficient common issues such as "the health hazards of asbestos, the defendants' knowledge of those dangers, the failure to warn or test, and the defendants' . . . conspiracy in the formation of and adherence to industry practices"—and "the existence of an industry-wide conspiracy to suppress that knowledge." *In re Sch. Asbestos Litig.*, 789 F.2d at 1009, 1011. These common issues prevailed despite some individualized issues at the margins, *see In re Sch. Asbestos Litig.*, 789 F.2d at 1009–09, 1011; *Scott*, 725 So.2d at 15, because in the end, these class actions came down to same common question: to what extent did the relevant chemicals (asbestos or nicotine) injure the class. *Scott*, 725 So.2d at 14; *In re Sch. Asbestos Litig.*, 789 F.2d at 1009–10.

(Pl's Reply at 14, ECF No. 210.)

Plaintiff maintains the same general pattern has occurred here.  That is, lawsuits related to PFAS started after the discovery of alleged industry-wide tortious conduct that allegedly created new, common, and widespread injuries.  And, "Mr. Hardwick presents the same common question here: to what extent does PFOA combined with one other PFAS in human blood injure the class." *Id*. at 12.  Moreover, Plaintiffs allege common questions courts have found sufficient, including the health hazards of PFAS, Defendants' knowledge of those dangers, the failure to warn or test, Defendants' alleged conspiracy in the formation of and adherence to industry practices, and the existence of an industry-wide conspiracy to suppress that knowledge.

Defendants offer experts to opine that there is no evidence that the PFOA or PFAS in anyone's blood is actually harmful.  (Alexander Report at PageID #4993, ECF No. 200-1) ("Exposure to any PFAS has not been established as a general cause of any disease outcome."), *id.* at PageID #4999 ("First of all, the scientific evidence has *not* consistently or reliably established known health risks for PFOA."), *id.* at PageID #5001 (same); (Beck Report at PageID #5144, n.2, ECF No. 200-2 ("It is my opinion that the epidemiological, toxicological, and mode-of-action evidence do not demonstrate that humans have been harmed from PFAS exposure."); (Herzstein Report at PageID #5272–73, ECF No. 200-3) (arguing that "no causal relationship has been established" between human disease and PFOA/PFAS exposure).

Plaintiff presents contrary evidence of Congressional Hearing transcripts and documents, governmental agency studies, private chemical industry/economic development groups' studies, and environmental and health watchdog groups' studies from governmental agencies (many cited above), and the expert reports on this Court's C-8 MDL docket that opine on the harmful effects of PFOA and other PFAS.  Plaintiff contends that this dispute is "why the source of exposure does not matter in this case. This class action is about confirming the effects of having PFOA (and at least one

33

other PFAS) in the body—which should never be there to begin with."  (Pl's Reply at 14, ECF No. 210.)  That common injury is what binds this class together.  *See Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 885 (6th Cir. 1997).

The Court agrees with Plaintiff that this portion of the commonality analysis is met for a nationwide class.  That is, Mr. Hardwick raises common questions relating to the extent to which having PFOA and at least one other PFAS at the levels required for class membership causes an increased risk of disease in the class members.  These questions have the capacity to generate common answers apt to drive the resolution of the litigation.

### b.      Elements of Plaintiff's Legal Claims

The next step prescribed by *In re Whirlpool Corp. Front-Loading Washer Products Liab. Litigation* is to take "[a] quick review of the elements of plaintiffs' legal claims" – in that case (i) "under Ohio law."  722 F.3d at 853.  However, with regard to a nationwide class, Defendants contend that commonality is not met because, (ii) many states do not recognize an increased risk of disease as a compensable injury, and (iii) the states that do recognize such a claim vary too greatly on other relevant inquiries.

### (i)      Commonality – Ohio Law

In the case *sub judice*, Plaintiff asserts common law claims, and the parties agree for the purposes of this analysis that Ohio choice-of-law rules would dictate that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Morgan v. Biro Mfg.Co.*, 474 N.E.2d 286, 289 (Ohio 1984).  As discussed at length *supra*, Ohio recognizes that injuries may consist solely of the increased risk of—and corresponding cost of screening for—certain diseases that are more likely to occur as a result of a defendant's tortious conduct.  Thus, as was the case

34

in *In re Whirlpool Corp. Front-Loading Washer Products Liab. Litigation*, the elements of Ohio law pose no threat to the commonality requirement with regard to individuals subject to the law of Ohio.

