**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT
100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: September 09, 2022

Mr. Robert Alan Bilott
Taft, Stettinius & Hollister
425 Walnut Street
Suite 1800
Cincinnati, OH 45202

Mr. William Earle Braff
Taft Stettinius & Hollister
50 E. RiverCenter Boulevard
Suite 850
Covington, KY 41011

Mr. Matthew S. Brown
Carlile, Patchen & Murphy
366 E. Broad Street
Columbus, OH 43215

Mr. Jeffrey S. Bucholtz
King & Spalding
1700 Pennsylvania Avenue, N.W.
Suite 900
Washington, DC 20006

Mr. David John Butler
Taft Law
65 E. State Street
Suite 1000
Columbus, OH 43215

Mr. Drew H. Campbell
Bricker & Eckler
100 S. Third Street
Columbus, OH 43215

Mr. Louis A. Chaiten
Jones Day
901 Lakeside Avenue, E.
Cleveland, OH 44114

Mr. Erik J. Clark
Organ Law
1330 Dublin Road
Columbus, OH 43215

Mr. Peter C. Condron
Crowell & Moring
1001 Pennsylvania Avenue, N.W.
Eighth Floor
Washington, DC 20004

Ms. Melanie Black Dubis
Parker Poe Adams & Bernstein
P.O. Box 389
Raleigh, NC 27602-0389

Ms. Lisa M. Gilford
Sidley Austin
555 W. Fifth Street
Suite 4000
Los Angeles, CA 90013

Mr. Theodore M. Grossman
Jones Day
250 Vesey Street
New York, NY 10281

Mr. Kristofor T. Henning
McCarter & English
1600 Market Street
Suite 3900
Philadelphia, PA 19103

Mr. Aaron M. Herzig
Taft, Stettinius & Hollister
425 Walnut Street
Suite 1800
Cincinnati, OH 45202

Ms. Jaren Janghorbani
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019-6064

Mr. James Armand King
Porter, Wright, Morris & Arthur
41 S. High Street
Suite 2800-3200
Columbus, OH 43215

Mr. Ronald Sinclair Kopp
Roetzel & Andress
222 S. Main Street
Suite 400
Akron, OH 44319

Mr. Lanny S. Kurzweil
McCarter & English
100 Mulberry Street
Newark, NJ 07102

Mr. Val Leppert
King & Spalding
1180 Peachtree Street, N.E.
Suite 1700
Atlanta, GA 30309

Ms. Heidi Levine
Sidley Austin
787 Seventh Avenue
New York, NY 10019

Mr. Michael A. London
Douglas & London
111 John Street
Suite 1400
New York, NY 10038

Mr. Neil E. McWilliams Jr.
Levin, Papantonio, Thomas, Mitchell, Echsner & Proctor
316 S. Baylen Street
Suite 600
Pensacola, FL 32501-0000

Ms. Rebecca G. Newman
Douglas & London
111 John Street
Suite 1400
New York, NY 10038

Mr. Shawn Joseph Organ
Organ Law
1330 Dublin Road
Columbus, OH 43215

Ms. Crystal Lohmann Parker
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019-6064

Mr. Andrew John Pincus
Mayer Brown
1999 K Street, N.W.
Washington, DC 20006

Mr. Charles Edward Raynal IV
Parker Poe Adams & Bernstein
P.O. Box 389
Raleigh, NC 27602-0389

Mr. James Robert Saywell
Jones Day
901 Lakeside Avenue, E.
Cleveland, OH 44114

Mr. Richard Donovan Schuster
Vorys, Sater, Seymour & Pease
52 E. Gay Street
Columbus, OH 43215

Mr. Joshua D. Yount
Mayer Brown
71 S. Wacker Drive
Chicago, IL 60606

Re:  Case No. 22-0305, *In re: 3M Company, et al*
Originating Case No. : 2:13-md-02433 : 2:18-cv-01185

Dear Counsel,

The Court issued the enclosed Order today in this case.  Judgment to follow.

Sincerely yours,

s/C. Anthony Milton
Case Manager
Direct Dial No. 513-564-7026

cc:  Mr. Richard W. Nagel

Enclosure

No mandate to issue

<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>

No. 22-0305

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

> **FILED**
> Sep 9, 2022
> DEBORAH S. HUNT, Clerk

In re E.I. DUPONT DE NEMOURS & COMPANY )
C-8 PERSONAL INJURY LITIGATION )
                 )
―――――――――――――――――――――― )
                 )    O R D E R
In re 3M COMPANY, et al., )
                 )
          Petitioners )
                 )

---

Before:  GUY, DONALD, and BUSH, Circuit Judges.