### (ii)      Commonality Nationwide Class – Recognition of Injury

Defendants contend:

> State law on medical monitoring varies enormously. Some States would not allow medical monitoring for someone like Hardwick, who (for one thing) admittedly has no present illness or disease.

(Defs' Mem. in Opp. at 23, ECF No. 201.)

With regard to states that do not recognize as an injury the increased risk of certain diseases that are more likely to occur as a result of a defendant's tortious, this Court agrees with Defendants.  That is, even though the harm alleged is nationwide in its impact, commonality is not met with regard to any individuals subject to the law of those states that do not recognize increased risk of disease as a compensable injury in a negligence and/or battery claim or a stand-alone medical monitoring claim.

The Court will issue a briefing schedule for Defendants to move for limitation of a potential class to exclude those who were injured in states that do not recognize medical monitoring (as a form of injury in a common law claim or a stand-alone claim) for someone like Mr. Hardwick, whose injury is an increased risk of disease, with no present manifestation of illness or disease.

### (iii)      Commonality of Clams Nationwide– Differences in State Law

Because the Court is only certifying an Ohio class, Defendants' arguments related to the differences in state law do not impact the Court's present conclusions.  However, because the

Court is seeking briefing from Defendants on the limitations necessary for this Court to consider

a nationwide class, addressing generally Defendants' arguments will be helpful to the parties.

Defendants maintain that, "[d]ifferent class members, even otherwise similarly situated,

would see different results on their individual claims" because "the laws of the fifty states differ

tremendously." (Defs' Mem. in Opp. at 24, ECF No. 201) (relying on *Pilgrim v. Universal*

*Health Card, LLC*, 660 F.3d 943, 946–49 (6th Cir. 2011). Defendants' argue that:

> Consider the proposed class negligence claim. States differ in the basis and scope
> analysis, and the definition of proximate cause. *See* Defs.' App'x B. For instance,
> in some states, a manufacturer owes no duty of care to a person with whom it lacks
> a relationship, while a relationship might not be necessary in other states. *See, e.g.*,
> *In re Certified Question from Fourteenth Dist. Court of Appeals of Tex.*, 740
> N.W.2d 206, 212 (Mich. 2007) (relationship required).
>
> These differences in state negligence law led the Sixth Circuit to reject certification
> of a nationwide class, reasoning that "a comparison of differing state pattern
> instructions on negligence and differing judicial formulations of the meaning of
> negligence and the subordinate concepts" indicates the "significance" of "how the
> law of negligence differs from jurisdiction to jurisdiction." *Am. Med. Sys.*, 75 F.3d
> at 1074, 1085. And the Sixth Circuit is by no means alone. . . . .
>
> Differences in state medical-monitoring law have led one court after another, listed
> in the footnote below, to reject nationwide medical-monitoring classes. As one
> court observed, "the necessity of applying 'the laws of each of the fifty states to the
> claims of members of the putative class'" is an "insurmountable obstacle to class
> treatment of the claim for medical monitoring." *Zehel-Miller*, 223 F.R.D. at 663.
> The same is true here.
>
> State law variations in these defenses have led courts to reject nationwide classes. *See,
> e.g.*, *Georgine*, 83 F.3d at 627; *Zehel-Miller*, 223 F.R.D. at 664. This Court should too.

(Defs' Mem. in Opp. at 22, 24–25.)

Initially, the Court notes that the Sixth Circuit cases upon which Defendants rely, *Pilgrim*

and *American Medical Systems*, are both proposed damages classes under Rule 23(b)(3), which

distinguishes them in important ways from the proposed declaratory/injunctive relief class under

Rule 23(b)(2) before this Court. (This is discussed in detail below in the section on Rule 23(b)).