This case concerns a group of chemicals known as PFAS—short for per- and polyfluoroalkyl substances. PFAS comprises about 5,000 different compounds that contain bonds between carbon and fluorine atoms. The exceptional strength of those bonds leads PFAS to degrade slowly over time, and, as a result, to accumulate within the human body. Though the long-term health effects of PFAS are uncertain, the present parties agree that nearly all Americans have PFAS in their blood. And plaintiffs allege that such exposure may increase the risk of developing diseases like cancer.

In response, plaintiffs filed suit in 2018, hoping to certify a nationwide class of every individual in the United States with PFAS in his or her blood—a class of nearly the entire nation. And they want an injunction ordering defendants to fund a "science panel" to study the effects of PFAS—whether and to what extent it may increase the risk of disease—and potentially to provide medical monitoring for every member of the class.

No. 22-0305
-2-

The district court recently took a substantial step in that direction, certifying a class of every individual "subject to the laws of Ohio" whose blood contains 0.05 parts per trillion of PFAS—an amount undetectable with current technology. Thus, as both parties acknowledge, the class comprises nearly all 11.8 million residents of Ohio, along with anyone else otherwise subject to its laws.

Defendants now petition this court for interlocutory review of the certification decision. For the reasons below, we find that the certification decision involves important and unsettled questions of law and that it could prove the death knell of the litigation. We thus **GRANT** defendants' petition for interlocutory review and hold that they may present their arguments against certification to a merits panel for definitive resolution.

## I.

PFAS does not exist in nature but, nevertheless, is ubiquitous. First developed in the 1930s and 1940s, it was "put into large-scale manufacture and use by the 1950s." Indeed, "thousands of companies make or once made thousands of PFAS-based products—including medical devices, pharmaceuticals, food packaging, building materials, automotive parts, water-repellent clothing, and a profusion of other goods." As a result, no single defendant in this suit accounts "for all the PFAS or products produced." And no defendant makes certain types of PFAS at present, though production continues in foreign nations like China.

One area in which PFAS was especially prolific, it turns out, was firefighting. The named plaintiff in this suit, Kevin Hardwick, served as a firefighter for over forty years. He alleges PFAS exposure from his fire-retardant gear and from aqueous film-forming foam—a fire suppressant designed particularly to combat liquid fires. Hardwick both worked with the foam and sold it to other firefighters.

No. 22-0305
-3-

Hardwick asserts that PFAS exposure is linked to many "toxicological, epidemiological, and/or adverse health effects and/or risks." Among these, he says, are kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, high blood pressure, and high cholesterol. Moreover, Hardwick argues defendants *knew* of these harmful effects and yet continued to make and market products containing PFAS. And they assured regulatory agencies that PFAS was "of no legal, toxicological, or medical significance of any kind."

Hardwick alleges he has PFAS in his blood. But he admits "he has 'no idea' which Defendant (if any) exposed him to PFAS." And he claims no health condition as a result of his exposure. He instead asserts that he faces an "associated *risk* of developing various diseases" later on. But how much of a risk he doesn't know. Indeed, that is the point of this lawsuit. Hardwick (and class counsel) want an injunction from the district court requiring defendants to fund a "science panel" to study whether exposure to PFAS is harmful and, if so, the degree of exposure required to cause health complications. Class counsel also seek medical monitoring for Hardwick and every other member of the proposed class—any resident of the United States "with 0.05 parts per trillion (ppt) or more of PFOA[1] and at least 0.05 ppt or more of any other PFAS chemical in their blood serum." As defendants point out (and plaintiffs do not contest) this class would include over 330 million Americans.

In March 2022, the district court certified the requested class as to Ohio under Civil Rule 23(b)(2), which permits certification of injunctive classes. The district court's order describes the class, specifically, as "[i]ndividuals subject to the laws of Ohio, who have 0.05 parts per trillion (ppt) of PFOA (C-8) and at least 0.05 ppt of any other PFAS in their blood serum." It reasoned

---

[1] PFOA—short for perflurooctanoic acid and sometimes referred to as "C-8"—is a specific type of PFAS that was linked to an increased risk of disease by a different science panel created pursuant to a settlement in other PFAS litigation. The crux of the suit here, essentially, is about discerning the harm or risk of harm from exposure to the thousands of *other* PFAS compounds.

that certification only as to Ohio was an appropriate first step, as Ohio appears to recognize medical-monitoring claims similar to what plaintiffs requested in their complaint. But it explained that it might expand the class to other states that recognize such claims, and that the burden was on defendants to "move for limitation of a potential class to exclude those who were injured in states that do not recognize medical monitoring." The parties thus agree that the class at present comprises at least about 11.8 million Americans who reside in Ohio.