As the Sixth Circuit in *American Medical* stated:

> The district judge certified the class [as a damages only class] under Rule 23(b)(3), which requires the court to find "that the questions of law or fact common to the members of the class *predominate* over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

> Subdivision (b)(3) parallels subdivision (a)(2) in that both require that common questions exist, *but subdivision (b)(3) contains the more stringent requirement* that common issues "predominate" over individual issues. 1 *Newberg, supra,* § 3.10, at 3–56.

*Am. Med. Sys.*, 75 F.3d at 1084 (second emphasis added).

Similarly, the Third Circuit case *Georgine v. Amchem Products*, *Inc.*, cited by Defendants for the proposition that varied defenses prohibited a nationwide class – was a 23(b)(3) damages class. That court specifically held in its commonality analysis:

> We believe that the commonality barrier is higher in a personal injury [Rule 23(b)(3)] damages class action, like this one, that seeks to resolve all issues, including noncommon issues, of liability and damages.

*Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 627 (3d Cir. 1996) (emphasis added),

*aff'd sub nom. Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997).[5]

---

[5] *Georgine* found it noteworthy that the asbestos class was no longer seeking to determine if the subject of the lawsuit was harmful to people, which is disputed by the parties in the instant action before this Court:

> The capacity of asbestos fibers to cause physical injury is surely a common question, though that issue was settled long ago. *See, e.g., In re School Asbestos Litig.,* 789 F.2d 996, 1000 (3d Cir.), *and National Gypsum Co. v. School Dist.,* 479 U.S. 915 (1986). Although not identified by the district court, there may be several other common questions, such as whether the defendants had knowledge of the hazards of asbestos, whether the defendants adequately tested their asbestos products, and whether the warnings accompanying their products were adequate. *See id.* at 1009.

*Georgine,* 83 F.3d at 626 (parallel citations omitted).

Finally, with regard to medical monitoring, the majority of the cases Defendants rely upon are 23(b)(3) damages classes that asked for a medical monitoring subclass, where the damages claims predominated. *See Zehel-Miller*, 223 F.R.D. at 663 ("The compensatory and punitive damage claims in the [c]omplaint herein can hardly be considered incidental" to a request for injunctive relief).

Finally, the Supreme Court, in *Califano v. Yamasaki*, affirmed "the district court's certification of a nationwide class composed of 'all individuals eligible for [old-age and survivors' benefits] whose benefits have been or will be reduced or otherwise adjusted without prior notice and opportunity for a hearing.'" 442 U.S. 682, 689 (1979) (the district court "excluded from the class residents of Hawaii and the Eastern District of Pennsylvania, where suits raising similar issues were known to have been brought). The *Califano* Court too differentiated between a class certified as an injunctive relief Rule 23(b)(2) and those certified as a damages class under Rule 23(b)(3):

> Nothing in Rule 23, however, limits the geographical scope of a class action that is brought in conformity with that Rule. Since the class here was certified in accordance with Rule 23(b)(2), the limitations on class size associated with Rule 23(b)(3) actions do not apply directly.
>
> Nor is a nationwide class inconsistent with principles of equity jurisprudence, since the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class. *Dayton Board,* 433 U.S., at 414–420. If a class action is otherwise proper, and if jurisdiction lies over the claims of the members of the class, the fact that the class is nationwide in scope does not necessarily mean that the relief afforded the plaintiffs will be more burdensome than necessary to redress the complaining parties.

*Id.* at 702 (parallel citation omitted) ("The certification of a nationwide class, like most issues arising under Rule 23, is committed in the first instance to the discretion of the district court. On the facts of this case we cannot conclude that the District Court . . . abused that discretion . . . .").

Indeed, this Court has held that **"**state law does not need to be universal in order to justify nationwide class certification." *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 292 (S.D. Ohio 1997). *Telectronics Pacing Systems* addressed the class claim of negligence in a putative nationwide products liability case, framing the parties' positions as follows:

> Taking into account the state law variations regarding negligence, Plaintiffs have divided the subclasses to reflect the forty-six jurisdictions that permit the introduction of state-of-the-art evidence and the two jurisdictions which do not.