Defendants timely petitioned this court for permission to appeal the certification decision under Civil Rule 23(f). They present four main arguments about why interlocutory review is appropriate. First, they contend that Hardwick lacks standing because he has failed to show an injury in fact, that his asserted injury is not traceable to defendants, and that, in any event, an Article III court cannot order the remedy he seeks. Second, defendants argue that the proposed class is insufficiently "cohesive" to satisfy Rule 23(b)(2). In other words, they say, because "the 11 million-plus class members [were] allegedly exposed [to PFAS] in different ways, in different amounts, and at different times to different chemicals," the proposed class is insufficiently "cohesive" for a single injunction to be "appropriate respecting the class as a whole." *See* Fed. R. Civ. P. 23(b)(2). Third and relatedly, they argue that plaintiffs must specifically describe the injunctive relief they seek, but that plaintiffs' vague descriptions of a "science panel" and "medical monitoring" don't satisfy that test. And last, defendants argue that the district court failed to adequately consider "the preclusive effect of a non-opt-out class on the possible damages claims of absent class members" when it certified the class.

Plaintiffs disagree with those contentions, unsurprisingly, and argue that interlocutory review is both "extraordinary" and inappropriate under the circumstances of this case.

No. 22-0305
-5-

We have no doubt that interlocutory review of a class-certification decision is an extraordinary procedure. But as should be clear, this is an extraordinary class, and one whose certification meets our traditional criteria for interlocutory appeal. After we examine our jurisdiction and standard of review, we explain why defendants are entitled to present their objections to a merits panel of this circuit.

## II.

We have jurisdiction under Civil Rule 23(f) and 28 U.S.C. § 1292(e). *See Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 833 (7th Cir. 1999); *see also Asher v. Baxter Intern. Inc.*, 505 F.3d 736, 741 (7th Cir. 2007). Rule 23(f) provides that "[a] court of appeals may permit an appeal from an order granting or denying class-action certification." Fed. R. Civ. P. 23(f). And 28 U.S.C. § 1292(e) authorizes jurisdiction to consider interlocutory appeals permitted by the Civil Rules and not otherwise provided for in § 1292. *See Blair*, 181 F.3d at 833; *Asher*, 505 F.3d at 741.

As to the relevant standards, we have broad discretion in determining whether to permit an interlocutory appeal under Rule 23(f)—"akin to the discretion exercised by the Supreme Court in acting on a petition for certiorari." *In re Delta Air Lines*, 310 F.3d 953, 957 (6th Cir. 2002) (quoting Fed. R. Civ. P. 23(f) Advisory Committee Notes (1998)). That said, we traditionally employ four factors to "guide our consideration" of whether to permit review. *In re CoreCivic, Inc.*, No. 19-0504, 2019 WL 4197586, at *1 (6th Cir. Aug. 23, 2019). The first is whether the certification decision represents the "death knell" of the litigation—in this case, whether the grant of certification would put extraordinary pressure on defendants to settle. *See id.*; *see also Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1708 (2017) ("Just as a denial of class certification may sound the death knell for plaintiffs, certification of a large class may so increase the defendant's potential damages liability and litigation costs that he may find it economically prudent to settle and abandon

No. 22-0305
-6-

a meritorious defense." (cleaned up)). Second, we evaluate whether the certification "raises a novel or unsettled question" important to class-action litigation as a whole. *In re Delta Airlines*, 310 F.3d at 960. Third, we consider the petitioner's likelihood of success on the merits, *see id.*—here, whether defendants would likely prevail in decertifying the class. And last, we evaluate "the posture of the case as it is pending before the district court." *Id.* A district court's indication that it may reconsider the certification decision, for instance, counsels against interlocutory review. *Id.*

No single factor is dispositive, ultimately, and none is a prerequisite to granting review. *Id.* at 959. Indeed, our circuit has "eschew[ed] any hard and fast test in favor of a broad discretion to evaluate relevant factors that weigh in favor of or against an interlocutory appeal." *Id.* We keep in mind, though, that interlocutory review is the exception rather than the norm; it "is never to be routine." *Id.* And with those principles in mind, we turn to the merits of defendants' arguments for review.

### III.

As we noted above, defendants' merits argument is fourfold, touching on standing, the cohesiveness of the class, the specificity (or lack thereof) of the requested relief, and the potential preclusion of other claims. We address standing first. We then turn to a combined analysis of cohesion and specificity of relief, finding them to be different sides of the same coin. All three issues, in our view, present unsettled and important questions on which defendants would likely succeed on appeal. And because those issues are independently sufficient to bless interlocutory review, we need not reach the preclusion concern.[2] Last, we address why both the "death knell" and "posture of the case" factors support interlocutory review as well.