> Plaintiffs state that forty-seven jurisdictions permit plaintiffs in product liability actions to bring negligence claims. Plaintiffs assert that all states that recognize negligence as a cause of action in a products liability action apply the same elements to determine liability: duty, breach, causation, injury and damage. *See e.g., Riley v. Warren Mfg., Inc.,* 688 A.2d 221, 224 (Pa.Super. 1997) ("In establishing a cause of action in negligence, plaintiffs bear the burden of demonstrating that there was a duty or obligation recognized by law, breach of that duty by the defendants, a causal connection between the defendants' breach of that duty and the resulting injury, and actual loss or damage suffered by the complainants.").

> Not only do all states use the same elements to define a cause of action for negligence, many of those states look to the same source for a standard in products liability cases. See Restatement (Second) of Torts § 395 and Appendix (cited with approval by courts in thirty-six states); *see e.g., Morris v. Chrysler Corp.,* 208 Neb. 341, 303 N.W.2d 500, 502 (1981); *Clark v. International Harvester Co.,* 99 Idaho 326, 581 P.2d 784, 791 (1978); *Hartman v. National Heater Co.,* 240 Minn. 264, 60 N.W.2d 804, 810 (1953) ("Although the parties differ in their application of the law to the facts presented, there is no substantial dispute between them as to the principles of law applicable to this case.") (citing Restatement (Second) of Torts § 395).

> As discussed earlier, the predominant issue to be decided in this case is whether TPLC is legally responsible for the "J" Lead fractures. A major element of that question is whether state law provides a defense because the product was designed, inspected, tested, labeled or produced with the with the best knowledge and technology reasonably available at the time. *See* Stuart M. Spieser, 6 *The American Law of Torts,* § 18:165 at 338 (1989); *Beshada v. Johns–Manville Products Corp.,* 90 N.J. 191, 447 A.2d 539, 544 (1982) ("Essentially, state-of-the-art is a negligence defense. It seeks to explain why defendants are not culpable for failing to provide a warning. They assert, in effect, that because they could not have known the product was dangerous, they acted reasonably in marketing it without a warning."). TPLC counters that just because those jurisdictions all recognize a cause of action in negligence in a products liability case does not mean that the law of negligence

is universal. TPLC insists that the law of negligence is too diverse to certify a nationwide products liability class action. TPLC argues that Plaintiffs have failed to properly consider all of the nuances of state law in defining its proposed subclasses. Finally, TPLC argues that the Court cannot decide for itself that any difference are insignificant. Presumably, this means that the Court may not, in essence, overlook these differences, no matter how slight, and certify a class which contains implantees from states whose pattern jury instruction are not identical.

We disagree. Our directive from the Sixth Circuit is to "consider how the law of negligence differs from jurisdiction to jurisdiction . . . " before determining whether class certification is appropriate. *In re American Medical Systems,* 75 F.3d at 1085. Obviously, that implies that the Court must make an evaluation to determine which variances are important or substantial enough to preclude class certification or require subclasses.

172 F.R.D. 271, 291–92 ("We find that the differences in state law regarding 'proximate cause' instructions are insignificant, and therefore, they present no hurdle to class certification on negligence classes proposed by Plaintiffs.).

This is true for the class proposed in the case *sub judice*. This Court must make an evaluation to determine whether the variances are important of substantial enough to preclude class certification or require subclasses. "District courts have broad discretion in determining whether to bifurcate proceedings or divide a class action into subclasses." *Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347, 355 (6th Cir. 2011). Plaintiff offers suggestions:

For example, on the negligence claim, Defendants' chart[6] suggests easy-to-manage subclasses that would eliminate their concerns: (1) class members from states that do not require a relationship to impose a duty, and (2) class members from states that do require a relationship to impose a duty. (App. B, [Doc. 200] at PageID #4867–69; *see also id.* (listing a similar yes-or-no question about whether the substantial factor test for proximate cause applies in each state).) On the battery claim, Defendants' chart suggests other easy-to-manage subclasses, such as (1) class members from states that do not require heightened intent, and (2) class members from states that do require heightened intent—or (1) class members from states that do not require physical impairment, and (2) class members from states that do require physical impairment. (App. C, [Doc. 200] at PageID #4879–86.)

---

[6] Defendants provide a detailed chart of the differences between state laws on these claims as an exhibit to their Memorandum in Opposition.