---

[2] Analyzing this issue is unnecessary to our decision. But we note that defendants remain free to present it to the merits panel if they so choose.

No. 22-0305
-7-

A. *Standing*

Despite defendants' clear objection to standing in their opening brief, plaintiffs deem it "improperly raised," decline to address standing in their opposition, and suggest that we "need not consider" plaintiffs' standing. Plaintiffs' refusal to brief standing has complicated our review of the issue, and their contentions about the scope of our inquiry lack merit. Subject-matter-jurisdictional issues are fair game in our review of a class-certification decision. *See Olden v. LaFarge Corp.*, 383 F.3d 495, 498 (6th Cir. 2004) ("The question of subject matter jurisdiction is a prerequisite to class certification and is therefore properly raised in this Rule 23(f) appeal."). And, in any event, "we have an independent obligation to ensure that subject matter jurisdiction exists." *Id.* (citations omitted). So irrespective of plaintiffs' refusal to brief the issue, we will examine whether the class established its Article III standing.

That question reduces to whether Hardwick, as the named plaintiff, established his own standing to sue. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) (citations omitted). And that question itself reduces to whether Hardwick met each of the three elements from the Supreme Court's familiar standing framework. Thus, we ask whether Hardwick illustrated (1) an injury in fact that is concrete and particularized and actual or imminent (rather than conjectural or hypothetical), (2) whether the injury can be fairly traced to defendants, and (3) whether the injury would likely be redressed by a decision in Hardwick's favor. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). As explained below, there are substantial questions as to Hardwick's showing on each of these elements.

*Injury in Fact and Redressability*. One initial issue concerns what Hardwick considers his injury in fact—whether the presence of PFAS in his blood is the injury itself, whether it's the allegedly increased risk of disease the PFAS inflicts, or both. Plaintiffs below suggested that it was

really both—the "concrete and present injury . . .of a man-made chemical toxin in his blood," "coupled with the additional imminent harm that will continue to manifest" as a result, i.e., in a disease. We will thus assume that plaintiffs consider both theories sufficient (given plaintiffs' failure to clarify their theory in the present briefing) and explain the problems with each.

The presence of PFAS in Hardwick's blood may potentially qualify as an Article III injury in fact—but not for the reasons the district court suggested. The district court found defendants' jurisdictional arguments foreclosed for two reasons. First, it noted that Ohio law permits medical-monitoring claims without proof of physical injury. And second, it believed that our decision in *Hirsch v. CSX Transportation, Inc.* was "on point and binding with regard to whether Mr. Hardwick alleges an injury in fact." Op. at 13, R. 233 (citing *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359 (6th Cir. 2011)). But both of those conclusions are open to doubt.

As to *Hirsch*, which involved a chemical leak from a train derailment, our decision never resolved (or even discussed) whether the plaintiffs' exposure to toxic fumes constituted an Article III injury in fact. *See generally Hirsch*, 656 F.3d at 359. Moreover, we affirmed the district court's grant of summary judgment to the defendants on the ground that the exposure so minutely increased the plaintiffs' risk of disease that no reasonable physician would order medical monitoring under the circumstances. *Id.* at 364. True, our decision to reach the merits may implicitly suggest that we believed the exposure an injury in fact. But as the Supreme Court has made clear, glossing over jurisdiction is not a holding on jurisdiction. *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011); *see also Hagans v. Lavine*, 415 U.S. 528, 535 n.5 (1974). And it may be telling as well that we considered the plaintiffs' exposure to the fumes such a *de minimis* injury that summary judgment was warranted for the defendants. *Hirsch*, 656 F.3d at 364. Thus, as to Article III standing, it is unclear why *Hirsch* is "binding" or even "on point."

No. 22-0305
-9-

Likewise, Ohio's recognition of a cause of action for medical-monitoring claims after exposure to toxic substances may be probative that such exposure constitutes an injury in fact. But as the Supreme Court has explained, a legislature's recognition of a cause of action is not itself dispositive that the asserted injury is cognizable under Article III. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341–42 (2016); *see also Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053, 1058–60 (6th Cir. 2022). Rather, we also undertake an independent inquiry into whether the asserted injury is "de facto"—"actually exist[ing]"—and also consider whether it has a close historical analogue. *Spokeo, Inc.*, 578 U.S. at 340; *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). Hardwick may have satisfied that showing. He analogizes his claim to battery, which may very well provide a "common-law analogue for [his] asserted injury." *TransUnion*, 141 S. Ct. at 2204. After all, the common law arguably regarded even minor intrusions as cognizable. *See, e.g.*, *Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 693 (5th Cir. 2021) (collecting sources).