> Although not necessary, the Court could easily transform any of Defendants'
> proposed yes-or-no questions into state law subclasses.

(Pl's Reply at 21, ECF No. 210.)

Because this Court is inclined to permit Defendants the opportunity to narrow the potential class to those individuals injured in states that recognize the claims for relief filed by Mr. Hardwick, it will subsequently set a briefing schedule for the parties to address potential subclasses in a nationwide class.

## C.     Rule 23(b)

If a proposed class meets the requirements in Rule 23(a), Plaintiff must show that "at least *one* of the subcategories of Rule 23(b)" is met before a district court may certify a class. *In re Am. Med. Sys.*, 75 F.3d at 1079 (emphasis in original). Plaintiff moves for injunctive and declaratory relief under Rule 23(b)(2). Rule 23(b)(3) provides for a damages class action and requires that common questions *predominate* and that a class action is a *superior* way to resolve the controversy. Fed. R. Civ. P. 23(b)(3) (emphasis added).

The primary distinction between (b)(2) and (b)(3) classes is in the relief sought: Rule 23(b)(2) classes are confined to declaratory and injunctive relief actions, with certain limited exceptions not relevant here, whereas Rule 23(b)(3) classes apply to damages actions. *Reeb v. Ohio Dep't of Rehab. & Corr., Belmont Corr. Inst.,* 435 F.3d 639, 651 (6th Cir. 2006). Consequently, courts are required to provide notice of a certified (b)(3) action to all class members and an opportunity for them to opt-out of the class (so that they will not be bound by any final judgment and can bring individual actions if they wish). Fed. R. Civ. P. 23(b)(3); *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797 (1985) (holding that due process requires at a minimum that an absent plaintiff in class action seeking to bind known plaintiffs concerning claims wholly or predominantly for money judgments be provided with opportunity to remove

41

himself from the class by executing and returning "opt out" or "request for exclusion" form to the court).

In contradiction, Rule 23(b)(2) permits class certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  In other words, "[t]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy." *Cmty. Refugee*, 334 F.R.D. at 507 (quoting *Dukes*, 564 U.S. at 360).  This type of "mandatory" class under Rule 23(b)(2) means that the alleged wrongful conduct "is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Id.* (quoting *Dukes*, 564 U.S. at 360).

Mr. Hardwick maintains that Rule 23(b)(2) class certification is appropriate "because Defendants' conduct affected the entire class equally (they marketed, manufactured, and released PFAS—causing widespread contamination in all the class members); which makes Mr. Hardwick's requested injunctive relief (setting up a program for study and testing/medical monitoring) appropriate for the whole class."  (Mot. at 1, ECF No. 164.)

Defendants disagree, asserting that Mr. Hardwick has failed to show he is entitled to a class under Rule 23(b)(2) because (1) Mr. "Hardwick does not come close to satisfying the cohesiveness requirement of Rule 23(b)(2)—a requirement he barely mentions,"; (2) the relief is inadequately specified, and (3) that the class definition makes the class unascertainable. ((Defs' Opp. at 21, ECF No. 201.)

### 1.    Cohesiveness

"Cohesiveness" is not mentioned in Rule 23. Fed. R. Civ. P. 23.  It is, instead, a judicially created term that is utilized by some courts, including those in the Sixth Circuit, in a Rule 23

analysis. Defendants combine the analysis of 23(a)'s commonality inquiry with what they

contend to be the cohesiveness requirements under Rule 23(b)(2). Specifically, Defendants

argue:

> All classes must be cohesive in a sense—they must satisfy Rule 23(a)'s
> commonality requirement, and (b)(3) [damages] classes must also satisfy the
> predominance requirement.
>
> But (b)(2) imposes a higher bar for cohesion still. "[T]he cohesiveness requirement
> of Rule 23(b)(2) is more stringent than the predominance and superiority
> requirements for maintaining a class action under Rule 23(b)(3)."

(Defs' Mem. in Opp. at 20–21) (quoting *Ebert v. Gen. Mills, Inc.* 823 F.3d 472, 480 (8th Cir.