But even if we assume the PFAS-in-the-blood theory supports an injury in fact, it raises another major issue: redressability. As defendants point out, Hardwick's requested remedy—a science panel and medical monitoring—can't do anything about the presence *per se* of PFAS in Hardwick's blood. Indeed, the studies and monitoring "would [not] eliminate [the] PFAS from his blood." Nor would they "prevent more PFAS from entering his blood in the future." So if Hardwick's injury is understood as being the mere presence of PFAS, it is questionable whether either aspect of his requested relief would likely redress his asserted injury.[3]

---

[3] It is also somewhat difficult to see why the district court would have authority to award the remedy that plaintiffs seek. What plaintiffs desire is an order that defendants fund, at substantial expense, both a science panel and potential medical monitoring. As *amici* point out, that claim is probably more analogous to a damages action than to traditional equitable relief. But plaintiffs' problem with a traditional damages action, of course, is that such a damages remedy would usually arise only *after* the district court had found causation and liability. Here, by contrast, plaintiffs want an "injunction" creating the science panel so that they can *discern* liability, *viz.*, whether PFAS contributes to the risk of disease. Set aside that cart-before-the-horse problem, though, and assume the remedy plaintiffs seek actually is equitable in nature. That raises the second issue: the federal equity power "is an authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English

No. 22-0305
-10-

This mismatch seems to be why Hardwick's theory of injury necessarily also relies on his additional claim that PFAS in his blood increases the likelihood he will develop certain diseases. As to that point, we have no doubt that Article III courts, at least in theory, may issue injunctions to mitigate potential harms. But it's also true that standing doctrine's "concrete-harm requirement" mandates that the "risk of harm" be both "imminent and substantial" to support jurisdiction for an injunction. *TransUnion LLC*, 141 S. Ct. at 2210. Indeed, the Supreme Court has explained that standing for injunctive relief hinges on whether the plaintiff is "*likely* to suffer future injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (emphasis added).

Yet the requirement that Hardwick show a "substantial" or "likely" risk of disease raises another apparent mismatch between injury and remedy. The whole reason Hardwick wants a science panel is to determine *whether* he has an elevated risk of disease. Therein lies what defendants assert is the circular nature of Hardwick's argument: he claims to be sufficiently likely to develop a disease to have Article III standing, but because he actually has no idea about his risk of future disease, he wants an injunction creating a science panel to tell him if he's at risk of developing a disease.

The district court seemed to resolve this tension by suggesting that Hardwick could rely on allegations alone to support class certification. And, if that were true, it might resolve the

---

Court of Chancery at the time of the separation of the two countries." *Grupo Mexicano de Desarrolo S.A. v. Alli. Bond Fund*, 527 U.S. 308, 318 (1999) (quoting *Atlas Life Ins. Co. v. W.I. Southern, Inc.*, 306 U.S. 563, 568 (1939)). In other words, district courts purporting to issue equitable remedies under the federal equity power are constrained to those remedies "traditionally accorded by courts of equity." *Id.* at 319; *see also id.* at 327, 333 (holding a remedy unavailable because it was "unknown to traditional equity practice" and "historically unavailable from a court of equity."). Plaintiffs make no argument before us that an "injunction" ordering a transfer of money to create a science panel (to discern liability) and to fund medical monitoring was a remedy somehow "traditionally accorded by courts of equity." *Id.* at 319. And all that the district court cited in its treatment of this issue was a *dissent* from one of our precedents, written thirty years before *Grupo Mexicano*, to conclusorily assert that the remedy plaintiffs seek is "traditional" and permissible. *See* Op. at 17, R. 128 (citing *Slapin v. Slapin*, 352 F.2d 55, 56 (6th Cir. 1965) (Mathes, J., dissenting)). That summary analysis is problematic in the context of a Rule 23(b)(2) injunctive class, given that plaintiffs, as we explain, must illustrate a viable injunctive remedy that could grant relief to the entire class in a single stroke.

circularity problem. Hardwick *alleges* that he is at a higher risk of disease, to be sure, so if allegations were enough for certification, his would suffice. But we have doubts that Hardwick can rely on allegations alone at the class-certification stage. To the contrary, the Supreme Court has explained that certification requires "a rigorous analysis" to ensure that the requirements of Rule 23 are met, *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982), and that "a party seeking to maintain a class action must 'satisfy through *evidentiary proof* at least one of the provisions of Rule 23(b).'" *Lyngaas v. Ag*, 992 F.3d 412, 428 (6th Cir. 2021) (emphasis added) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)); *see also In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). Moreover, Hardwick must illustrate his standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. So putting those principles together, his standing argument needed some "evidentiary proof" about why he's at an increased risk of disease. *Lyngaas*, 992 F.3d at 428; *see also Neale v. Volvo Cars of N.A., LLC*, 794 F.3d 353, 359 (3d Cir. 2015); *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 361 & n.11 (3d Cir. 2013). Again, however, his *lack* of such proof is the point of his lawsuit.