2016)). Defendants conclude:

> Only true cohesiveness—over and above commonality and even predominance,
> cohesiveness that eliminates concerns over both the loss of individual claims and
> the prospect of individual issues—can make a proposed class worthy of (b)(2)
> certification. *See Romberio*, 385 F. App'x at 433–34; *Coleman*, 296 F.3d 447–48;
> *Ebert*, 823 F.3d at 481; *Gates*, 655 F.3d [255,] 264 [(3d Cir. 2011).]

*Id*. This Court, however, disagrees.

Defendants rely on two Sixth Circuit cases for the proposition that cohesiveness under a

23(b)(2) injunctive relief class presents a bar higher than the one posed by the analyses of

commonality under 23(a) and predominance under a 23(b)(3) damages relief class. These cases

do not support this proposition.

Specifically, there is no discussion of cohesiveness requirements in an injunctive relief

class in in *Coleman v. Gen. Motors Acceptance Corporation*. Instead, the Sixth Circuit in

*Coleman* dealt with "the question of whether compensatory damages are recoverable by a Rule

23(b)(2) [injunctive relief] class," noting that the Sixth Circuit "has not explicitly addressed the

question." 296 F.3d 443, 446 (6th Cir. 2002).

As for the unpublished case, *Romberio*, it merely states that "cohesiveness, or homogeneity," was vital to a Rule (b)(2) injunctive relief class. The case makes no reference or even suggestion that this cohesiveness imposes a higher bar that is over and above commonality or predominance. *Romberio v. UnumProvident Corp.*, 385 Fed. Appx. 423, 433 (6th Cir. 2009).

Finally, as stated above, Rule 23(b)(2) never mentions "cohesiveness." Newberg on Class Actions § 4:34 (5th ed.) (explaining that a "cohesion" requirement "lack[s] a textual mooring" and creates an "additional criterion" to the "textual requirements for (b)(2) class actions"). The Advisory Committee Notes only mention cohesion in reference to Rule 23(b)(3)'s predominance requirement. The United States Supreme Court makes the same limited connection to cohesion. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

That is, in considering a Rule 23(b)(3) damages class, the *Amchen Products* Court stated that "[t]he Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623 (citing 7A Wright, Miller, & Kane 518–519). The Court explained that "[e]ven if Rule 23(a)'s commonality requirement may be satisfied . . . the predominance criterion is far more demanding." *Id.* at 623–24. And, "courts that have imposed a cohesion test treat it similarly to Rule 23(b)(3)'s predominance inquiry." *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 937 (9th Cir. 2019) (holding that "the district court erred in imposing a 'cohesiveness' requirement for the proposed Rule 23(b)(2)). In other words, because Rule 23(b)(2) classes only demand commonality – not a more demanding predominance requirement, judicially grafting a cohesion obligation higher than predominance is unsupported textually in the Rule and in Supreme Court precedent.

Thus, while homogeneity or cohesiveness have been noted in this circuit in the context of a (b)(2) declaratory/injunctive relief class, there is no support for the proposition that the criterion provide a higher bar than commonality or predominance as Defendants contend. The

Court concludes here that, to the extent it is required, Plaintiff has met the

cohesiveness/homogeneity requirement.  *See* 2 Newberg on Class Actions § 4:34 ("if the class

proponents can satisfy the textual requirements of Rule 23(b)(2)—that the defendant has acted in

a manner that affects the class members generally such that injunctive relief would be

appropriate for all—they ought to be able to meet the cohesiveness test as to that same injunctive

relief).  Mr. Hardwick has sufficiently shown that the defendants acted in a manner that affects

the class members generally such that injunctive relief would be appropriate for all.

### 2.    Relief Definition

Defendants argue that Mr. Hardwick has failed to provide

> any level of detail about the vaguely described 'medical monitoring program and
> scientific studies/scientific panel' the motion seeks on behalf of the class.  He does
> not explain, for instance, who will be monitored, for what conditions, over what
> period of time, or how or by whom any proposed "scientific studies" will be
> designed or conducted. Nor does he support with any expert analysis the purported
> ability to conduct any sort of class-wide monitoring or scientific studies. *Cf.*
> Herzstein Rep. 2–4 (medical monitoring); Alexander Rep. 4–8, 14–16 (feasibility
> of the epidemiology). Under these circumstances, Hardwick has failed his burden
> of showing that the class's requested injunctive relief satisfies Rule 23(b)(2) and
> Rule 65(d), which alone defeats certification.