*Traceability*. That brings us to the other issue with Hardwick's standing: traceability. True, Hardwick need not plead that any one defendant was the proximate cause of his alleged injury. *See Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 713 (6th Cir. 2015). But at this stage, Hardwick at least needed some "evidentiary proof" that there was "a causal connection between the injury and the conduct complained of." *Lyngaas*, 992 F.3d at 428; *Lujan*, 504 U.S. at 560. And again, based on our preliminary review, Hardwick comes up short. As defendants point out, Hardwick admits "he has 'no idea' which Defendant (if any) exposed him to PFAS." Such a concession is particularly troubling where, as here, PFAS comprises a huge family of chemicals—over 5,000 discrete compounds—which for decades were used in scores of products by scores of

No. 22-0305
-12-

manufacturers. The litany of possible pathways through which Hardwick might have been exposed calls into question the district court's view that mere allegations about traceability sufficed. To the contrary, this seems just the situation in which some "evidentiary proof" is required to explain why *these* manufacturers can be sued on a class-wide basis. *Lyngaas*, 992 F.3d at 428.

These considerations convince us that there is sufficient "weakness" in "the district court's [standing] decision" to merit further review. *In re Delta Air Lines*, 310 F.3d at 960. After all, without standing, there can be no class action. *See Olden*, 383 F.3d at 498 ("The question of subject matter jurisdiction is a prerequisite to class certification[.]").

## B.   Class Cohesion and Specificity of Relief

"[D]espite our initial doubts about standing," we proceed to the likely deficiencies with the certification decision itself, "given the predictive nature" of our present inquiry. *Arizona v. Biden*, 31 F.4th 469, 479 (6th Cir. 2022). Under Civil Rule 23, the district court may certify a class action if all elements of Rule 23(a) are met, along with an additional element from Rule 23(b). *See* Fed. R. Civ. P. 23(b). Rule 23(a) prescribes four requirements for certification, commonly called numerosity, commonality, typicality, and adequacy of representation. *See* Fed. R. Civ. P. 23(a)(1)–(4); *see also Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 396 (6th Cir. 1998). Additionally, Rule 23(b)(2)—the injunctive-class provision on which plaintiffs rely—requires that plaintiffs show defendants "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

As to the Rule 23(a) requirements, defendants' main criticism focuses on commonality— "the rule requiring a plaintiff to show that 'there are questions of law or fact common to the class.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (quoting Fed. R. Civ. P. 23(a)). As the

No. 22-0305
-13-

Supreme Court has explained, this provision is "easy to misread." *Id.* Commonality requires not merely that everyone in the class be able to ask some common question, but that "examination of all the class members' claims for relief will produce a common *answer*." *Id.* at 352 (emphasis added).

Plaintiffs here may all be able to ask a common *question*—whether exposure to PFAS is sufficiently harmful to warrant medical monitoring. But, as defendants note, that question having a common *answer* seems highly suspect. To the contrary, it would likely hinge on "the type, amount, and timing of each of the millions of class members' exposures, as well as his or her background health risks related to age, gender, medical history, genetic predispositions, and lifestyle choices." Moreover, the 11 million-plus class members were likely "exposed in different ways, in different amounts, and at different times." So even if one class member could "prove a risk of injury caused by a given level of exposure to a certain type of PFAS linked to one defendant," it would say "nothing about another class member's ability to prove risk of injury caused by a different level of exposure to a different amount of a different PFAS linked to a different Defendant."

Those considerations alone raise serious concern about whether plaintiffs satisfied the commonality requirement. But that brings us to the additional issue of Rule 23(b). Even if it were assumed that plaintiffs satisfied the Rule 23(a) commonality requirement, defendants say, plaintiffs' request for injunctive relief under Rule 23(b)(2) means that they must also show the class is *cohesive*. In other words, even if a damages class could tolerate some degree of individually tailored relief, that degree of heterogeneity is impermissible when seeking a class-wide injunction. After all, Rule 23(b)(2) requires that a single, indivisible injunction be "appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *see also Dukes*, 564 U.S. at 360.