(Defs' Mem. in Opp. at 46, ECF No. 201.)

Plaintiff responds:

> Mr. Hardwick has more than adequately described the injunctive relief he seeks for
> the class. (*E.g.*, First Am. Compl., [ECF No. 96] at PageID #576–77, ¶¶ 67, 133;
> Pl.'s Combined Mem. in Opp. to Mots. to Dismiss, [ECF No. 94] at PageID #523.)
> Mr. Hardwick has no obligation at the class certification stage under either Rule
> 23(b) or Rule 65(d)(1) to explain—as Defendants demand—every nuance and facet
> of how the requested science panel would operate.

> Rule 65(d)(1) does not address class certification. The rule, in fact, is not even
> directed at litigants. Rule 65(d)(1) mandates that a *court* granting an injunction state
> in its order "the reasons why [the order] issued," "its terms specifically," and a
> description "in reasonable detail[,] . . . [of] the act or acts restrained or required."
> Fed. R. Civ. P. 65(d)(1). And nowhere does the rule state or even suggest that a
> plaintiff must explain, at the class certification stage, every detail of the injunctive

relief he seeks. *See id.*; *see also Shook v. Bd. of Cnty. Comm'rs*, 543 F.3d 597, 605 n.4 (10th Cir. 2008) (stating that plaintiffs need not "come forward with an injunction that satisfies Rule 65(d) with exacting precision at the class certification stage"); *Ashker v. Governor of State of California*, No. C 09-5796 CW, 2014 WL 2465191, at *7 (N.D. Cal. June 2, 2014) ("[N]umerous courts have expressly held that plaintiffs are not required to satisfy Rule 65(d) in order to obtain class certification."). Such detail comes later at the merits or injunction stage.

Rule 23(b)(2) contains no such requirement either. When a plaintiff identifies an action or refusal to act by the defendant that applies generally to the class, the rule simply mandates that the injunctive relief be "appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *see Shreve v. Franklin Cty., Ohio*, No. 2:10-cv-644, 2010 WL 5173162, at *16 (S.D. Ohio Dec. 14, 2010) (Sargus, J.) (concluding that the plaintiffs established a class action under Rule 23(b)(2) where they "allege[d] a policy or practice, created and maintained by Defendants, that affect[ed] all of the members of the proposed class" and sought an injunction that "if granted, [would] appropriately benefit all class members")

(Pl's Reply at 26–27, ECF No. 210.)  This Court agrees.

That is, Plaintiff has provided sufficient detail for the relief he seeks, as discussed throughout this decision.  Indeed, courts have established science panels outside of the settlement context, as this Court explained previously:

> [T]he Ohio Supreme Court in a case addressed at oral argument by counsel for Plaintiff and Defendants, and reviewed at length above, discusses scientific studies as part of medical monitoring relief in considering and adopting guidelines to determine whether an action is injunctive.  *See Wilson v. Brush Wellman, Inc.*, 103 Ohio St. 3d 538, 543 (2004) ("Court supervision and participation in medical-monitoring cases is a logical and sound basis on which to determine whether the action is injunctive.  It has the added advantage of being a bright-line test, which can be readily and consistently applied.  We hereby adopt that guideline for making such determinations.").  In *Brush Wellman*, the Ohio Supreme Court, reviewed the "multitudinous variations that these claims may take" and quoted this Court as follows:
>
> > "Relief in the form of medical monitoring may be by a number of means.  First, a court may simply order a defendant to pay a plaintiff a certain sum of money.  The plaintiff may or may not choose to use that money to have his medical condition monitored.  Second, a court may order the defendants to pay the plaintiffs' medical expenses directly so that a plaintiff may be monitored by the physician of his choice.  Neither of these forms of relief constitute[s] injunctive relief as required by rule 23(b)(2).