No. 22-0305
-14-

Seeking to circumvent this issue, plaintiffs (echoing the district court) offer two responses. First, they argue that Rule 23(b)(2) lacks a cohesion requirement, since the Rule itself never explicitly provides for one. But already their claim faces some strong headwinds. Six other Circuits have adopted a cohesion requirement in precedential opinions, including the Tenth Circuit in an opinion by then-Judge Gorsuch. *See Reid v. Donelan*, 17 F.4th 1, 11 (1st Cir. 2021) ("[A] Rule 23(b)(2) class must actually have more cohesiveness than a Rule 23(b)(3) class."); *Egbert v. Gen. Mills, Inc.*, 823 F.3d 472, 480 (8th Cir. 2016) (labeling the cohesion requirement "well established"); *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 838 (5th Cir. 2012) (reversing a district court for "certifying a class that lacked cohesiveness under Rule 23(b)(2)."); *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 n.8 (7th Cir. 2011) ("Where a class is not cohesive such that a uniform remedy will not redress the injuries of *all* plaintiffs, class certification is typically not appropriate."); *Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008) (Gorsuch, J.) ("Rule 23(b)(2) demands a certain cohesiveness among class members with respect to their injuries, the absence of which can preclude certification."); *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998) ("While 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive.").[4] So cohesion would seem a well-credentialed requirement.

And, for that matter, an unpublished decision of our own circuit required cohesion for class-wide injunctive relief. In *Romberio v. UnumProvident Corp.*, we reversed a class-certification decision because the class was rife with individual issues—in violation of the "well-

---

[4] Apparently only the Ninth Circuit has rejected a cohesion requirement. *See Senne v. Kan. City Royals Baseball Corp.*, 934 F.3d 918, 937 (9th Cir. 2019).

No. 22-0305
-15-

recognized rule that Rule 23(b)(2) classes must be cohesive." 385 F. App'x 423, 433 (6th Cir. 2009) (emphasis deleted).

Plaintiffs largely ignore other circuits' precedent regarding the cohesion requirement. And their attacks on *Romberio* range from the irrelevant—it was authored by a visiting judge—to the self-defeating—it is unpublished and drew a dissent. That no published decision in this circuit speaks for or against a cohesion requirement (and that the sole opinion on it was split and unpublished) is a rationale in *favor* of interlocutory review, not against it. After all, the requirement's unsettled status in our circuit shows that it presents a "novel" and "unsettled" issue, and one with important implications for the certification of any injunctive class under Rule 23(b)(2). *In re Delta Air Lines*, 310 F.3d at 960.

Plaintiffs also respond to the cohesion critique by arguing that even *if* such a requirement exists, the plaintiff class meets it. Plaintiffs' argument tracks the district court's own conclusion on this issue, which hinged on the assumption that cohesion is no different than commonality. And because commonality was satisfied, the district court reasoned, then so must be cohesion.

But setting aside that even commonality is murky here, the very point of a cohesion requirement under Rule 23(b)(2) is that it's *not* just a duplication of 23(a)'s commonality requirement. To the contrary, it represents an additional hurdle because of the nature of the remedy sought—a single, indivisible injunction that must be able to grant relief in a single stroke to "the class as a whole." Fed. R. Civ. P. 23(b)(2); *see also Dukes*, 564 U.S. at 350. Given this conflation, the district court could not have conducted the proper analysis when it deemed the class "cohesive." So despite its efforts, it produced no genuine alternative holding on the cohesion issue.

And that all brings us to the specificity of relief. According to plaintiffs, they need not describe the relief they seek in any specific way. They argue instead that it suffices to merely

No. 22-0305
-16-

request an "injunction" ordering defendants to pay for a science panel and medical monitoring for whomever the science panel determines necessary. Yet plaintiffs lack in-circuit authority for the proposition that they can permissibly define their requested "injunction at [this] stratospheric level of abstraction." *Shook*, 543 F.3d at 604 (Gorsuch, J.) (citations omitted). And despite their contention that there is no necessary relationship between certification and specificity of relief, significant authorities cut in the opposite direction. *See, e.g.*, *id.*; *see also Kartman*, 634 F.3d at 893; *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007).

Indeed, as then-Judge Gorsuch persuasively explained in *Shook*, a district court can only properly discern whether a class-wide injunction is appropriate—whether it could grant relief "respecting the class as a whole"—if the injunction is described at the certification stage "in reasonably particular detail." *Id.* at 605 ("At the class certification stage, the injunctive relief sought must be described in reasonably particular detail such that the court can at least conceive of an injunction that would satisfy Rule 65(d)'s requirements, as well as the requirements of Rule 23(b)(2)."). Only *then* can the district court undertake an intelligent analysis of whether Rule 23(b)(2) is satisfied. *See id.*

All in all, we think an interlocutory appeal warranted based on these issues alone. Because the district court's certification decision implicated sufficiently unsettled questions—and resolved them in a way open to serious dispute—defendants' arguments are entitled to further review. Nonetheless, we will also explain why the additional factors—"death knell" and "posture of the case"—support review as well.