46

> "However, a court may also establish an elaborate medical monitoring program of its own, managed by court-appointed court-supervised trustees, pursuant to *which a plaintiff is monitored by particular physicians and the medical data produced utilized for group studies*. In this situation, a defendant, of course, would finance the program as well as being required by the court to address issues as they develop during program administration. Under these circumstances, the relief constitutes injunctive relief as required by rule 23(b)(2)." *Day v. NLO, Inc.,* 144 F.R.D. at 335–336.

*Brush Wellman, Inc.*, 103 Ohio St. 3d at 543 (emphasis added).

> Finally, the Court notes that the Northern District of Ohio too has evaluated a request for scientific studies as part of medical monitoring relief. In a multidistrict litigation regarding welding fumes, the plaintiffs asked for "court[-]supervised observational epidemiological study of steel welders that is sufficiently powered to assess the association between such welding and neurological and neuropsychological injury." *In re Welding Fume Products Liab. Litig.*, 245 F.R.D. 279, 285 (N.D. Ohio 2007).

(Op. and Order at 18–20, ECF No. 128); *see also, Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1392–93 (D. Or. 1996) (appointing independent technical advisors with expertise in "epidemiology, immunology/toxicology, rheumatology, and chemistry to assist [the court] in evaluating the reliability and relevance of the scientific evidence."); *In re Silicone Gel Breast Implant Prods. Liab. Litig.*, No. CV 92-P-10000-S, 1996 WL 34401813, at *1 (N.D. Ala. May 31, 1996) (appointing a science panel "to evaluate and critique pertinent scientific literature an studies bearing on the issues in breast implant litigation pending in, or to be remanded to, [transferor courts].").

Additionally, there are numerous studies presented by the parties to this Court, including the Science Panel Reports in the C-8 MDL and nationwide studies designed by the Agency for Toxic Substances and Disease Registry show that the type of harm alleged by Plaintiff can be measured. *See, e.g.,* Agency for Toxic Substances and Disease Registry, *Per- and*

*Polyfluoroalkyl Substances (PFAS) and Your Health, Multi-Site Health Study*,

https://tinyurl.com/1lq6kr5p.

Accordingly, the Court finds that Plaintiff has sufficiently defined the relief he has

requests.

### 3.    Ascertainability

The last argument Defendants make is that the class definition is unascertainable.  The

parties dispute whether ascertainability is required in a Rule 23(b)(2) class.  The Court, however,

need not address these arguments because the modification to the definition of the class made

herein has alleviates this concern.  Moreover, the Sixth Circuit has approved, and even

commended, the continued modification of a class definition throughout the litigation as

necessary, which may be necessary as this case progresses.  *Powers v. Hamilton County Pub.*

*Def. Commn.*, 501 F.3d 592, 619 (6th Cir. 2007) ("[D]istrict courts have broad discretion to

modify class definitions, so the district court's multiple amendments merely showed that the

court took seriously its obligation to make appropriate adjustments to the class definition as the

litigation progressed.").

### V.

Based on the foregoing, the Court **GRANTS IN PART AND DENIES IN PART**

Plaintiff's Motion for Class Certification.  (ECF No. 164.)  The Court **CERTIFIES** a class

defined as:

> Individuals subject to the laws of Ohio, who have 0.05 parts per trillion (ppt) of
> PFOA (C-8) and at least 0.05 ppt of any other PFAS in their blood serum.

The Court **APPOINTS** as class counsel Robert A. Bilott and David J. Butler from Taft

Stettinius & Hollister LLP, Gary J. Douglas of Douglas & London PC, and Ned McWilliams

from Levin Papantonio PA.  This Class shall proceed into the discovery phase.

The Court will forthwith issue a briefing schedule to permit Defendants the opportunity to narrow the requested class to those individuals injured in states that recognize the claims for relief filed by Mr. Hardwick.  Once decided, the Court will set a briefing schedule address potential subclasses of individuals injured in the remaining states.

**IT IS SO ORDERED.**


<u>3/7/2022</u>                                        <u>s/Edmund A. Sargus, Jr.</u>
**DATE**                                              **EDMUND A. SARGUS, JR.**
                                                      **UNITED STATES DISTRICT JUDGE**