### C. *Death Knell of the Litigation*

As we noted above, the potential that a certification decision may sound the "death knell" of the litigation counsels in favor of interlocutory review. *In re Delta Air Lines*, 310 F.3d at 957,

960. That term is sometimes employed where the *failure* to certify a class would lead plaintiffs to abandon their claims. *Id.* at 957. Here, by contrast, we face a "reverse death knell" scenario: where the certification decision threatens such massive liability that it induces defendants to settle rather than defend the action on the merits. *Baker*, 137 S. Ct. at 1708 n.2. As Rule 23 itself anticipates, because such a certification decision "is likely dispositive of the litigation," interlocutory review is appropriate. *In re Delta Airlines*, 310 F.3d at 957 (quoting Fed. R. Civ. P. 23(f) Advisory Committee Notes (1998)). And two specific features of this case bolster that conclusion.

First is the size of the class. For a point of comparison, the Supreme Court described the class at issue in *Dukes* as "one of the most expansive" in history—a class that comprised "about one and a half million plaintiffs." *Dukes*, 564 U.S. at 342. Yet the class the district court certified here dwarfs the class in *Dukes*. Indeed, with nearly 11.8 million members at present, it almost *octuples* it. And the district court expressed an intent to expand the class to other states that recognize medical-monitoring claims. Some of the few classes comparable, as the district court itself acknowledged, surfaced in the federal tobacco cases of the 1990s and 2000s. Tellingly, the courts of appeals in the respective jurisdictions where such classes were certified granted interlocutory review of the certification decisions. *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 220 (2d Cir. 2008); *In re Simon II Litig.*, 407 F.3d 125, 128 (2d Cir. 2005); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 738 (5th Cir. 1996).[5]

Second is the scope of defendants' potential liability. Though the relief plaintiffs seek purports to be an "injunction,"[6] it would have the practical effect of extracting billions of dollars from defendants. The science panel itself, as defendants point out, may cost tens of millions of

---

[5] Perhaps another potential analogue is the recent opioid litigation in this circuit. There too we granted interlocutory review of a class-certification decision. *See In re Nat'l Prescription Opiate Litig.*, 976 F.3d 664, 669 (6th Cir. 2020).
[6] *But see supra* note 3.

No. 22-0305
-18-

dollars. And the medical-monitoring claims may cost tens of billions. For instance, a recent PFAS-related settlement proposal allocated an average of $11,000 per class member for medical monitoring. Assuming medical monitoring here would be similarly expensive, if even ten percent of the *current* class were found to require medical monitoring, defendants' liability would surpass $10 billion. And that's to say nothing about potential liability if the district court were to expand the class beyond Ohio.

Given those facts, we are persuaded that certification could prove the death knell of the litigation. Moreover, the heavy pressure on defendants to settle could permit the important legal issues detailed above to evade review. *In re Delta Air Lines*, 310 F.3d at 960. So the "death knell" factor works in defendants' favor as well.

### D. *Posture of the Case*

Last, precedent directs us to consider the "posture of the case" in the district court. *Id.* at 960. If the district court has not yet entered a formal certification order, for instance, or if it indicated intent to revisit its class-certification decision, those facts could cut against interlocutory review. *See id.* The former situation isn't at issue here, of course, since the district court already certified a class. By contrast, plaintiffs argue the latter issue *is* a concern, since the district court indicated that it might revisit its class-certification decision. That's true. But the district court indicated that it might *expand* the class to other states that permit medical-monitoring claims—a decision that would necessarily hinge upon questionable assumptions about standing and cohesion. And, for that matter, plaintiffs have advocated for a class of the entire population. Far from defusing the issue, therefore, the district court's stated willingness to entertain plaintiffs' request for this cosmic class underscores the need for a second look.

No. 22-0305
-19-

## IV.

In closing, we emphasize the limited nature of today's decision. Definitive resolution of whether the class may go forward awaits the merits panel's review. We hold merely that when a district court certifies one of the largest class actions in history, predicated on a questionable theory of standing and a refusal to apply a cohesion requirement endorsed by seven courts of appeals, to authorize pursuit of an ill-defined remedy that sits uneasily with traditional constraints on the equity power and threatens massive liability, such a decision warrants further review. We thus **GRANT** defendants' petition to appeal under Rule 23(f).[7]

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk

---

[7] We likewise **GRANT** defendants' motion to file a reply and **GRANT** the motion of *amici curiae* to file their additional brief.